**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

FILED
at 7 o'clock & 01 min P M
Date 2/14/05
MICHAEL ___ ___ CLERK
United States Bankruptcy Court
Savannah, Georgia

| | |
|---|---|
| In re: | ) Case No. 05-40129 |
| | ) |
| FRIEDMAN'S INC., et al., | ) Chapter 11 |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) Hon. Lamar W. Davis, Jr. |
| | ) |

**MOTION FOR (I) AN ORDER APPROVING THE PROCEDURES BY WHICH THE DEBTORS MAY SELECT A CLOSING STORE AGENT, AND (II) AN ORDER APPROVING THE TERMS OF A MERCHANDISE DISPOSITION AGREEMENT AND THE CONDUCT OF STORE CLOSING SALES**

Friedman's Inc. ("Friedman's") and seven of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby move this Court for entry of orders granting the Debtors authority to close certain of their stores and to liquidate the merchandise and other items of personal property at these stores. In support of this Motion, the Debtors respectfully represent as follows:

<u>BACKGROUND</u>

1.     On January 14, 2005 (the "Petition Date"), the Debtors each filed a voluntary petition in this Court for reorganization relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.



2.     On January 24, 2005, the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.  No trustee or examiner has been appointed.

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.     The statutory predicates for the relief requested herein are sections 105(a) and 365(a) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure.

<u>RELIEF REQUESTED</u>

5.     By this Motion, the Debtors seek entry of two separate orders necessary to implement their plan to close approximately 165 of their stores (as defined herein, the "Closing Stores").  In general, the first is a procedures order which would set forth the process by which the Debtors may select a store closing agent and the second is a store closing order which would authorize and approve the manner in which certain store closings will take place. This two-step process is designed to provide maximum notice under the circumstances to parties in interest, to create certainty on critical issues that may effect those with an interest in the store closing process and to provide flexibility to the Debtors in planning the store closing sales. This process is similar to many requests by debtors to approve the disposition of assets pursuant to which an initial order is entered approving a process for disposing

2

of the assets, followed by a final order that actually approves the asset disposition to the bidder who submits the highest and best offer.

6.      The proposed procedures order (the "Procedures Order") is attached hereto as Exhibit A.  The Procedures Order essentially does three things: (i) it establishes the applicable deadlines and notice requirements to be employed in connection with a final hearing to consider the store closing program; (ii) it establishes the bidding procedures to be used in connection with the selection of a Store Closing Agent (as defined herein), which procedures include approval to use a form of Merchandise Disposition Agreement (defined herein) to be utilized as a common starting point by parties submitting bids, and (iii) it authorizes the Debtors to offer a termination fee to a bidder if, after consultation with the Committee, the Debtors determine that offering such fee would reasonably enhance the bidding process.

7.      The proposed store closing order (the "Store Closing Order") is attached hereto as Exhibit B.  The Store Closing Order provides various forms of substantive relief necessary to effectuate a substantial store closing program.  First, the Store Closing Order would authorize the Debtors to discontinue operations at the Closing Stores.  Second, the Store Closing Order would authorize the Debtors to enter into a Merchandise Disposition Agreement with the party submitting the highest and best bid to act as disposition agent.[1]  Third, the Store Closing Order would

---

[1]      Typically, in an "agency" agreement such as the attached Merchandise Disposition Agreement, the Store Closing Agent provides a minimum guaranteed

(continued...)

3

approve procedures governing the conduct of the store closing sales, similar to procedures that have been entered by Bankruptcy Courts presiding over other chapter 11 retail cases. These procedures include terms typical in the chapter 11 store closing context that invalidate lease and contractual restrictions that may impair the Debtors' ability to conduct the Store Closing Sales; limit the effect of federal, state and local laws, statutes, rules and ordinances that may impair store closing and liquidation sales; and afford a proposed severance and retention program for certain store level employees.

8.    The Procedures Order will be considered at a hearing currently scheduled for February 22 at 1:00 p.m. and objections to entry of the Procedures Order are due by February 18, 2005. The more substantive relief contemplated by the Store Closing Order will be considered at a hearing currently scheduled for March 2, 2005. This date is consistent with the Debtors' need to commence their store closing process as early as possible in March. In order to be prepared to address objections to entry of the Store Closing Order, objections to all matters other than the conduct of any auction must be filed and served so as to be received by the Debtors' professionals on February 25. Any auction will be conducted on February 25. The

---

[1]    (...continued)
recovery to the Debtors coupled with a sharing arrangement to the extent net sale proceeds exceed one or more thresholds. While the Debtors' preference is to enter into an "agency" form of agreement with a guaranteed minimum recovery, by this Motion, the Debtors specifically reserve the right, after consultation with the Committee, to reject any and all agency bids received and proceed on an hourly, flat or fixed fee "consulting" basis.

4

Debtors will file with this Court and post on the website of their claims agent, http://kccllc.net/friedmans.com, the agreement of the winning bidder on or before February 28. Objections related to the conduct of the auction, if any, must be filed on or before March 1 at 12:00 p.m.

BASIS FOR RELIEF

A.   <u>Background</u>

    *(i)*    *The Closing Stores*

9.   As part of the their efforts to improve operations and financial performance, the Debtors have been evaluating their store base to identify underperforming or unprofitable stores to be considered for closure. This process has involved significant analysis of the Debtors' entire store portfolio by a cross-functional team comprised of real estate, sales organization, finance, merchandising, marketing, and creditor personnel employed by the Debtors.

10.   Among the factors considered by the Debtors in connection with their review and identification of stores for potential closure were: a store's historical results; its recent performance during the 2004 holiday selling season; the age of a store; a store's location; the terms of a store's underlying lease; the physical condition of a property; and credit and collection performance. The Debtors also considered their current and future competitive strengths and weaknesses, the current realizable inventory values, and the continued costs of operating underperforming stores.

5

11.     In connection with their review, the Debtors have been assisted by Abacus Advisors Group, LLC ("Abacus") and Gemini Realty Advisors, LLC ("Gemini"), both of whom the Debtors seek to retain by separate applications filed concurrently herewith.  Abacus has significant experience in working with distressed retailers in advising them regarding their strategic considerations in determining stores to close and in conducting closing store sales, including acting as advisor in the Kmart, Montgomery Ward, and Service Merchandise cases.  Gemini has similar experience in assisting retailers in examining their real estate lease portfolios and determining where resources are best utilized as part of a retailer's store rationalization plan.

12.     Based upon the Debtors' and their advisors' analysis of the Debtors' store portfolio and the performance of each, the Debtors have compiled a list of stores (the "Closing Stores") that they propose to close, a copy of which is attached hereto as Exhibit E.   The Debtors determined, in the exercise of their business judgment, that ceasing operations of the Closing Stores is the best way to maximize the value of the merchandise and their other assets and emerge from these chapter 11 cases in a better position to compete with other like retailers.  By closing the Closing Stores, the Debtors will be able to focus their reorganization efforts on their profitable stores.  In addition, by streamlining the Debtors' retail operations, they will be able to increase cash flow, minimize excessive carrying costs, and increase return on invested capital.  The Debtors expect to realize approximately $6.9 million in annual savings upon completion of the shut down of the Closing Stores.

6

(ii)     *Timing of Store Closing Sales*

13.     A primary challenge of the Debtors in conducting their store closing program is to coordinate the timing of that program with the Valentine's Day and Mother's Day holidays, the Debtors' second and third highest selling holidays, respectively.  In particular, the Debtors determined not to formally announce any store closures until immediately after Valentine's Day, thereby avoiding any negative impact on sales in connection with that holiday.  However, in order to avoid any negative impact on sales in connection with Mother's Day on May 10, the Debtors must move expeditiously on their store closing program so that they can complete or substantially complete the liquidation process in advance of that date.  There are several locations around the country where closing stores are located within the vicinity of stores that the Debtors intend to keep open as part of their go-forward strategy.  Liquidation sales at the closing stores during the Mother's Day shopping season would, in the Debtors' view, have a material, negative impact on much needed sales at these go-forward stores.

14.     Based upon the amount of inventory located at the closing stores and the length of time that the Debtors have determined, in conjunction with their business advisors, is necessary to liquidate such inventory in a fashion so as to maximize their value, the Debtors have concluded that they must commence store closing sales in early March so as to ensure that the inventory is substantially liquidated well in advance of the anticipated Mother's Day shopping period.  This period of time –

7

including the contemplated liquidation period and the holiday shopping period – only spans two months from early March to early May.

B.   The Procedures Order

  (i)   *Solicitation of Interest*

15.   While the nature of the relief requested in this Motion requires that it be handled on an expeditious basis, there were substantial efforts taken by the Debtors prior to the filing of this Motion designed to assist potential bidders in participating in the process and alleviate common concerns raised by parties in interest in connection with store closing programs. Specifically, after the Debtors concluded that it was in the best interest of the Debtors and their creditors to close the Closing Stores, the Debtors, with the assistance of Abacus, determined that there were twelve industry participants potentially interested in acting as the Debtors' agent with respect to the Store Closing Sales. On or about January 20, 2005, the Debtors circulated confidentiality agreements to these parties. A total of eleven of these parties expressed interest in doing so and executed confidentiality agreements.

16.   As set forth in the Procedures Order, the Debtors intend to distribute to these parties packages containing a list of closing stores, along with detailed financial and operational information regarding these stores and a copy of the form Merchandise Disposition Agreement for their review. This distribution will occur no later than February 18, 2005.

  (ii)   *Use of Form Agreements*

8

17.     The Procedures Order would also authorize the Debtors to utilize a standard form of contract customary in the store closing context in liquidating inventory, plus a standard form of agreement relating to the liquidation of furniture, fixtures, and equipment.  Copies of these forms of contracts are attached hereto as Exhibit C and Exhibit D (the "Merchandise Disposition Agreement" and "FF&E Disposition Agreement," respectively).  The Procedures Order would not approve any of the terms of these forms of agreement or constitute any sort of finding that the agreements are in the best interests of the estate.

18.     Rather, the Order would simply authorize the Debtors to use this form as a starting point in their efforts to find a closing store agent satisfactory to them. Absent a common starting point, an unduly complicated "battle of forms" could easily develop as individual bidders submit bids that are difficult to compare to one another. Moreover, having a known starting point permits all parties to at least have a general understanding of the ultimate form of Merchandise Disposition Agreement from the outset of the process, with any changes to that general form to be highlighted prior to the approval of any such agreement.

*(iii)     Participation Requirements*

19.     The Procedures Order would require that persons interested in serving as the Debtors' Store Closing Agent submit their bids for doing so in the form of a signed Merchandise Disposition Agreement marked to show such changes as re-quested by a bidder by no later than February 23, 2005.  While February 23, 2005 is a

9

relatively short deadline in which to submit bids, the Debtors do not believe that it will negatively affect the Debtors' efforts to obtain the highest and best value for their closing store merchandise. The potential disposition agents are accustomed to the quick pace of liquidation sales and, in the opinion of the Debtors and their advisors, no economic advantage would be gained by extending the bidding and other deadlines contained in the proposed procedures.

20.     The procedures relating to the submission of bids and the manner in which the Debtors will select the highest and best bid are contained in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order attached hereto as Exhibit A. These Procedures were designed with the assistance of Abacus, based upon industry practice, and are meant to ensure that the Debtors will obtain the best return possible on the Store Closing Sales for the benefit of their estates and creditors. The salient terms of the Bidding Procedures are summarized as follows[2]:

> Participation Requirements. To participate, each person must be a "Qualified Bidder." A Qualified Bidder must provide (i) the identity of the potential bidder and of an officer(s) or authorized agent(s) who will appear on behalf of such bidder, (ii) evidence, satisfactory to the Debtors, of the financial wherewithal and operational ability to manage the Store Closing Sales program contemplated and the financial and other obligations contemplated by the proposed Merchandise Disposition Agreement, including any guaranty of the Debtors' Expenses, and (iii) a refundable deposit in an amount consistent with the Debtors' business judgment in order to maximize the value of their estates (such a bid being deemed a "Qualified Bid").

---

[2]     This is a summary only; the full terms of the Bidding Procedures are contained in Exhibit 1.

10

> Bid Deadline. All bids must be received no later than noon (EDT) on February 23, 2005. (the "Bid Deadline"), which deadline may be extended by the Debtors upon notice to Qualified Bidders.
>
> Auction Procedures and Bidding Increments. After all Qualified Bids have been received, the Debtors may conduct an auction (the "Auction") among Qualified Bidders. The Auction, if conducted, will take place at 10:00 a.m. (CDT) on February 25, 2005 at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, or via teleconference.

21.     The Debtors believe that the Bidding Procedures will ensure that the bidding process will be fair and reasonable. The Bidding Procedures resemble procedures that have been previously approved by courts in other cases involving the sale or liquidation of a substantial portion of a debtor's retail merchandise.  See e.g. In re Kmart Corp., Case No. 02-2474 (SPS) (Bankr. N. D. Ill. March 27, 2002); In re Montgomery Ward, LLC, Case No. 00-4667 (RTL) (Bankr. D. Del. Jan. 16, 2001); In re Service Merchandise Co., Case No. 399-02649, (Bankr. M.D. Tenn., Jan. 18, 2002); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Oct. 24, 1997).

22.     The Debtors believe that adequate notice of the Bidding Procedures and of the date of the Auction, as described herein, has been given under the circum-stances.  As described above, the Debtors, with the assistance of Abacus, have been considering potential Store Closing Agents for several weeks.  Based upon the fact that industry participants of the sort that the Debtors have contacted are accustomed to the quick pace of the typical store closing sale, the Debtors and Abacus do not

11

believe any further delay in approving the Bidding Procedures or in attempting further
notice will increase the likelihood that a more qualified Store Closing Agent will be
found or that better terms will be offered.

    *(iv)*    *Debtors' Reservation of Rights*

    23.    To the extent that none of the bids received from the potential Agents
are acceptable to the Debtors, the Debtors reserve the right to reject all bids received
and to conduct the Store Closing Sales themselves.  The officers of the Debtors and
the Debtors' advisors, including Abacus, having conducted store closing sales at
hundreds of locations with like retailers and cleared billions of dollars of merchandise,
have significant experience in this regard.  If the Debtors decide to conduct the Store
Closing sales themselves, the Debtors may nonetheless retain the services of one or
more liquidation agents to serve as liquidation consultants on a commission basis
and/or to provide additional personnel or assistance as may be required.

    24.    The Debtors will file the terms of any such consulting agreements or
the final form of Merchandise Disposition Agreement, as appropriate, on or before
February 28, 2005, and request approval thereof at the March 2, 2005 hearing set in
these cases.  The Agreement also will be posted on the website maintained by the
Debtors' notice and claims agent, http://kccllc.net/friedmans.com.

    *(v)*    *Termination Fee*

    25.    Finally, the Procedures Order would afford the Debtors the flexibility
to offer a break-up fee of up to 2% of certain asset values in order to induce bidders

to participate.  The Debtors do not know at this time whether they will have to offer a break-up fee in order to create interest in the closing store merchandise.  However, they do need the authority to offer it in the event they determine, with the assistance of their advisors, that such an offer will help them in maximizing the value of the closing store inventory.

C.   The Store Closing Order

(i)    Approval of Merchandise
       Disposition Agreement

26.    Once the Debtors identify the Closing Store Agent to assist them in their Closing Store Sales, the Debtors will request that this Court enter the Store Closing Order, a copy of which is attached hereto as Exhibit B.  That Order, if entered, will afford several different items of relief, including approval of the Closing Store Agent and authorization for the Debtors to enter into the Merchandise Disposition Agreement with such Agent.  It also approves procedures governing the conduct of store closings.  Such procedures are attached as Exhibit 2 to the Store Closing Order.

27.    The Store Closing Order will seek approval of a final Merchandise Disposition Agreement.  The form attached hereto as Exhibit C is an "agency agreement" commonly used in the context of closing store sales.  One of the key aspects of this particular form of agreement is that it contemplates a fee structure for the proposed Store Closing Agent pursuant to which the Agent receives no fee unless

13

a certain guaranteed dollar value is obtained from disposition of the closing store merchandise.

28.     While the Debtors will require potential Closing Store Agents to submit their bids in the form attached hereto, the Debtors reserve their right, after consultation with their advisors, to reject any such bids containing proposed fee structures that the Debtors determine, in the exercise of their business judgment, are not in the best interests of the estate.  If this occurs, the Debtors will request proposed Closing Store Agents to propose a fee structure that does not entail any guaranteed recovery, but that instead affords a set fee to the Closing Store Agent for each Closing Store, or a set fee for the entire store portfolio.

29.     A set fee is a customary, alternative approach utilized in the closing store context.  Under such a fee structure, the form of agreement may not take the form of the more traditional "agency" agreement, a copy of which is attached, but instead may take the form of a simpler form of "consulting" or "operating agreement."  However, there typically are no terms in a consulting or operating agreement that are not contained in the typical form of agency agreement such as the form attached hereto.

30.     Whichever form of Merchandise Disposition Agreement the Debtors ultimately determine to utilize here, following is a summary of the salient terms of the arrangement between the Debtors and any Store Closing Agent:

        **Sale Commencement**:  The Store Closing Sale will commence on a date to be set forth in the Merchandise Disposition Agreement, al-

though such date will in all likelihood be March 3, 2005, immediately after entry of the Store Closing Order, to ensure that the Store Closing Sales will be concluded by Mother's Day (the "Sale Commencement Date"). The Store Closing Sale will be conducted as a store closing sale, as that term is generally understood, and may be signed, and advertised as such. The Store Closing Agent will provide field supervisors to the Closing Stores to implement the Store Closing Sale consistent with the terms of the Merchandise Disposition Agreement and orders of this Court.

**Scope of Services**: The Store Closing Agent will manage the Store Closing Sale at the Closing Stores. The Store Closing Agent will (a) determine advertising and staffing levels, (b) oversee conduct of the Sale, (c) coordinate with the Debtors on the accounting functions for the Store Closing Sale, and (d) manage the transfer of inventory to the stores.

**Term**: The Store Closing Sale will last from the Sale Commencement Date to the Sale Termination Date determined by the Store Closing Agent for any location, but in no event later than a date certain to be agreed upon by the Debtors and the Store Closing Agent.

**Merchandise**: The Store Closing Sale shall include all finished merchandise salable in the ordinary course at the Debtors' Closing Stores as of the Sale Commencement Date, as well as certain Transfer Goods (as defined in the Merchandise Disposition Agreement) and Merchandise brought into the Closing Stores ("Augmentation Inventory") to ensure an appropriate mix of Merchandise.

**Store Closing Agent's Fee**: As noted above, the Debtors are reserving their rights with respect to the fee structure payable to any Closing Agent that the Debtors ultimately select. Under one possible fee structure common in the closing store context, the Debtors would be entitled to receive as the proceeds of the Store Closing Sales an agreed upon percentage (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise plus an amount sufficient to pay all Expenses (the "Guaranteed Amount"). Under this scenario, the Store Closing Agent would be entitled to no fee unless the Proceeds of the Store Closing Sale exceed the Guaranteed Amount and all Expenses, subject to an Expense Cap. In the event that the Proceeds of the Store Closing Sale exceed the Guaranteed Amount, the Store Closing Agent

15

would be entitled to a specified percentage of the Aggregate Cost Value of the Merchandise (the "Store Closing Agent's Base Fee").

**Cost Value**: The average standard cost (determined by applicable merchant accounting unit for each item of Merchandise as reflected in the Debtors' master cost file as of the Sale Commencement Date (the "Cost File"), which average cost is inclusive of freight and shipping charges.

(ii)   *Sale of FF&E*

31.   Pursuant to this Motion, the Debtors also seek authority to undertake efforts to sell furniture, fixtures, and equipment ("FF&E") located in their Closing Stores. The process of selling closing store FF&E typically does not commence until after commencement of the Closing Store Sales themselves, although retailers sometimes begin contacting potential purchasers of FF&E prior to commencement of the sales. The Debtors intend to commence this process as soon as reasonably practicable. The Debtors and their advisors do not believe that the process of disposing of FF&E necessarily must occur pursuant to formalized procedures such as the Bidding Procedures governing disposition of the Merchandise. However, the Debtors, with the assistance of Abacus, will contact several industry participants in order to obtain the best terms possible for the sale of the Debtors' FF&E.

32.   The Debtors intend to utilize the form of FF&E Disposition Agreement, a copy of which is attached hereto as Exhibit D and which is based upon forms customarily used in this context. The Debtors, with the assistance of Abacus, will determine the appropriate time for trying to finalize bids from potential FF&E disposition agents. Once the Debtors have located an acceptable agent and obtained

16

agreement on an acceptable form of FF&E Disposition Agreement, the Debtors will request, by way of separate motion, formal approval of such Agreement and disposition of the FF&E. The fee for disposition of the FF&E may be a flat fee, as contemplated by Exhibit D, or it may be based on a percentage of net sales above an approved budget. The relief requested in such motion in all likelihood will be sought on shortened notice.

33.     As an alternative to the foregoing, the Debtors may determine to select the Store Closing Agent to dispose of FF&E. The form of Merchandise Disposition Agreement attached hereto contains provisions regarding the sale of FF&E in order to afford the Debtors' flexibility in pursuing this approach. If the Debtors determine to select the Store Closing Agent to dispose of FF&E, it is conceivable that the Debtors may seek approval of the parties' agreement in connection with the hearing on entry of the Store Closing Order on March 2.

(iii)     *Effectuation of Store Closing Sales*

34.     Aside from the foregoing matters that would be approved in the Store Closing Order, the proposed Store Closing Order is a lengthy and detailed document. The Debtors have not summarized in this Motion all of the salient terms of the Order, and therefore direct parties-in-interest to the Order itself for all of the operative terms that will govern the Store Closing Sales. Of particular importance, the Order would allow the Store Closing Sales to proceed notwithstanding potentially restrictive provisions contained in leases or other agreements, and it also would clarify that the

17

Order would supercede and limit the effect of state laws that may be construed to impose undue restrictions upon a debtor-in-possession attempting to maximize estate value in accordance with its duties under the federal Bankruptcy Code.

35. The proposed Store Closing Order, however, has been carefully developed based on orders approved by courts in other large, chapter 11 retail cases. In particular, it contains court-approved provisions that embody agreements with landlords that resolve the typical sorts of objections and concerns that landlords often raise in the store closing context. In re Service Merchandise Co., Case No. 399-02649 (Paine) (Bankr. M.D. Tenn. January 18, 2002); In re Montgomery Ward, LLC, Case No. 00-4667 (RTL) (Bankr. D. Del. January 16, 2001).

36. The proposed Store Closing Order also contains a number of provisions designed to ensure compliance with state laws and concerns typically raised by state attorneys general. Indeed, the Order contains provisions suggested and agreed to by a large consortium of state attorneys general who appeared in the Kmart chapter 11 case, which conducted two of the largest store closing sales in history and that spanned over 40 states. See In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N. D. Ill. March 27, 2002).

37. Based upon the foregoing, the Debtors believe the proposed Store Closing Sales Procedures strike a fair balance between the rights of landlords and other interested parties to maintain the integrity of their properties, on the one hand, and the rights of the Debtors and the interests of the Debtors' creditors to maximize

18

proceeds from the Store Closing Sales, on the other hand. To the extent that these procedures are altered in the final form of Merchandise Disposition Agreement, the Debtors will file and serve updated Store Closing Sales Procedures.

> (iv)    *Employee Considerations*

38.    One of the keys to ensuring successful Store Closing Sales is the continued service of the Debtors' employees. The Debtors' stores are staffed with sales associates knowledgeable in jewelry merchandise and sales and uniquely trained to sell the Debtors' product. The service of these employees is therefore vital to efficient and profitable Store Closing Sales. In the ordinary course of their business, the Debtors offer their employees various bonus payments, incentive compensation, and severance pay designed to incent the employees to maximize business performance.

39.    The Debtors intend to continue offering these forms of compensation to employees located the Closing Stores, although the precise terms have been modified as appropriate to the Closing Store context. A summary of the terms of their compensation structure is attached hereto as Exhibit F (the "Severance and Retention Program"). Since the Debtors view the Severance and Retention Program as a continuation of pre-petition compensation practices, albeit modified, the Debtors believe that the Program is an ordinary course matter that may, and will, be implemented immediately upon the filing of this Motion. Nonetheless, out of an abundance

19

of caution, the Debtors will request approval of the Program in conjunction with entry of the Store Closing Order at the March 2 hearing.

     40.     Under an "agency" agreement such as the attached Merchandise Disposition Agreement, the retention component of the Program will be treated as Expenses under the Merchandise Disposition Agreement and therefore will be the responsibility of the Store Closing Agent.  Accordingly, the payment of any amounts related to such program will not have a direct impact on the Debtors' cashflow.[3]  The costs associated with the severance component of the program will be born by the Debtors.  However, if the Debtors enter into a consulting agreement providing for an hourly, flat or fixed fee for the sale of the Merchandise, the Debtors will incur the costs of both the retention and severance components of the program.

APPLICABLE AUTHORITY

A.     <u>Section 363(b)(1)</u>

     41.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Assets of the Debtors may be sold outside of the ordinary course of business if a sound business purpose exists for doing so. <u>See, e.g.</u>, <u>Big Shanty Land Corp. v. Comer Properties</u>, Inc., 61 B.R. 272, 278 (N.D. Ga. 1985)

---

[3]     It is conceivable that a Store Closing Agent may wish to offer more advantageous terms to employees.  If the successful Store Closing Agent does so, the terms of such program will be filed and served in connection with the filing and service of the final Merchandise Disposition Agreement.

(citing Committee of Equity Sec. Holders v. Loinel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1070-72 (2d Cir. 1983)), Fulton State Bank v. Schipper, 933 F.2d 513,

515 (7th Cir. 1991); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Telesphere Communications, Inc.,

179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); Stephens Indus., Inc. v. McClung, 789

F.2d 386, 390 (6th Cir. 1986); In re Titusville Country Club, 128 B.R. 396 (W.D. Pa.

1991); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991).

    42.    There is ample business justification for the Debtors' decision to

discontinue their business operations at the Closing Stores and sell the related

Merchandise. As discussed above, the Debtors, with the assistance of Abacus and

Gemini, have evaluated the performance of all of their stores and have determined

that the business operations at the Closing Stores are either unprofitable or are

performing below the Debtors' expectations. Moreover, continued operation of the

Closing Stores would result in the expenditure of vital resources in order to maintain

operations at the Closing Stores instead of using those resources to support the

Debtors' profitable stores and assisting in the Debtors' reorganization efforts.

Accordingly, continued operation of the Closing Stores is not feasible and, even if it

were, would not be in the best interests of the Debtors, their creditors, or their

estates.

    43.    Moreover, the disposition of the Merchandise pursuant to the Store

Closing Sales Procedures and the selection of a Store Closing Agent, pursuant to the

Bidding Procedures, on terms similar to those reflected in the Merchandise Disposition Agreement, represents an accepted method for the sale of retail merchandise that has been approved in numerous chapter 11 cases of retailers.  See, e.g., In re Bradlees Stores, Inc., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan, 4, 2001); In re Hechinger Investment Company of Delaware, Inc., Case No. 99-2261 (PJW) (Bankr. D. Del. June 28, 1999); In re WSR Corp., Case No. 98-1241 (MFW) (Bankr. D. Del. Oct. 28, 1998); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1999); In re Montgomery Ward, LLC, Case No. 00-4667 (RTL) (Bankr. D. Del. Jan. 24, 2001) ; see also In re Stauffens Music House, Inc., 213 B.R. 842 (Bankr. E.D. Mo. 1997).

44.     Indeed, the Debtors believe that the Merchandise Disposition Agreement will provide them with several benefits.  First, allowing a Store Closing Agent to sell inventory in the manner described herein will enable the Debtors to maximize returns, while minimizing the distraction that such efforts can cause at this critical stage of the Debtors' reorganization efforts.  In addition, it is generally more cost-effective for the Store Closing Agent, with its substantial experience, to conduct these sales, rather than the Debtors.

45.     Because the Merchandise Disposition Agreement will be negotiated at arm's-length and in good faith after other parties and their qualifications and proposals are considered, the Debtors will request this Court to find, in connection with entry of the Store Closing Order, that the Store Closing Agent has acted in good faith

22

within the meaning of section 363(m) of the Bankruptcy Code.  See generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting In re rock Indus, Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

46.    In sum, the Debtors have determined that entering into the Merchandise Disposition Agreement with the Store Closing Agent, as selected pursuant to the Bidding Procedures, is in their best interests and the best interests of the Debtors' stakeholders.  Accordingly, the Debtors should be permitted to enter into the Merchandise Disposition Agreement with the selected Store Closing Agent.  However, to the extent the Debtors determine that it is in their best interest to conduct the Store Closing Sales themselves, the Debtors should be permitted to conduct the Store Closing Sales without the assistance of a Store Closing Agent.

B.    The Sale of Merchandise and FF&E Should be
      Free and Clear of Claims, Liens, and Encumbrances

47.    To facilitate the sale of the Merchandise and FF&E, the Debtors request authorization to sell such property free and clear of any and all claims, liens and encumbrances that may be asserted against such property.  Pursuant to section

23

363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363 "free and clear of any interest in such property of an entity other than the estate" if, among other things, entities with interests in such property consent or if other bases for such sales under the Bankruptcy Code are satisfied. 11 U.S.C. § 363(f).

48.     The Debtors believe that their DIP lenders, their prepetition lenders, and certain prepetition trade vendors have enforceable, properly perfected security interests in certain of the Merchandise and FF&E located at the Closing Stores. The Debtors believe that these creditors will consent to the sale of the Merchandise and FF&E free and clear of their claims, liens and encumbrances with such claims, liens and encumbrances attaching to the net sale proceeds. Even without such consent, the Debtors are authorized to sell collateral so long as the related liens attach to the proceeds of sale. See 11 U.S.C. § 363(f).

49.     Accordingly, this Court should authorize the Debtors to sell the Merchandise and FF&E free and clear of any and all claims, liens and encumbrances that may be asserted by any parties, with any such claims, liens and encumbrances attaching to the net proceeds of the Store Closing Sales in the same order and priority as existed as of the petition date or pursuant to this Court's order approving debtor-in-possession financing.

C.    The Court Should Invalidate any Restrictions
      In Restrictive Documents that May Impair the
      Debtors' Ability To Conduct the Store Closing Sales

50.    The Closing Stores will be located on properties that are leased by the

Debtors.  Thus, the contemplated Store Closing Sales may be inconsistent with

certain provisions of such leases or other documents ("Anti-Alienation Provisions"),

whether or not filed of record with respect to any of such leased premises (the

"Premises") in the land records, including, without limitation, reciprocal easement

agreements, agreements containing covenants, conditions and restrictions (including,

without limitation, "go-dark" provisions and landlord recapture rights), or other

similar documents or provisions  (collectively, the "Restrictive Documents").[4]

51.    Anti-Alienation Provisions also include terms intended to protect the

image of a shopping center or mall or avoid disruption of normal commerce, includ-

ing Anti-Alienation Provisions purporting to restrict or prohibit the Debtors from

conducting store closing, going out of business, inventory liquidation or similar sales.

Such Anti-Alienation Provisions in leases have been deemed unenforceable in other

chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value

of its assets under section 363 of the Bankruptcy Code.  See In re Ames Dep't Stores,

---

[4]    With respect to any other documents that may relate to any of the Debtors'
Premises, but are not recorded and to which the Debtors are not parties, such
documents cannot, as a matter of law, prohibit, restrict or otherwise prevent
the Debtors' use of the respective portions of the Premises.  See Chevron
U.S.A., Inc. v. Traillour Oil Co., 987 F.2d 1138, 1158 (5th Cir. 1993)(holding
that lease could not be enforced against sublessee in absence of privity of
contract or estate).

25

Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (enforcement of anti-going-out-of-business sales clause would contravene overriding federal policy requiring debtors to maximize assets); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (anti-going-out-of-business sales clause in lease is unenforceable); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (same).

52.     The Debtors propose to conduct the Store Closing Sales in accordance with the Store Closing Sales Procedures which, as described above, limit the effect of Anti-Alienation Provisions and are essentially the same as such procedures entered in other large, chapter 11 retail cases.  In re Montgomery Ward, LLC, Case No. 00-4667 (RTL) (Bankr. D. Del.), In re Service Merchandise Company, Inc., 399-02649 (Paine) (Bankr. M.D. Tenn) and In re Kmart Corp., Case No. 02-2474 (SPS) (Bankr. N. D. Ill).  These procedures fairly balance the rights of landlords to maintain the integrity of their properties with the obligation of the Debtors to maximize recoveries from liquidation sales.  To the extent Anti-Alienation Provisions exist in any Restrictive Documents, they should not be permitted to interfere with, or otherwise restrict the Debtors or the Store Closing Agent from conducting the Store Closing Sales or the closing of Closing Stores.

D.      The Store Closing Sales Should be Exempt
        from Certain Federal, State, and Local Laws,
        Statutes, Rules and Ordinances Related to
        Store Closing and Liquidation Sales

53.     Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing,

26

liquidation, or other inventory clearance sales, including, but not limited to, state and local statutes and regulations establishing licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, and consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").  However, state statutes and regulations typically provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with these Liquidation Sale Laws.  Ga. Code Ann., § 10-1-393; Ga. Code Ann., § 11-6-103; N.C.G.S.A. § 25-6-103; IC 26-1-6.1-103; IC 26-1-6.1-103; V.T.C.A., Bus. & C. § 17.91; Ala. Code 1975 § 8-13-23; T. C. A. § 47-25-204; N.C.G.S.A. § 66-82.

54.    The Debtors, therefore, request that this Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  Because the Debtors and their assets are subject to this Court's jurisdiction, this Court will be able to supervise the Store Closing Sales and the liquidation of the Merchandise.  The Store Closing Sales are a legitimate method by which the Debtors can maximize the return from the sale of assets for the benefit of their estates and creditors.  Accordingly, this Court should dispense with any requirement that the Debtors comply with technical requirements that are not intended to curtail persons from conducting store closing sales with bankruptcy court supervision.

27

55.     Such relief is contemplated by 28 U.S.C. § 959, which requires trustees and, thus, debtors-in-possession, to comply with state and other laws in performance of their duties.  Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents where they are liquidating assets. See, e.g., In re N.P. Min. Co., Inc., 963 F.2d 1449, 1460-61 (11th Cir. 1992) (28 U.S.C. § 959(b) is not applicable to businesses' operations that have ceased and whose assets are being liquidated); Walker v. Maury County (Matter of Scott Housing Systems, Inc.,) 91 B.R. 190, 195-96 (Bkrtcy S.D.GA. 1988) (J. Davis); see also In re Valley Steel Products Co., Inc., 157 B.R. 442, 447 (Bkrtcy E.D.Mo. 1993); In re Heldor Indus- tries, Inc., 131 B.R. 578, 587 (Bkrtcy. D.N.J. 1991); In re Borne Chemical Co., Inc., 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applica- ble only where the property is being managed or operated for the purpose of continu- ing operations);  California State Bd. of Equalization v. Goggin, 191 F. 2d 726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does not apply to transactions that are in the nature of a liquidation), cert. denied, 342 U.S. 909 (1952).

56.     Here, the Store Closing Sales will continue for a limited duration, all advertising will fairly describe the Store Closing Sales, and no aspect of the relief sought is intended to alter laws or regulations affecting public safety.  For these and other reasons, 28 U.S.C. § 959(b) should not be read to apply to the Store Closing Sales, as the Debtors will be ceasing their operations at the Closing Stores with the

28

knowledge and oversight of their creditors and this Court and in accordance with the Court-approved Store Closing Sales Procedures.

57.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, to the extent such state or local law conflicts with federal bankruptcy law, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under Bankruptcy Code section 363.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  See, e.g., In re Shenango Group, Inc., 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

58.     While preemption of state law is not always appropriate, as where the protection of public health and safety is involved, see In re Baker & Drake, 35 F. 3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption where state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate where, as here, the only state laws involved concern economic regulation.  Id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

29

59.     Here, section 363 of the Bankruptcy Code, which requires debtors to operate their businesses in a way that maximizes recoveries for creditors, will be severely undermined if the Court does not provide for the waiver of Liquidation Sale Laws.  Similar relief has been granted in other bankruptcy cases, including In re Big V Stores, Case No. 00-4372 (PJW) (Bankr. D. Del.); In re Levitz Furniture, Inc. et al., Case No. 97-1842 (MFW) (Bankr. D. Del.); In re Hechinger Investment Company of Delaware, Inc., et al., Case No. 99-02261 (PJW) (Bankr. D. Del.); In re County Seat, Inc., Case No. 96-1637 (HSB) (Bankr. D. Del.); In re Weiner Stores, Case No. 95-417 (PJW) (Bankr. D. Del.); In re Casual Male Corp., Case No. 01-41404 (REG) (Bankr. S.D.N.Y.); In re Lechters, N.Y.C., Inc., Case No. 01-41432 (AJG) (Bankr. S.D.N.Y.); In re Bradlees, Inc., Case No. 00-16033 (BRL) (Bankr. S.D.N.Y.).

60.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtors only request that this Court authorize the Debtors and/or the Store Closing Agent to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits; observing state and local waiting periods or time limits; and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as a store closing or similar type sale, or transferring Merchandise to or

30

between the Closing Stores.  The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

61.    Indeed, as explained above, the Debtors have incorporated into the proposed Store Closing Order provisions previously requested by a large consortium of state attorneys general in the Kmart case designed to ensure compliance with other laws of general applicability.  By including such provisions, the Debtors intend to demonstrate their commitment to comply with such laws, and that their Store Closing Sales will not be conducted in unfair disregard of the rights of others.

62.    In order to ensure fairness to the Debtors, however, the Debtors request that no person or entity, including, but not limited to, any lessor or federal, state or local agency, department or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of such Store Closing Sales, in the manner set forth in the Store Closing Order.

63.    Likewise, the Debtors request that all private parties and persons of every nature and description, including landlords and utility companies, and all those acting for or on behalf of such private parties (including governmental units or public officials thereof), be prohibited and enjoined from instituting any action or proceeding in any court or administrative body seeking an order or judgment that might in any way  directly or indirectly interfere with, or adversely affect, the conduct of the Store Closing Sales.

31

64.     Finally, the Debtors request that all parties and persons of every nature and description, including creditors, newspapers and other advertising mediums, and all those acting for or on their behalf, be prohibited and enjoined from charging advertising rates in excess of those rates charged pursuant to the Debtor's prepetition advertising agreements or, if no such agreements exist, charging advertising rates in excess of those regularly and customarily charged in the ordinary course to non-bankrupt customers on account of prepetition outstanding obligations.

E.     Authority to Pay Store Closing Expenses

65.     In connection with the Store Closing Sales, the Debtors expect to expend considerable resources over the next few weeks to prepare for, commence, and conduct the Store Closing Sales.  Such expenses (the "Store Closing Expenses") are anticipated to include post-petition expenses that may be payable to third-parties, such as potential liquidators, related to those third parties' post-petition efforts to prepare the Debtors' Closing Stores for, and to implement, the Store Closing Sales. Although the Debtors believe that they may incur and pay such expenses as adminis-trative expenses pursuant to section 503 of the Bankruptcy Code, out of an abun-dance of caution, they request that the Court authorize them to do so.

F.     Termination Fee and Other Bid Procedures

66.     The Debtors are also requesting the authority to offer a bidder a termination fee (the "Termination Fee") not to exceed 2% of any fee or minimum guaranteed percentage recovery proposed in such bidder's Merchandise Disposition

32

Agreement. The ability of the Debtors to offer potential bidders a Termination Fee is beneficial to the Debtors' estates and creditors in that a Termination Fee may be needed to provide the incentive needed to induce a bidder to make or increase its bid prior to an auction. To the extent bids can be improved prior to an auction, a higher floor is in effect established for further bidding.

67.     Thus, even if a bidder is offered a Termination Fee and is ultimately not the highest or otherwise best bidder, the Debtors still will have benefitted from the higher floor established by the improved bid. The Debtors will exercise prudent business judgement before offering or agreeing to any of the forms of bid protection and shall only do so if the Debtors believe that offering such protections to a bidder will ultimately result in greater overall value realized on the Merchandise.

68.     Approval of termination fees in connection with the sale of significant assets has become an established practice in Chapter 11 asset sales, enabling a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining even greater benefits for the estate through an auction process. In re Allegiance Telecom, Inc., et al., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. January 15, 2004) ($8 million break-up fee, approximately 2% of the purchase price of the Debtors' assets); In re NRG Energy Inc., et al., Case No. 03-13024 (PCB) (Bankr. S.D.N.Y. September 10, 2003) ($55 million break-up fee, approximately 3% of the purchase price); In re Bethlehem Steel Corporation, et al., Case Nos. 01-15288 through 01-15315 (BRL) (Bankr. S.D.N.Y.

33

March 27, 2003) ($27 million break-up fee, approximately 2.7% of the purchase price); In re Rouge Industries, Inc., et al., Case No. 03-13272 (MFW) (Bankr. D. Del. December 2, 2003) (break-up fee of 3% of the purchase price); In re Mosaic Group (US) Inc., et al., Case No. 02-81440 (HDH) (Bankr. N.D. Tex. June 26, 2003) (break-up fee of approximately 2.14% of the purchase price); In re Conseco Inc., et al., Case No. 02-49672 (Bankr. N.D. Ill. January 8, 2003) ($30 million break-up fee); In re Comdisco, Inc., et al., Case No. 01-24795 (Bankr. N.D. Ill. August 9, 2001) ($18.3 million break-up fee, 3% of the purchase price); In re Einstein/Noah Bagel Corp., et al., Case Nos. 00-04447 and 00-04448 (CGC) (Bankr. D. Ariz. March 5, 2001) ($5 million break-up fee, approximately 3%).

G.     Rule 6004(g)

69.     Rule 6004(g) provides that a Court may direct that an order respecting the disposition of estate property may take effect immediately upon its entry notwithstanding the 10-day, automatic stay of the effectiveness of such orders otherwise applicable by virtue of such Rule.  Given the need of the Debtors to move expeditiously to implement their Store Closing program, as outlined above, the Debtors request that the Procedures Order and the Store Closing Order provide that such orders shall be deemed effective immediately upon entry.

70.     No prior motion for the relief requested herein has been made to this or any other court.

34

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Procedures Order and the Store Closing Order substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>; (b) approving the forms of Merchandise Disposition Agreement and FF&E Disposition Agreement attached hereto as <u>Exhibit C</u> and <u>Exhibit D</u>; and (c) grant such other and further relief as is just and proper.

Dated: Savannah, Georgia
      February 14, 2005

FRIEDMAN'S, INC., et al.,

John Wm. Butler, Jr.
George N. Panagakis
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

and

By: _____
Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga. Bar. No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE,
COURINGTON & CHISHOLM,
  A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000

Attorneys for Debtors and
  Debtors-in-Possession

36

## Exhibit A

**Procedures Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No.05-40129 |
|  | ) |  |
| FRIEDMAN'S INC., et al., | ) | Chapter 11 |
|  | ) | Jointly Administered |
|  | ) |  |
|  | ) | Hon. Lamar W. Davis, Jr. |
| Debtors. | ) |  |
|  | ) |  |

ORDER ESTABLISHING
PROCEDURES FOR THE SELECTION OF
STORE CLOSING AGENT

Upon the motion dated February 14, 2005 (the "Motion"),[1] wherein

Friedman's Inc. ("Friedman's") and seven of its subsidiaries and affiliates (the "Affili-

ate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), requested entry of an order seeking approval of proce-

dures for the selection of a store closing agent, authority to close certain stores, and

authority to sell the merchandise and other personal property at such stores; and it

appearing to the Court that (i) it has jurisdiction over the matters raised in the Motion

pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28

U.S.C. § 157(b)(2); (iii) the relief requested in the Motion, as addressed in this Order,

---

[1]     Unless otherwise defined herein, all capitalized terms shall have the meanings
ascribed to them in the Motion.

is in the best interests of the Debtors, their estates and their creditors; (iv) under the circumstances, proper and adequate notice of the limited relief requested in this Order and the hearing thereon has been given and that no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon that good and sufficient cause exists for the granting of the relief as set forth herein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT

I.      Bidding Procedures

1.      The bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") for the selection of a store closing agent (the "Store Closing Agent") to conduct the Store Closing Sales are hereby approved.

2.      No later than February 18, 2005, the Debtors shall have circulated bid packages to potential bidders seeking to be selected as the Store Closing Agent, pursuant to a confidentiality agreement in form and substance acceptable to the Debtors.

3.      All potential bidders interested in serving as the Debtors' Store Closing Agent must submit their bids for doing so to the persons identified in the Bidding Procedures so as to be received no later than 12:00 p.m. (EDT) on February 23, 2005.

3.      After February 23, 2005, the Debtors may conduct an auction (the "Auction") among Qualified Bidders. The Auction, if conducted, will take place at 10:00 a.m. (CDT) on February 25, 2005 at the offices of Skadden, Arps, Slate,

2

Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, or via teleconference.

4.      Upon conclusion of the Auction or, if the Debtors determine not to hold an Auction, then promptly following the Bid Deadline, the Debtors, in consultation with their advisors, the Committee, the post-petition lenders, and, to the extent that the principal balance of the pre-petition lenders' loans have not been paid in full, the pre-petition lenders, shall (i) review each Qualified Bid and (ii) identify the offer which the Debtors believe to be the highest and best offer to perform store closing and related services (the "Successful Bid").

5.      The Debtors will file with this Court a copy of the Successful Bid on or before February 28, 2005, and serve a copy thereof on representatives of the U.S. Trustee, the Committee, and the pre- and post-petition lenders.  The Debtors also will post a copy of the Successful Bid on the website of the claims and notice agent, http://kccllc.net/friedmans.com.  Any interested party requesting a copy of the Successful Bid shall be provided with a copy by the Debtors prior to the hearing on March 2, 2005 (referenced below).  Approval of the Successful Bid shall be considered at the hearing scheduled for March 2, 2005.

6.      To the extent that none of the bids received from the potential Agents are acceptable to the Debtors, the Debtors reserve the right to reject all bids received and to conduct the Store Closing Sales themselves.  If the Debtors decide to conduct the Store Closing Sales themselves, the Debtors may nonetheless retain the services of

3

one or more liquidation agents to serve as liquidation consultants on a commission basis and/or to provide additional personnel or assistance as may be required. The approval of any such relief shall be considered at the hearing scheduled for March 2, 2005 (referenced below).

II.    Form of Merchandise
       Disposition Agreement

7.    The Debtors are authorized to utilize the form of Merchandise Disposition Agreement attached to the Motion as Exhibit C in connection with their efforts to find an acceptable Store Closing Agent. This Order does not constitute approval of any of the terms of this form of Agreement, nor does it constitute any sort of finding that the Agreement is in the best interests of the estate. Rather, this Order merely authorizes the Debtors to use this form as a starting point in their efforts to find a Store Closing Agent satisfactory to them.

8.    The Debtors have the right, after consultation with their advisors, to reject any bid in the form of the Merchandise Disposition Agreement or that other-wise proposes a fee structure that the Debtors determine, in the exercise of their business judgment, is not in the best interests of the estate and to request potential Store Closing Agents to instead propose bids, in the form of consulting or operating agreements if requested, containing alternative fee structures, including set fees for each Closing Store or a set fee for the entire store portfolio.

4

III.    Closing Store FF&E

      9.    The Debtors are authorized to undertake efforts to sell FF&E located in their Closing Stores by attempting to locate potential FF&E disposition agents.  As part of this authority, the Debtors are authorized to determine, with the assistance of their advisors, the appropriate time for trying to finalize bids from potential FF&E disposition agents.

      10.    The Debtors also are authorized to utilize the form of FF&E Disposition Agreement attached to the Motion as Exhibit D in connection with their efforts to find an acceptable FF&E disposition agent.  However, this Order does not constitute approval of any of the terms of this form of FF&E Disposition Agreement, nor does it constitute any sort of finding that the FF&E Disposition Agreement is in the best interests of the estate.  Rather, this Order merely authorizes the Debtors to use this form as a starting point in their efforts to find an FF&E disposition agent satisfactory to them.

      11.    Once the Debtors have located an acceptable FF&E agent and obtained agreement on an acceptable from of FF&E Disposition Agreement, the Debtors shall request, by way of separate motion, formal approval of such FF&E Disposition Agreement and disposition of the FF&E.  However, the Debtors reserve the right to select the Store Closing Agent as their FF&E disposition agent pursuant to the terms of the Merchandise Disposition Agreement.  If the Debtors determine to

5

do so, this Court will consider approval of such arrangement at the hearing scheduled for March 2, 2005 (referenced below).

IV.     Termination Fee

12.     The Debtors are authorized to offer potential Store Closing Agent bidders a termination fee (the "Termination Fee") not to exceed 2% of any fee or minimum guaranteed percentage recovery proposed in such bidder's Merchandise Disposition Agreement.

V.      Sale Hearing; Objections

13.     A hearing to consider entry of the Store Closing Order, a copy of which was attached to the Motion as Exhibit B, shall be held on March 2, 2005, at 10:00 a.m., at which time the Court shall consider approval of the Store Closing Sales; authority for the Debtors to conduct the Store Closing Sales; approval of the procedures for the conduct of the Store Closing Sales; authority for the Debtors to accept the Successful Bid; and approval of the Retention Program.

14.     All objections to the relief sought in the Store Closing Order, except objections pertaining to the conduct of the Auction, if any, shall be filed and served upon all persons required to be served by this Court's case management order by no later than February 25, 2005.  All objections to the conduct of the Auction, if any, shall be filed and served by no later than February 28, 2005.

6

VI.     Scope of this Order;
        <u>Reservation of Rights</u>

15.     The relief requested in the Motion and granted by this Order is limited to the relief specifically referenced herein, which is of a procedural nature only. All rights of any party in interest to object to the relief requested in the Store Closing Order, which will not be considered until the March 2, 2005 hearing referenced above, are hereby preserved notwithstanding entry of this Order. Entry of this Order will not preclude any party from filing any objection, by the deadlines referenced in paragraphs 12 and 13 hereof, to any of the relief requested in the Store Closing Order.

16.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedures, this Order shall take effect immediately upon its entry.

So Ordered in Savannah, Georgia this ___ day of February, 2005

_____
Honorable Lamar W. Davis, Jr.
United States Bankruptcy Judge

7

Order prepared by:

John Wm. Butler, Jr.
George N. Panagakis
Timothy P. Olson
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

and

Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga.. Bar No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE, COURINGTON
  & CHISHOLM, A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000


Attorneys for Debtors and
  Debtors-in-Possession

8

## EXHIBIT 1

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be used in connection with the Debtors' selection of a Store Closing Agent for the Store Closing Sales. All capitalized terms used herein which are not otherwise defined shall have the meanings assigned to them in that certain Motion for (I) An Order Approving the Procedures by Which the Debtors May Select a Closing Store Agent, and (II) An Order Approving the Terms of a Merchandise Disposition Agreement and the Conduct of Store Closing Sales, filed on February 14, 2005 in the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division.

1.      Any party wishing to submit a competing bid to conduct the Store Closing Sales (in the form of a Merchandise Disposition Agreement to conduct store closing sales) must submit such offer, in writing, to (i) Steve Moore, Chief Administrative Officer, Friedman's Inc., 171 Crossroads Parkway, Savannah, Georgia 31422; (ii) Marian P. Wexler and George Panagakis, 333 West Wacker Drive, Chicago, Illinois 60606; and (iii) Alan Cohen and Jack Rapp, Abacus Advisors Group, LLC, 745 Fifth Avenue, Suite 1506, New York, New York 10151, so as to be received no later than 12:00 p.m. (EDT) on February 23, 2005.

2.      To be considered a "Qualified Bidder" the party must accompany such written offer with (i) the identity of such potential bidder and of an officer(s) or authorized agent(s) who will appear on behalf of such bidder, (ii) evidence, satisfactory to the Debtors in their reasonable discretion, of the bidder's financial wherewithal and operational ability to manage the Store Closing Sales program contemplated in the proposed Bidding Procedures Order and the financial and other obligations contemplated by the proposed Merchandise Disposition Agreement including guaranty of the Debtors' Expenses, and (iii) a refundable deposit in an amount consistent with the Debtors' business judgment in order to maximize the value of their estates; in the bid package to be provided to the bidders, a specific deposit amount will be requested (such a bid being deemed a "Qualified Bid").

3.      In the event that a Qualified Bid is received from a Qualified Bidder and the Debtors deem an auction is necessary (after consultation with the Committee), an auction will be conducted at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 W. Wacker Drive, Chicago, Illinois, 60606 or by teleconference commencing at 10:00 a.m. (CDT) on February 25, 2005, to consider any and all Qualified Bids. Any Qualified Bidder may appear and submit its highest

or best bid to conduct the Store Closing Sales on behalf of the Debtors.  At such Auction, Qualified Bidders will be permitted an opportunity to increase their bids, in minimum increments to be established at the Auction.  Upon conclusion of the Auction or, if the Debtors determine not to hold an Auction, then promptly following the Bid Deadline, the Debtors, in consultation with their advisors, the Committee and their lenders, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale process, and (ii) identify the highest or best offer to be the Store Closing Agent (the "Successful Bid").

4.     The following requirements apply to all Qualified Bids:  (i) the bidder must agree to be bound by the terms of the Merchandise Disposition Agreement (with appropriate modifications for the identity of the successful bidder, the increased or modified bid, or other terms more favorable to the Debtors), (ii) the bidder must provide adequate assurance of its ability to perform both from a financial and operational point of view and (iii) the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder or any financing contingency.

5.     The "Sale Commencement Date" for the Store Closing Sales shall be March 3, 2005 or a date agreed to by the Agent and the Debtors for all purposes.

6.     Bidders may bring to the Auction a marked copy of the Merchandise Disposition Agreement containing only conforming changes and in a form ready for execution, or may bring such other documentation as they believe is sufficient and appropriate under the circumstances, subject to the requirements of paragraphs 2 and 4 above.  The Debtors, however, shall determine in their reasonable discretion whether such alternative documentation is sufficient and appropriate under the circumstances.

7.     All evidence of the bidder's financial wherewithal and human resources to consummate the competing bid and perform under the Merchandise Disposition Agreement must be presented in writing and in a form satisfactory to the Debtors.

2

8.     Each competing offer made or deemed to be made shall remain open and irrevocable until the earliest to occur of (i) entry of a final order approving the Merchandise Disposition Agreement, as it may be modified prior to entry,  and the dissolution of any stays of such order, or (ii) implementation of a transaction involving any other bidder.

9.     The Debtors reserve the right to (i) determine in their reasonable discretion which offer is the highest or best offer and (ii) reject at any time prior to entry of an order of the court approving an offer, any offer, which the Debtors, in their reasonable discretion and without liability (except as set forth in the Merchandise Disposition Agreement) deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the terms and conditions of the Merchandise Disposition Agreement or the procedure set forth therein or herein, or (z) contrary to the best interests of the Debtors and their estates.

10.    The selection of a successful bidder, however, in this connection, shall be within the reasonable business judgment of the Debtors, subject to this court's approval; economic considerations shall not be the sole criteria upon which the Debtors base their decision.

11.    In assessing whether a bid from a party constitutes a higher or better offer, the Debtors shall consider, among other things, the net economic effect upon the estates.

3

## Exhibit B

**Store Closing Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Case No.05-40129 |
|  | ) |  |
| FRIEDMAN'S INC., et al., | ) | Chapter 11 |
|  | ) | Jointly Administered |
|  | ) |  |
|  | ) | Hon. Lamar W. Davis, Jr. |
| Debtors. | ) |  |
|  | ) |  |

**ORDER (A) APPROVING STORE CLOSING SALES, (B) AUTHORIZING
THE DEBTORS TO ENTER INTO MERCHANDISE DISPOSITION
AGREEMENT (C) APPROVING EMPLOYEE RETENTION PROGRAM
AND (D) GRANTING OTHER RELIEF**

Upon the motion dated February 14, 2005 (the "Motion"),[1] wherein

Friedman's Inc. ("Friedman's") and seven of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors") requested entry of an order, pursuant to 11 U.S.C. §§

105 and 363 and Fed. R. Bankr. P. 6004, seeking (a) approval to discontinue

operations and immediately begin selling inventory at all stores identified by the

Debtors in Exhibit 1 attached hereto (the "Stores") through store closing sales (the

"Store Closing Sales"); (b) approval of the procedures for the conduct of the Store

---

[1]      Unless otherwise defined herein, all capitalized terms shall have the meanings
ascribed to them in the Motion.

Closing Sales attached hereto as Exhibit 2; (c) authority to enter into the disposition agreement between the Debtors and the Store Closing Agent, a copy of which is attached hereto as Exhibit 3 ("Merchandise Disposition Agreement"); (d) approval for the Debtors to implement an employee retention plan as discussed in the Motion; and (e) other related relief; and it appearing to the Court that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; (iv) under the circumstances, proper and adequate notice of the Motion and the hearing thereon, afforded to the parties in interest identified in the Motion, has been given and that no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon that good and sufficient cause exists for the granting of the relief as set forth herein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.　　The Debtors are authorized, pursuant to Bankruptcy Code sections 363(b)(1) and (f), to immediately begin to sell the Merchandise (as defined in the Merchandise Disposition Agreement) through the Store Closing Sales with respect to the Stores identified on Exhibit 1.

2.　　The Store Closing Sales Procedures, attached hereto as Exhibit 2, are approved.

2

3.      Pursuant to section 363(f) of the Bankruptcy Code, all sales of Merchandise pursuant to the Store Closing Sales, whether by the Debtors or the Store Closing Agent, shall be free and clear of any and all claims, liens and encumbrances that may be asserted by any party, with any such claims, liens and encumbrances attaching to the net proceeds of the Store Closing Sales in the same order and priority, and with the same validity, as existed as of the petition date or pursuant to this Court's order approving debtor-in-possession financing, provided, however, that any such claims, liens and encumbrances shall attach to the proceeds of the Store Closing Sales subject to (i) any claims and defenses the Debtors may possess with respect thereto and (ii) the Store Closing Agent's Fee and Expenses reimbursable to the Store Closing Agent, which shall be free and clear of all claims, liens and encumbrances and shall be payable to Store Closing Agent out of Proceeds without further order of the Court and without the filing of fee applications.

4.      The Store Closing Sales shall be conducted in accordance with the Store Closing Sales Procedures notwithstanding any provisions ("Anti-Alienation Provisions") in the leases for the Closing Stores or any documents filed of record with respect to any of such leased premises (the "Premises") in the land records, including without limitation, the leases for such Premises, reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions (collectively, the "Restrictive Documents") and with respect

3

to the terms that are intended to protect the image of a shopping center or mall or avoid disruption of normal commerce, including Anti-Alienation Provisions purporting to restrict or prohibit the Debtors from conducting store closing, going out of business, inventory liquidation, or similar sales.

5.      Provided that the Store Closing Sales are conducted in accordance with the terms of this Order (and subject to the provisions of paragraphs 32 and 33 of this Order) and the Store Closing Sales Procedures and the Merchandise Disposition Agreement, the Debtors and the Store Closing Agent shall be presumed to be in compliance with any licensing and other requirements governing the conduct of store closings or other inventory clearance sales, including, but not limited to, state and local statutes and regulations establishing licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closing Sales (the "Liquidation Sale Laws").

6.      The term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws (the "Safety Laws") or any state and local laws, regulations or police powers of general applicability (the "General Laws") regarding matters such as consumer protection, labor and employment, taxes (including, but not limited to, the collection of sales taxes), the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring, and the Debtors and the Store Closing Agent shall continue to be required to comply, as applicable, with such Safety Laws and

4

General Laws, subject to any applicable provision of the Bankruptcy Code and federal law. In addition, the restriction on enforcement of Liquidation Sale Laws contained herein shall not apply to the conduct of the operations of any of the Debtors' stores that are not being closed pursuant to this Order, except to the extent that this Order provides the Debtors with a limited right to transfer goods from such stores to the Closing Stores.

7.     No person or entity, including, but not limited to, any lessor or federal, state or local agency, department or governmental authority, shall take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of such Store Closing Sales.

8.     Except as expressly provided in paragraphs 5, 32, and 33 of this Order, all private parties and persons of every nature and description, including landlords and utility companies and all those acting for or on behalf of such private parties (including governmental units or public officials thereof), are prohibited and enjoined from (a) interfering in any way with, or otherwise impeding, the conduct of the Store Closing Sales and/or (b) instituting any action or proceeding in any court or administrative body seeking an order or judgment that might in any way directly or indirectly interfere with, or adversely affect, the conduct of the Store Closing Sales.

9.     All parties and persons of every nature and description, including, but not limited to, creditors, newspapers, other advertising mediums, and all those acting

5

for or on their behalf, are prohibited and enjoined from charging advertising rates in excess of the rates charged pursuant to the Debtor's prepetition advertising agreements or, if no such agreements exist, charging advertising rates in excess of those regularly and customarily charged in the ordinary course to non-bankrupt customers on account of prepetition outstanding obligations.

10.     The Debtors are authorized to discontinue operations at the Stores in accordance with this Order and the Store Closing Sales Procedures and the Merchandise Disposition Agreement.

11.     As provided for in the provisions of this Order and the Store Closing Sales Procedures and the Merchandise Disposition Agreement, the Debtors and the Store Closing Agent shall be, and hereby are, authorized and empowered to conduct the Store Closing Sales at the Stores, and take all actions reasonably related thereto or arising in connection therewith, including, without limitation, advertising the Store Closing Sales as "store closing" sales in media advertisements, on interior and exterior banners and on other signage that the Store Closing Agent deems appropriate.

12.     Neither the Debtors nor the Store Closing Agent nor any of their officers, employees, and agents shall be required to obtain the approval of any landlord or any other third parties to conduct the Store Closing Sales and to take the related actions authorized herein.

6

13.     All benefits and protections granted the Debtors in this Order shall also inure to the benefit of the Store Closing Agent selected by the Debtors pursuant to the Bidding Procedures.

14.     The Debtors and/or the Store Closing Agent shall not be allowed to augment inventory through inventory owned by persons or entities other than the Debtors, except to the extent provided in the Store Closing Sales Procedures and the Merchandise Disposition Agreement.  To the extent so authorized, the Debtors and the Store Closing Agent are authorized to transfer and/or augment inventory to and between Stores without further order of Court.

15.     No equipment that is leased by the Debtors or that is otherwise not owned by the Debtors may be sold during the Store Closing Sales without the express written permission of such lessor or owner.  The Debtors shall notify in writing (the "Lessor Notice") such lessors or owners of the date of the store closures five business days prior to the closing of any store in which their equipment is located.

16.     The Debtors are authorized to pay promptly the store closing expenses that may be payable to third-parties, such as potential liquidators, related to those third parties' post-petition efforts to prepare the Debtors' Closing Stores for, and to implement, the Store Closing Sales, as administrative expense.

17.     To the extent that the taxing authorities for the jurisdictions in which the Closing Stores are located (the "Taxing Authorities") are claiming liens on the Merchandise or tangible personal property that is subject to the Motion and have

7

valid liens on such property, in order to adequately protect such liens and claims, such liens, and the priority thereof, are preserved, subject to a full reservation of rights of any party in interest with standing to contest the validity, amount, extent and priority of such liens.  Any such valid liens shall attach, in the same priority, amount and extent, to the proceeds of such property until the underlying claims are paid or such proceeds are segregated as provided in this paragraph (at which time the lien will only attach to such segregated proceeds).  Payment of the amount of the Taxing Authorities' allowed secured claims, if any, including all amounts allowable under 11 U.S.C. § 506 or otherwise secured, shall either be paid before the Sale Termination Date or be the subject of a segregated account (the "Segregated Account") to be established before the Sale Termination Date in an agreed amount.  This paragraph is without prejudice to the Taxing Authorities' right to request additional adequate protection with respect to any claims secured by real property or tangible personal property of the Debtors or used by the Debtors.  No distribution to parties other than the Taxing Authorities may be made from the Segregated Accounts absent notice to the Taxing Authorities and their agreement or an order from the Court authorizing such distributions.  Notwithstanding the foregoing, the Debtors may pay any uncontested amounts with respect to the claims of the Taxing Authorities without further order or authorization of the Court.  Nothing in this Order alters the Debtors' prepetition obligation to pay tangible personal property taxes and timely file returns related thereto.

8

18.     The terms of the Merchandise Disposition Agreement, attached hereto as Exhibit 3, as submitted in final form to the Court by the Debtors, shall be, and hereby are, approved, including, without limitation, the provisions for compensation of the Store Closing Agent.

19.     This Order and the Merchandise Disposition Agreement shall be binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to these Debtors.

20.     Subject to the restrictions set forth in this Order and the Store Closing Sales Procedures, the Debtors and the Store Closing Agent shall be, and hereby are, authorized to take any and all actions as may be necessary or desirable to implement the Merchandise Disposition Agreement; and each of the transactions contemplated by the Merchandise Disposition Agreement, and any actions taken by Debtors and the Store Closing Agent necessary or desirable to implement the Merchandise Disposition Agreement prior to the date of this Order, shall be, and hereby are, approved and ratified.

21.     The Debtors and their officers, employees, and agents shall be, and hereby are, authorized to execute such documents as are necessary or desirable to carry out the Store Closing Sales and related actions authorized herein, including, without limitation, the Merchandise Disposition Agreement.

9

22.     Subject to the limitations set forth in the Merchandise Disposition Agreement, the Store Closing Agent shall be, and hereby is, granted a limited license and right to use, from the Sale Commencement Date to the Sale Termination Date (as defined in the Merchandise Disposition Agreement), the Stores, and the trade names, logos and customer lists relating to, and used in connection with, the operation of the Stores, solely for the purpose of conducting the Store Closing Sales.

23.     Except as expressly set forth in the Merchandise Disposition Agreement, the Store Closing Agent shall not be liable for any claims against the Debtors, and the Store Closing Agent shall have no successor liabilities whatsoever.

24.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein, and the Store Closing Agent shall expressly be authorized to sell Merchandise through bulk sales in accordance with the Merchandise Disposition Agreement and the Store Closing Sales Procedures.

25.     Pursuant to section 1146(c) of the Bankruptcy Code, no transfer, stamp or similar tax shall apply to the transactions authorized herein.

26.     Consistent with section 363(m) of the Bankruptcy Code, the Merchandise Disposition Agreement was negotiated at arm's length, and entered into in good faith by the respective parties, and thus the Store Closing Agent is entitled to the benefits and protections provided under section 363(m) of the Bankruptcy Code.

10

27.     Consistent with the terms of the Merchandise Disposition Agreement, the Store Closing Agent shall not be liable for sales taxes.

28.     Consistent with the terms of the Merchandise Disposition Agreement, Debtors' employees shall at all times remain employees of the Debtors and are not employees of the Store Closing Agent.

29.     Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Store Closing Agent is authorized to sell consigned goods on behalf of the Debtors in accordance with the terms of the Merchandise Disposition Agreement and this Order.

30.     To the extent of any conflict between this Order, the Merchandise Disposition Agreement, the Motion, or any other order entered in these cases, the terms of this Order shall govern.

31.     Except as set forth expressly herein, nothing contained in this Order shall alter or affect the Debtors' obligations under any unexpired lease of nonresidential real property, pursuant to section 365(d)(3) of the Bankruptcy Code. The assumption or rejection of a lease for a Closing Store shall be accomplished by a motion other than the Motion granted hereby.

32.     This Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the Store Closing Sales Procedures, the Merchandise Disposition Agreement or this Order, provided, however, that nothing herein shall preclude any governmental entity from enforcing Safety Laws or General Laws in the appropriate nonbankruptcy forum, except to the extent that there is a dispute (a

11

"Reserved Dispute") over the enforceability of a Liquidation Sales Law.  Resolution of any Reserved Dispute will take place before this Court as provided herein.

33.     Any time before thirty (30) days following the Sale Commencement Date (as defined in the Merchandise Disposition Agreement), any governmental unit may assert a Reserved Dispute by sending a notice explaining the nature of the dispute to the Debtors' counsel.  If the Debtors and such governmental unit are unable to resolve the Reserved Dispute within fifteen (15) days of receipt of the governmental unit's notice, the governmental unit may file a motion with the Court requesting the Court to resolve the Reserved Dispute, including, but not limited to, determining that the governmental unit may enforce the law that is the subject of the Reserved Dispute, without regard to the presumption in paragraph 5.  Nothing herein shall preclude the Debtors from asserting that the provisions of any such Liquidation Sales Law are preempted or otherwise rendered unenforceable by the Bankruptcy Code or applicable federal law, in whole or in part or that the terms of this Order do not violate such law.  This compromise is not to bind the Debtors or the states in the event of a future sale of the Debtors' assets that are not the subject of this Order. Filing of a motion for determination of a Reserved Dispute shall not be deemed to affect the finality of this order, or to limit or interfere with the Debtors' ability to conduct the Store Closing Sales pursuant to this Order, the Store Closing Procedures, and the Operating Agreement, absent further order of this court.

34.     As provided in the Merchandise Disposition Agreement, the Debtors and the Store Closing Agent are authorized to implement and fund the Retention Program for certain Store Level Employees (as defined in the Merchandise Disposition Agreement) that have not voluntarily terminated employment nor have been terminated for cause.

35.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, this Order shall take effect immediately upon its entry.

So Ordered in Savannah, Georgia this ___ day of March, 2005

_____

Honorable Lamar W. Davis, Jr.
United States Bankruptcy Judge

13

Order prepared by:

John Wm. Butler, Jr.
George N. Panagakis
Timothy P. Olson
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

and

Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga.. Bar No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE, COURINGTON
  & CHISHOLM, A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000


Attorneys for Debtors and
  Debtors-in-Possession

14

## EXHIBIT 2

## STORE CLOSING PROCEDURES

1.     The Store Closing Sales shall be conducted so that the Closing Stores remain open during the normal hours of operation provided for in the respective leases for the Closing Stores.  The Debtors and/or the agent selected during the auction contemplated by the Bidding Procedures Order (the "Store Closing Agent") shall not conduct an auction or fire sale and shall abide by mall hours and all mall guidelines concerning, among other things, maintenance, security, and trash removal.

2.     The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales shall be conducted on a Sunday.

3.     The Debtors and/or the Store Closing Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Store's premises, except as permitted by the lease or agreed to by the landlord, but may solicit customers in the Stores themselves.  The Debtors and/or Store Closing Agent shall not use flashing lights or any type of amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted by the lease or agreed to by the landlord.

4.     The Debtors and the Store Closing Agent shall be permitted to augment or otherwise bring any new merchandise into the Closing Stores in order to maintain a desired mix of merchandise; provided, however, that such merchandise is of the same type or quality as the Merchandise currently or previously sold in the Closing Stores.

5.     The Store Closing Sales subject to the Merchandise Disposition Agreement shall end on or before the applicable Sale Termination Date provided in the Merchandise Disposition Agreement.  Within thirty days after the conclusion of the Store Closing Sales, the Debtors shall disclose Store Closing Sales figures to those landlords paid on a percentage rent basis.

6.     At the conclusion of the Store Closing Sales, Store Closing Agent shall vacate the Closing Stores in "broom-clean" condition, and shall leave the Closing Stores in the same condition as on the commencement of the Store Closing Sales, ordinary wear and tear excepted; provided however that the Debtors do not undertake any greater obligation than that set forth in an applicable lease with respect

to a Store. The Debtors and/or the Store Closing Agent may sell FF&E owned by the Debtors and located in the Closing Stores during the Store Closing Sales. The Debtors or the Store Closing Agent, as the case may be, may advertise the sale of FF&E. Additionally, the purchasers of any FF&E sold during the Store Closing Sales shall only be permitted to remove the FF&E either through the back shipping areas or through other areas of the store after store business hours.

7.      Store Closing Agent shall not advertise or market the Store Closing Sales as a "going out of business" sale. Moreover, the Store Closing Agent shall not advertise or market the Store Closing Sales as "bankruptcy" sales in markets in which the Debtors continue to operate stores. In all other markets, signs advertising the Store Closing Sale shall contain the words "store closing" or words of similar import. The Debtors and/or the Store Closing Agent shall post a sign in the cash wrap areas of the Closing Stores to the effect that all sales are "final."

8.      Neither the Debtors nor the Store Closing Agent shall make any alterations to the storefront or exterior walls of any of the Closing Stores (including the removal of store signs) (the posting of signs, as provided herein, shall not be deemed an alteration).

9.      The Debtors and/or Store Closing Agent shall keep the Closing Store premises and the surrounding area clear and orderly consistent with present practices.

10.      The landlords of the Closing Stores shall have reasonable access to the Closing Store premises upon conclusion of the Store Closing Sales solely for the purpose of dressing Closing Store windows to minimize the appearance of a dark store.

11.      No property of any landlord of a Closing Store shall be removed or sold during the Store Closing Sales.

12.      The Debtor and/or the Store Closing Agent shall only utilize existing furniture, fixtures and equipment to conduct the Store Closing Sales, unless a landlord otherwise consents.

13.      The Debtors and/or Store Closing Agent shall designate a party to be contacted by landlords should an issue arise concerning the conduct of the Store Closing Sales.

2

14.    The capitalized terms used herein shall be defined as follows:

a.    "Store Closing Sales" shall mean the store closing or similar type sale to be conducted at each of the Closing Stores.

b.    "Closing Stores" shall mean those retail store locations identified by the Debtors.

c.    "Debtors" shall mean Friedman's Inc. and certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession in Bankruptcy Case No.05-40129 in the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division.

d.    "Store Closing Agent" shall mean that agent engaged by the Debtors to conduct the Store Closing Sales in accordance with the terms of the Merchandise Disposition Agreement.

e.    "Store Closing Order" shall mean that order (a) authorizing the Debtors and/or their Agent to conduct the Store Closing Sales pursuant to Sections 105 and 363 of the Bankruptcy Code; (b) authorizing the Debtors to enter into the Merchandise Disposition Agreement with the store closing agent submitting the highest and best offer which is otherwise acceptable to the Debtors to perform store closing and related services; (c) approving an employee retention program and (d) granting other related relief.

f.    "Merchandise Disposition Agreement" shall mean that Merchandise Disposition Agreement entered into by the Debtors and the Store Closing Agent.

g.    "Sale Termination Date" shall mean the date specified in the Merchandise Disposition Agreement unless the Closing Sale is extended by mutual written agreement of the Debtors and the Store Closing Agent.

h.    "FF&E" shall mean furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Closing Stores and owned by the Debtors.

3

## Exhibit C

**Form of Merchandise Disposition Agreement**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this _____ day of February, 2005, by and between _____, (the "Agent") and Friedman's, Inc., a Delaware corporation, (the "Merchant") with a principal place of business at 171 Crossroads Parkway, Savannah, Georgia 31422.

## RECITALS

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the purpose of selling all of the Merchandise (as hereinafter defined) located in [_____] (x)[1] retail store locations and distribution centers set forth on Exhibit 1 attached hereto (the "Stores")  The group 1 stores (the "Group 1 Stores") represent those stores in markets that will be closed in their entirety, the group 2 stores (the "Group 2 Stores") represent those stores in continuing markets.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Agency Account | Section 7.2(a) |
| Agency Documents | Section 12.1(b) |
| Agent | Preamble |
| Agent's Base Fee | Section 3.2 |
| Agent Claim | Section 13.5 |
| Agent's Fee | Section 3.1(b) |
| Agent Letter of Credit | Section 3.3(b) |
| Agent's Incentive Fee | Section 3.2 |
| Agent Indemnified Parties | Section 14.1 |
| Aggregate Cost Value of Remaining Merchandise | Section 3.2 |
| Agreed Expenses | Section 3.1(c) |
| Approval Order | Section 2 |
| Augmented Merchandise | Section 17(a) |
| Benefits Cap | Section 4.1(A)(1) |
| Central Expenses | Section 3.1(B)(i) |

---

[1] The Company reserves the right to increase or decrease the number of store locations prior to the execution of this agreement.

| Defined Term | Section Reference |
|---|---|
| Cost File | Section 5.2 |
| Cost Value | Section 5.2 |
| Defective Merchandise | Section 5.1(b) |
| Designated Merchant Accounts | Section 7.2(b) |
| Estimated Guarantee Amount | Section 3.3(a) |
| Events of Default | Section 15 |
| Excluded Benefits | Section 4.1(B)(ii) |
| Expenses | Section 4.1 |
| Expense Budget | Section 4.3 |
| Expense Cap | Section 3.1(c) |
| Expense L/C | Section 4.2(b) |
| FF&E | Section 5.1(b) |
| FF&E Agent | Section 16 |
| Final Reconciliation | Section 3.6(b) |
| Gross Rings | Section 3.5 |
| Group 1 Stores | Recitals |
| Group 2 Stores | Recitals |
| Guaranteed Amount | Section 3.1(a) |
| Guaranteed Amount Deposit | Section 3.3(a) |
| Guaranty Percentage | Section 3.1(a) |
| Inventory Completion Date | Section 3.4 |
| Inventory Date | Section 3.4 |
| Inventory Report | Section 3.3(a) |
| Inventory Taking | Section 3.4 |
| Inventory Taking Instructions | Section 3.4 |
| Inventory Taking Service | Section 3.4 |
| Inventory Threshold | Section 3.1(c) |
| Lender Agent | Section 3.3(b) |
| Memo Merchandise | Section 5.1(b) |
| Merchandise | Section 5.1(a) |
| Merchant | Preamble |
| Merchant Account Usage Period | Section 7.2(a) |
| Occupancy Expenses | Section 4.1(B)(iii) |
| Payment Date | Section 3.3(a) |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retained Employee | Section 10.1 |
| Retention Bonus | Section 10.4 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |

| Defined Term | Section Reference |
|---|---|
| Sale Guidelines | Section 2 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 9.3 |
| Sharing Threshold | Section 3.1(b) |
| Stores | Recitals |
| Supplies | Section 9.4 |
| Transfer Goods | Section 5.1(b) |
| WARN Act | Section 10.1 |

Section 2.    Appointment of Agent.  Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and to the extent designated by Merchant, disposing of Merchant's owned FF&E, in accordance with the terms and conditions of this Agreement.  Merchant's and Agent's obligations hereunder are subject to approval of the Bankruptcy Court and shall be of no force and effect in the event that it is not so approved.  As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the Bankruptcy Court for an order approving this Agreement in its entirety in form and substance satisfactory to Agent (the "Approval Order").  The Approval Order shall provide, among other things, that: (i) this Agreement is in the best interests of Merchant, Merchant's estate, creditors and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims or encumbrances thereon; (v) any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the Guaranteed Amount, the Recovery Amount, if any, and amounts reimbursed to Merchant on account of Expenses; (vi) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (vii) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "store closing" or similar type sale without further consent of any person, other than Merchant, which consent shall not be unreasonably withheld, in a manner consistent with the sale guidelines for Group 1 Stores and the sale guidelines for Group 2 Stores, attached hereto as Exhibit 2 (the "Sale Guidelines"); (viii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the

Agreement; (ix) each and every federal, state or local agency, department or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license or permit of any governmental authority shall be required; (x) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (xi) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xii) Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever; (xiii) sales of Merchandise shall be protected by Section 363(m) of the Bankruptcy Code in the event that the Approval Order is reversed or modified on appeal; and (xiv) any amounts owed by the Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Chapter 11 Case pursuant to section 364(a) of the Bankruptcy Code and secured by valid and perfected first-priority security interests in the Merchandise and the Proceeds granted pursuant to section 364(d) of the Bankruptcy Code junior only to an amount equal to the unpaid portion of the Guaranteed Amount (without the necessity of filing financing statements to perfect the security interests).

Section 3.       Guaranteed Amount and Other Payments.

3.1       Payments to Merchant.

(a)       As a guaranty of Agent's performance hereunder, Agent guarantees to Merchant that the Proceeds of the Sale shall equal or exceed __% (the "Guaranty Percentage") of the aggregate Cost Value (as defined below) of the Merchandise as determined under Sections 3.4 and 3.5 hereof (the "Guaranteed Amount") plus an amount sufficient to pay all Expenses.

(b)       To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, (y) the Agreed Expenses of the Sale (as defined below) and (z) ____ percent (___%) of the aggregate Cost Value of the Merchandise (the "Agent's Fee") (the sum of (x), (y) and (z), the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared _____ percent (___%) to Merchant and ____ percent (___%) to Agent. All amounts, if any, to be received by Merchant from Agent in excess of the Sharing Threshold shall be referred to as the "Recovery Amount". Agent shall pay to Merchant the Guaranteed

Amount, unreimbursed Expenses due to Merchant, and the Recovery Amount, if any, in the manner and at the times specified in Sections 3.3 and 3.4 below. The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the Final Inventory Report (as defined below), and (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement).

(c)     Subject to the Expense Cap adjustment set forth in Exhibit 3.1(d), the "Expense Cap" shall mean ___% of the aggregate Cost Value of the Merchandise. The Expense Cap and the Guaranty Percentage have been calculated and agreed upon based upon the aggregate Cost Value of the Merchandise not being less than $_____ (the "Inventory Threshold"). To the extent that the aggregate Cost Value of the Merchandise is greater than or less than the Inventory Threshold the Expense Cap and the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d) hereto, as and where applicable. The "Agreed Expenses" shall mean the lower of the actual Expenses of the Sale and the Expense Cap.

3.2     Payments to Agent. As its compensation for services rendered to Merchant, after sufficient Proceeds have been generated to pay the Guaranteed Amount and all Expenses, which do not exceed $_____, Agent shall be entitled to receive Proceeds up to an amount equal to __% of the aggregate Cost Value of the Merchandise ("Agent's Base Fee"). In addition, if sufficient Proceeds are generated from the Sale, Agent shall be entitled to receive __% of any Proceeds remaining after payment of the Guaranteed Amount, all Expenses which do not exceed $_____, and Agent's Base Fee ("Agent's Incentive Fee"). Subject to Merchant's rights with respect to the Recovery Amount, all Merchandise remaining, if any, at the Sale Termination Date (the "Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances, provided however, that Agent shall use its best efforts to sell all of the Merchandise during the Sale and provided further that, at the conclusion of the Sale, Merchant and Agent shall jointly conduct a physical inventory taking of the Remaining Merchandise at Agent's expense to calculate the aggregate Cost Value of such Remaining Merchandise (the "Aggregate Cost Value of Remaining Merchandise") for the purposes of calculating the portion of the Guaranteed Amount attributable to such Remaining Merchandise. Any proceeds received from the sale of any Remaining Merchandise shall be deemed Proceeds under this Agreement.

3.3     Time of Payments.

(a)     No later than two (2) business days after the later of (x) entry of the Approval Order and (y) execution hereof (the "Payment Date"), Agent shall pay eighty-five percent (85%) of the Guaranteed Amount (the "Guaranteed

Amount Deposit") in cash, which amount shall be wired to the following account: [_____], Account Name: [_____], Account Number: #_____. Agent shall calculate the amount of the Guaranteed Amount Deposit based upon the Cost Value of the Merchandise as of the Sale Commencement Date as reflected in Merchant's books and records (the "Estimated Guarantee Amount"). Agent shall pay the unpaid and undisputed balance of the Guaranteed Amount in cash to Merchant no later than the earlier of (i) the date ten (10) business days after the Sale Commencement Date (in which case payment shall be of the undisputed portion of the balance of the Estimated Guaranteed Amount) and (ii) the second business day following the issuance of the audit report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service, after verification thereof by the Agent and the Merchant (the "Inventory Report"), and the Agent's failure to pay such balance or undisputed portion shall entitle the Lender Agent on behalf of the Merchant may draw upon the Agent Letter of Credit (as defined below) to the extent of such balance or undisputed portion. To the extent that the Merchant is entitled to receive a Recovery Amount from Proceeds, such Recovery Amount shall be paid to the Merchant as earned weekly. In the event that after the issuance of the Inventory Report, the Guaranteed Amount is greater than the sum of the Guaranteed Amount Deposit plus the payment of the undisputed portion of the Estimated Guaranteed Amount, the Agent shall pay the remainder of the Guaranteed Amount to the Lender Agent for the benefit of the Merchant within two (2) business days after the Inventory Report has been issued. In the event there is a dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.6 hereof.

(b)     To secure payment of the unpaid portion of the Guaranteed Amount and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit, naming [_____] (the "x") as beneficiary, substantially in the form of Exhibit 3.3(b) attached hereto, in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date, (the "Agent Letter of Credit"). Agent shall use its best efforts to cause the Agent Letter of Credit to be delivered no later than the Payment Date. In the event that Agent shall fail to pay to the [_____] or any successor agent under the Merchant's prepetition and debtor-in-possession credit facilities (the "Lender Agent"), for the benefit of Merchant, any amount required to be paid hereunder, the Lender Agent shall be entitled to draw on the Agent Letter of Credit to fund such amount following five (5) days' written notice to Agent of the Lender Agent's intention to do so. The Agent Letter of Credit shall expire on _____, 2005; provided however; the Lender Agent, Merchant and Agent agree that after payment of the unpaid portion of the Guaranteed Amount (whether the Estimated Guaranteed Amount or the Guaranteed Amount calculated pursuant to the Inventory Report) pursuant to Section 3.3(a), the face amount of the

Agent Letter of Credit shall be reduced in an amount(s) to be agreed upon by Merchant, Lender Agent, and Agent.

3.4     Inventory Taking.  Merchant and Agent shall cause to be taken a SKU physical inventory of the Merchandise located in the Stores (the "Inventory Taking"), which Inventory Taking shall be completed in all of the Stores no later than _____ (_____) days after the Sale Commencement Date (the "Inventory Completion Date"), and the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store).  Merchant and Agent shall jointly employ _____ or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking.   The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 3.4, including a requirement that senior representatives of Merchant and Agent shall be personally present at the Inventory Taking at the first _____ (____) Stores in order to establish the standards for the Inventory Taking in the remaining Stores (the "Inventory Taking Instructions"). Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  Except for the Inventory Taking costs payable to or other third party, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Stores shall be closed to the public and no sales or other transactions shall be conducted.  Merchant and Agent agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

3.5     Gross Rings.  For the period from the Sale Commencement Date until the Inventory Date for each Store, Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value of the merchandise sold by SKU.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of __% of the aggregate Cost Value of Merchandise sold during the Gross Rings period.

3.6     Reconciliation

(a)     On each Thursday during the Sale Term, commencing on the second Thursday after the Sale Commencement Date, Agent and Merchant shall cooperate to jointly prepare a reconciliation of the weekly Proceeds of the Sale, Expenses and any other Sale related items that either party may reasonably request.

(b)     Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including, without limitation, a summary of Proceeds, Expenses, and any other accounting required hereunder (the "Final Reconciliation").  Within five (5) days of completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.   During the Sale Term, and until all of the Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

(c)     In the event that there is a dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for a determination.   Merchant and Agent hereby agree to submit to the jurisdiction of the Bankruptcy Court for such determination.

Section 4.     Sale Expenses.

4.1     Expenses.  The Merchant is obligated to pay, subject to its right to receive reimbursement on a weekly basis pursuant to the reconciliation procedures set forth in Section 4.2, all expenses directly incurred in connection with and attributable to the Sale (collectively, the "Expenses"), limited to:

(A) (1) base payroll of Merchant's Retained Employees  (which includes Merchant's estimate of SPIFS) used in connection with the Sale for actual days worked (or in the case of hourly employees, the hours worked), plus (b) an amount not to exceed ____% of such base payroll (the "Benefits Cap") for the payment of all related payroll taxes, workers' compensation and benefits of Merchant's Retained Employees used in connection with the Sale (including, without limitation, medical and dental benefits, group life insurance, accidental death and dismemberment insurance, short and long term disability, accrual for sick pay, and accrual for vacation and holiday pay) for all such Retained Employees used, in aggregate, which are either due or accrue during the period of the Sale and are attributable to the Sale, plus (c) actual costs payable to third party payroll processors;

(2)     costs of all security in the Stores including, without limitation, courier and guard service;

(3)     Retention Bonuses for Retained Employees, plus payroll taxes, as provided for in Section 10.4 below;

(4)     (a) advertising and direct mailings relating to the Sale and (b)

Store interior and exterior signage and banners;

(5)     local and long-distance telephone expenses and line charges;

(6)     bank card fees, bank card error fees, credit card fees, and chargebacks in respect of disputed sales (however there shall be cooperation between Merchant and Agent to resolve chargeback of any kind in respect of any authorized sale on a credit card where Agent or Merchant produces a receipt evidencing that the sale subject to such chargeback was a final sale);

(7)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses;

(8)     costs for additional supplies in accordance with Section 9.4 hereof;

(9)     all fees and charges required to comply with all laws and regulations applicable to the Sale;

(10)    any and all costs, including delivery and freight costs, related to the processing, transfer and consolidation of Merchandise between the Stores (excluding all costs, including delivery and freight costs, to deliver the Transferred Merchandise to the Stores, but including, from and after the Sale Commencement Date, all costs of processing the Transferred Merchandise upon its arrival at the Stores and thereafter);

(11)    housekeeping and cleaning expenses related to the Stores;

(12)    all travel expenses, including living expenses, payable to Merchant's employees relating to travel by such employees at the direction of Agent, which shall include, without limitation, the costs of transferring Merchant's employees between Stores;

(13)    on-site supervision during the Sale, including base fees and reasonable and customary bonuses of Agent's field personnel, travel to and from the Stores, and incidental out-of-pocket and commercially reasonable travel expenses relating thereto;

(14)    all costs and expenses of providing such additional Store-level services, including, without limitation, the employment of temporary help (which shall be coordinated and implemented through Merchant's human resources department), which the Agent in its discretion considers appropriate, and other approved miscellaneous Store-level expenses incurred by Agent;

(15)    postage, courier and overnight mail charges to and from or among the Stores and central office (solely to the extent relating to the Sale);

(16)    Occupancy Expenses on a per diem, per store basis and limited to the total per diem by Store in the categories described in Exhibit 4.1;

(17)    Central Expenses of $___ per Store per week during the Sale Term;

(18)    Agent's legal fees and cost of capital;

(19)    Agent's due diligence in connection with the Sale, including travel related expenses, in an aggregate amount not to exceed $_____;

(20)    Merchant's liability insurance and casualty insurance premiums in the amount of $___ per Store per week required under Section 13.1 and Section 13.2 hereto;

(21)    any other expense approved by Merchant directly incurred by Agent in connection with the Sale.

(B)    As used herein, the following terms have the following respective meanings:

(i)    "Central Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale consisting of sales audit, MIS services, POS systems, payroll processing, cash reconciliation, inventory processing and handling, data processing and reporting and any similar services.

(ii)    "Excluded Benefits" means the following benefits, except as provided in Section 4.1(A)(1), in excess of the Benefits Cap: vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, union dues or other amounts due under any union contract or collective bargaining agreement, pension benefits, ERISA coverage and similar contributions, and payroll taxes, worker's compensation and health insurance benefits.

(iii)    "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, real estate and use taxes, merchant's association dues and expenses, personal property leases (including, without limitation, point of sale equipment), cash register maintenance, telephone base fees, rental for furniture, fixtures and equipment, security systems, building alarm service, alarm service maintenance and store trash and snow removal expenses, all of the foregoing as categorized or reflected on Exhibit 4.1 hereto.

"Expenses" shall not include: (i) Excluded Benefits; (ii) any rent or occupancy expenses related to the Stores other than Occupancy Expenses as limited to those categories as described in Exhibit 4.1; and (iii) any other costs, expenses or liabilities payable by Merchant, all of which shall be paid by Merchant promptly when due for and during the Sale Term.

4.2    Payment of Expenses. (a)    Merchant shall be responsible for the payment of all Expenses up to the amount of the Agreed Expenses during the Sale; provided, however, Agent shall be responsible to reimburse Merchant for all Expenses of the Sale (whether or not in excess of the Agreed Expenses).   All Expenses up to the amount of the Agreed Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Merchant as provided for herein, subject to reimbursement by Agent immediately following the weekly Sale reconciliation pursuant to Section 3.6. Agent and/or Merchant may review or audit the Expenses at any time.  To the extent that any Expenses may be described in more than one section hereof, then such Expenses shall be paid, reimbursed or accounted for only once.

(b)  To secure payment of the Expenses, Agent shall deliver to Lender Agent an irrevocable and unconditional standby letter of credit, naming Lender Agent, as beneficiary, in the original face amount equal to three (3) weeks estimated Occupancy Expenses and payroll Expenses, substantially in the form of Exhibit 4.2(b) attached hereto (the "Expense L/C").  The Expense L/C shall be delivered to Lender Agent no later than two (2) business days after the Sale Commencement Date, shall be issued by a bank selected by Agent and reasonably acceptable to Merchant and Lender Agent, and shall contain terms, provisions and conditions mutually acceptable to Merchant, Lender Agent, and Agent. The Expense L/C shall expire no earlier than sixty (60) days after the Sale Termination Date. Unless the parties shall have mutually agreed that they have completed the final reconciliation under this Agreement, then, at least thirty (30) days prior to the initial or any subsequent expiry date, Lender Agent or Merchant, as the case may be, shall receive an amendment to the Expense L/C solely extending (or further extending, as the case may be) the expiry date by at least sixty (60) days.  If Lender Agent does not receive such amendment to the Expense L/C no later than thirty (30) days before the expiry date, then all amounts hereunder shall become immediately due and payable and Lender Agent shall be permitted to draw under the Expense L/C in payment of amounts owed and Merchant shall hold the balance of the amount drawn under the Expense L/C as security for amounts that may become due and payable to Merchant hereunder.

4.3    Expense Budget.  Attached hereto as Exhibit 4.3 is the budget (the "Expense Budget") setting forth in reasonable detail Agent's estimated budget for the Expenses (as defined above) of the Sale, as agreed to by Merchant.

Section 5.    <u>Merchandise</u>.

5.1    <u>Merchandise Subject to this Agreement</u>.

(a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean: (i) all finished goods inventory that is owned by Merchant and located at the Stores as of the Sale Commencement Date or (ii) goods held by Merchant on memo, on consignment, or as bailee (unless excluded by Merchant) ("Memo Merchandise"). Merchandise shall include, Transfer Goods, Defective Merchandise, and Merchandise subject to Gross Rings.

(b)    Notwithstanding the foregoing, Merchandise shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) Defective Merchandise for which Merchant and Agent cannot agree upon a Cost Value; and (3) furnishings, trade fixtures, equipment and improvements to real property which are located in the Store (collectively, "<u>FF&E</u>").  As used in this Agreement the following terms have the respective meanings set forth below:

"<u>Transfer Goods</u>" means [_____].

"<u>Defective Merchandise</u>" means any item of merchandise agreed upon and identified by Agent and Merchant as defective or otherwise not salable in the ordinary course because it is dented, worn, scratched, broken, faded, torn, mismatched, non-redeemed or layaway altered merchandise or merchandise affected by other similar defects rendering it not first quality, that is sold by Agent during the Sale Term, and as to which Agent and Merchant mutually agree on its value to define its Cost Value.

5.2    <u>Valuation</u>.

For purposes of this Agreement, "<u>Cost Value</u>" shall mean, with respect to each item of Merchandise, the average standard cost (determined by applicable merchant accounting unit for such item of Merchandise as reflected in Merchant's master cost file as of the Sale Commencement Date (the "Cost File"), which average cost is inclusive of freight and shipping charges. Merchant and Agent agree that the Cost File does not account for any volume discounts, advertising co-op discounts, rebates or discounts associated with expedited payment terms offered by any vendor, and further that the Cost Value of any item of Merchandise shall not be adjusted for any such amounts.

5.3    <u>Excluded Goods</u>.  Merchant shall retain all responsibility for any goods not included as Merchandise hereunder.

Section 6.    <u>Sale Term</u>.

6.1     Term.   The Sale shall commence at the Stores on or about March ___, 2005 (the "Sale Commencement Date").  The Agent shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before _____ __, 2005 but, in no event sooner than _____, 2005 (the "Sale Termination Date") unless the Sale is extended by mutual agreement of Agent and Merchant, provided that Agent may terminate the Sale at any Store upon mutual agreement with Merchant and upon ten day's notice to Merchant after mutual agreement.  The period for the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."  The Sale Termination Date may be extended by mutual written agreement of Agent and Merchant.

6.2     Vacating the Stores.   On the Sale Termination Date, the Agent shall leave the Stores in "broom clean" condition (ordinary wear and tear excepted).  All assets of Merchant used by Agent in the conduct of the Sale (e.g. FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores premises at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent; provided however, Agent shall remove all unsold Merchandise at the end of the Sale Term at each of the Stores and Agent shall retain title of the unsold Merchandise.

Section 7.     Sale Proceeds.

7.1     Proceeds.   For purposes of this Agreement, "Proceeds" shall mean the aggregate of: (a) the total amount (in U.S. dollars) of all sales of Merchandise made under this Agreement, exclusive of Sales Taxes, and (b) any proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.

7.2     Deposit of Proceeds.   (a) Within (i) _____ (____) business days after the Sale Commencement Date, with respect to cash transactions, and (ii) ____ (____) days after the Sale Commencement Date, with respect to credit card transactions (as and where applicable the "Merchant Account Usage Period"), Agent shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder, which accounts may be the Designated Merchant Accounts (as defined below) so long as Merchant, Agent and the Lender Agent agree (the "Agency Accounts") and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts; provided however, in the event that Agent establishes a reasonable business justification therefore, Merchant and Lender Agent shall consent to an appropriate extension of the applicable Merchant Account Usage Period.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant

shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(b)     During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into Merchant's existing accounts designated for the Designated Closing Stores, but also are designated solely for the deposit of Proceeds of the Sale (including credit card proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Merchant Accounts"). Commencing on the first business day following the payment of the Guaranteed Amount Deposit and the posting of the Expense L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited in such accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date, if any). During the applicable Merchant Account Usage Period, or such other extended date as shall be agreed between and among Merchant, Agent and Lender Agent, Lender Agent agrees not to take any action with respect to such Proceeds deposited into the Designated Merchant Accounts; provided however, Lender Agent retains all of its rights and remedies with respect to the proceeds deposited into such Designated Merchant Accounts that do not constitute Proceeds of the Sale. Notwithstanding anything to the contrary contained herein, Agent shall have until _____ (__) business days after the expiration of the applicable Merchant Account Usage Period, to provide the Lender Agent with notice and demand asserting that a specific amount of proceeds maintained in the Designated Merchant Accounts constitute Proceeds of the Sale which are the property of Agent.

7.3     Credit Card Proceeds.  Agent shall use its reasonable best efforts to establish its own merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account prior to the expiration of the Merchant Account Usage Period. Until such time as Agent establishes its own identification numbers, Agent shall have the right (but not the obligation) to use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts) for credit card Proceeds. In the event that Agent elects so to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale

Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's Merchant identification number(s).  All credit card Proceeds will constitute the property of the Agent and shall be deposited into the Designated Merchant Accounts or Agency Accounts, as the case may be. To the extent credit card proceeds are deposited into the Designated Merchant Accounts, Merchant shall transfer such Proceeds to Agent daily (on the date received by Merchant if received prior to 12:00 noon, or otherwise within one business day) by wire transfer of immediately available funds.  At Agent's request, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all credit card Proceeds for Agent's account.  Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

> **Section 8.**     <u>Sale of Warranties</u>.

> 8.1     The sales of NEW warranties shall not be included in the calculation of Proceeds, however, profits from the sale of NEW warranties shall be shared.  Merchant shall retain or Agent shall remit (if deposited in Agent account) sufficient payment to cover cost of service after which payment will be shared _____ percent (_____ %) to the Merchant and _____ percent (_____ %) to the Agent.

> **Section 9.**     <u>Conduct of the Sale</u>.

> 9.1     <u>Rights of Agent</u>.  Agent shall be permitted to conduct the Sale as a Store Closing Sale.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

> (a)     to establish and implement advertising and promotion programs consistent with the Sale themes set forth above, provided that Merchant shall have the right to approve all such advertising in advance;

> (b)     to establish Sale prices and Store hours which are consistent with the terms of applicable leases;

> (c)     to use in furtherance of the Store Closings only without charge during the Sale Term all FF&E, advertising materials, Store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations

required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(d)     to use without charge Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale; provided, however, that in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Stores and relating to the sale of merchandise by Merchant, Agent shall be responsible for the actual incremental cost of such services as an Expense; and

(e)     to transfer Merchandise between and among the Stores, the costs of which shall be paid by Agent as an Expense of the Sale; provided however Merchant and Agent shall maintain detailed listings of all transfers of Merchandise in and out of the Stores during the Sale Term and shall jointly track when and where such Merchandise is received.

9.2     Terms of Sales to Customers.  All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same.  Agent shall clearly mark all Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the Merchandise sold at Merchant's ongoing retail store locations.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash and nationally recognized bank credit cards or by other nationally recognized non Merchant credit facilities.  Agent will accept Merchant's gift certificates and Store credits, issued by Merchant prior to the Sale Commencement Date, provided that Agent shall be reimbursed by Merchant in connection with the Sale reconciliation contemplated under Section 3.6 hereof on a dollar for dollar basis for any gift certificates and Store credits accepted by Agent.

9.3     Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, and deposited into Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  If Agent fails to perform its responsibilities in accordance with this Section 9.3, and provided

Merchant complies with its obligations in accordance with this Section 9.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

9.4    Supplies.    Agent shall have the right to use all existing supplies (e.g. boxes, bags, twine) located at the Stores at no charge to Agent. In the event that additional supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent. Supplies have not been transferred since February _____, 2005 and shall not be prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

9.5    Returns of Merchandise.    To the extent Merchant directs Agent to accept returns of merchandise, then any such returned merchandise that is saleable as first-quality merchandise shall be included in Merchandise, returned to the sales floor. For purposes of the calculation of the Guaranteed Amount shall be valued at the Cost Value applicable to such item. The aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any returned Merchandise included in Merchandise, and the Guaranteed Amount shall be adjusted accordingly. Any increases in payment on account of the Guaranteed Amount as a result of returned Merchandise shall be paid by Agent pursuant to Section 3.1 hereof. Agent shall not accept returns of merchandise where the customer contemplates repurchasing the same item so as to take advantage of the sale price being offered by Agent.    To the extent that Merchant is required to issue refunds to customers in respect of any returned Merchandise, such amounts shall not reduce Proceeds under this Agreement.    Any returned Merchandise not included in Merchandise shall be disposed of by Agent in accordance with instructions received from Merchant or, in the absence of such instructions, returned to Merchant at the end of the Sale Term. Merchant and Agent shall jointly track returns of merchandise for purposes of determining any increase or decrease to the Guaranteed Amount, or any amounts owed by Merchant to Agent as a result of Agent accepting such returns.

9.6    Force Majeure.    If any casualty or act of God or act of terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Store, then such Store and the remaining Merchandise located at such Store shall be transferred to other Closing Stores and the cost of such transfer shall be borne by Agent.

Section 10.     Employee Matters.

10.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.   Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, payroll, benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

10.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event that Agent determines to stop using any Retained Employee, Agent will notify Merchant at least ten (10) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such event.  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.

10.3    Payroll Matters.   During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation and benefits for all Retained Employees in accordance with its usual and customary procedures.

10.4    Employee Retention Bonuses.  Agent shall have the right to elect to pay, as an Expense, retention bonuses (each a "Retention Bonus") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of [10%] of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause". Subject only to limitation of [10%] of base payroll, the actual to be paid to each such Retained Employee shall be in an amount to be determined by Agent, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan upon execution of this Agreement.

Section 11.   Conditions Precedent.  The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)   All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default (as defined herein) shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)   Merchant shall have provided Agent reasonable access to all pricing and cost files, computer hardware, software and data filed, inter-Store transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(c)   Agent shall have obtained, in the name of and with the assistance of Agent, all permits and licenses necessary to conduct the Sale.

(d)   Merchant shall have obtained any necessary consent to the Sale from its secured lenders.

(e)   Merchant shall have obtained the Approval Order by _____ _, 2005, and the Approval Order shall not have been stayed nor shall an application for a stay of the Approval Order be pending.

Section 12.   Representations and Warranties.

12.1   Merchant's Representations, Warranties Covenant, and Agreements.  Merchant hereby represents, warrants, covenants, and agrees in favor of Agent as follows:

(a)   Merchant: (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization stated above; (ii) has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including the jurisdiction in which the Stores are located.

(b)   Subject to Bankruptcy Court approval, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this

Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. No contract or other agreement to which Merchant is a party or by which the Merchant is otherwise bound will prevent or impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise with the exception of Memo Merchandise.

(d)     Merchant has and will maintain its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein. All pricing files and records requested by Agent relative to the Merchandise have been and will continue to be made available to Agent. All such pricing files and records are and shall continue to be true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods as of the dates and for the periods indicated therein. Merchant's price files reflect hard markdowns taken by Merchant on items of Merchandise but not reflect point-of-sale or other temporary promotional activity.

(e)     Merchant has not, and shall not up to the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance or reduced price merchandise.

(f)     Merchant shall ticket or mark all items of inventory received at the Stores prior to and after the Sale Commencement Date in a manner consistent with similar inventory located at the Stores and in accordance with Merchant's historic practices and policies relative to pricing and marking inventory. Merchant has taken hard markdowns consistent with the margins represented in the due diligence materials provided by Merchant to Agent.

(g)     Except as may be restricted by virtue of Merchant's chapter 11 filing, Merchant covenants to continue to operate the Stores in the ordinary course of business from the date of this Agreement to the Sale Commencement Date, in that  (i) Merchant shall continue selling inventory during such period at customary prices, (ii) Merchant shall not promote or advertise any sales or in-store promotions (including POS promotions) to the public except for Merchant's historic and customary promotions for all of its locations as set forth in Exhibit 12.1(g)   attached hereto, (iii) Merchant does not represent that the replenishment of merchandise in the Stores through the Sale Commencement Date will be at the same levels as with historical practices, and (iv) Merchant shall not make any management personnel moves or changes at the Stores without Agent's prior consent (which consent will not be unreasonably withheld.

(h)     To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state, or local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices regarding product recalls prior to the Sale Commencement Date.

(i)     Merchant shall throughout the Sale Term maintain in good working order, condition and repair, at its sole expense (except to the extent such amounts are included in Occupancy Expenses), all cash registers, heating systems, air conditioning systems, elevators, escalators, Store alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores.

(j)     Merchant has paid and will continue to pay throughout the Sale Term, (i) all self-insured or Merchant funded employee benefit programs for employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, (ii) all casualty, liability, workers' compensation and other insurance premiums, (iii) all utilities provided to the Stores, and (iv) all applicable taxes.

(k)     Merchant has not and shall not throughout the Sale Term take any actions the result of which is to increase the cost of operating the Sale, including, without limitation, increasing salaries or other amounts payable to employees.

(l)     Merchant is not a party to any collective bargaining agreements with its employees at the Stores and, to the best of Merchant's knowledge; no labor unions represent Merchant's employees at the Stores.

(m)     All information provided by Merchant to Agent in the course of Agent's due diligence and preparation and negotiation of this Agreement (including information as to the Store inventories and operating expenses) is as of the date hereof and shall remain true and accurate in all material respects.

(n)    Except with respect to such other sales or promotions as may be approved by the Bankruptcy Court, during the Sale Term, Merchant shall not promote sales at its on-going stores outside the ordinary course of business.

12.2    Agent's Representations and Warranties.    Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Agent: (i) is a _____ validly existing and in good standing under the laws of the State of _____; (ii) has all requisite power and authority to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents and to perform its obligations thereunder.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 13.    Insurance.

13.1    Merchant's Liability Insurance.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability

insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retention's or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (other than Merchant's employees).

13.2   Merchant's Casualty Insurance.   Merchant will provide throughout the Sale Term at its expenses, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible (which amounts shall be paid by Merchant), shall constitute Proceeds hereunder and shall be paid to Agent. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

13.3   Worker's Compensation Insurance.   Merchant shall at all times during the Sale Term, at its cost, maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

13.4   Agent's Insurance.   Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance

reasonable satisfactory to Merchant. In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

   13.5 <u>Risk of Loss</u>. Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Merchant and Agent agree that Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors or employees located at the Stores (an "<u>Agent Claim</u>"). In the event of any such liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's historic policies and procedures, and shall provide a copy of the initial documentation relating to such claim to Agent. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide a copy of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

   Section 14. <u>Indemnification</u>.

   14.1 <u>Merchant Indemnification</u>. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

     (a) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c)     subject to Agent's compliance with its obligations under Section 9.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)     any consumer warranty or products liability claims relating to Merchandise;

(e)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act), except for Agent Claims; and

(f)     the negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents or representatives.

14.2    Agent Indemnification.    Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its representatives;

(c)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(d)     any Agent Claims; and

(e)     the negligence or willful misconduct of Agent or any of its officer, directors, employees, agents or representatives.

Section 15.    Defaults.    The following shall constitute "Events of Default" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and throughout the Sale Term; or

(c)     The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party.

Section 16.     Fixtures.  Upon request of Merchant, Agent or such other party as requested by Merchant ("FFE Agent") shall use its best efforts to sell Merchant's owned FF&E.  FFE Agent shall be entitled to compensation based upon net proceeds plus reimbursement of any actual out of pocket expense incurred in selling such fixtures if engaged on a commission basis and otherwise if engaged on a guarantee basis.  FFE Agent shall have the right to abandon any unsold fixtures upon termination of the Sale.

Section 17.     Augmentation.

(a)     Agent shall be authorized to include in the Sale goods supplied and delivered to the Stores, at the sole expense of Agent, for inclusion in the Sale, up to an aggregate cost value of _____ million (_____) (the "Augmented Merchandise"), provided, however, that the Augmented Merchandise is reasonably acceptable to Merchant and is new, and similar in nature and quality to the Merchandise sold by the Merchant at the Stores during the Chapter 11 Case; provided further, however, that the Augmented Merchandise is segregated or otherwise separately identifiable from the Merchandise.

(b)     If and to the extent the Sale includes Augmented Merchandise, the proceeds therefrom shall be shared_____ percent (___%) by the Agent and _____ percent (___%) by the Merchant payable in the manner and at the times specified in Section 3.3.

Section 18.     Security Interest.  In consideration of the Agent's initial payment of the Guaranteed Amount, Expenses and the provision of services hereunder to Merchant, the Approval Order shall grant to Agent a valid and perfected first priority security interest in and lien upon the Merchandise and the Proceeds to

secure all obligations of Merchant to Agent hereunder, junior only to an amount equal to the unpaid portion of the Guaranteed Amount. Merchant shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

Section 19.    Miscellaneous.

19.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to the Agent:

If to the Merchant:          Friedman's, Inc.
                             171 Crossroads Parkway
                             Savannah, Georgia 31422
                             Phone: (912) 233-9333
                             Fax: (912) 201-6609

                             Attn:  Mr. Steve Moore

With copies to:              Skadden, Arps, Slate, Meagher & Flom
                             LLP
                             333 West Wacker Drive, Suite 2100
                             Chicago, Illinois 60606
                             Phone: (312) 407-0700
                             Fax: (312) 407-0411

                             Attn: Marian P. Wexler, Esq.

19.2    Governing Law.    This Agreement shall be governed and construed in accordance with the laws of the State of Illinois without regard to conflicts of laws principles thereof.

19.3    Entire Agreement.    This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated

hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

19.4   Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto along with the written consent of the Lender Agent, which consent shall not be unreasonably withheld or delayed.

19.5   No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

19.6   Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns.

19.7   Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

19.8   Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

19.9   Survival.  All representations, warranties, covenants and agreements made by the parties hereto shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

AGENT:

_____

By:
Its:

MERCHANT: FRIEDMAN'S, INC.

_____

By:
Its:

## LIST OF EXHIBITS

Exhibit 1
List of Stores

Exhibit 2
Sales Guidelines

Exhibit 3.1(d)
Expense Cap Schedule

Exhibit 3.3(b)
Form of Letter of Credit

Exhibit 3.4
Inventory Taking Procedures

Exhibit 4.1
Occupancy Expenses per Store

Exhibit 4.2(b)
Expense Letter of Credit

Exhibit 4.3
Expense Budget

Exhibit 12.1(g)
Historic and Customary Promotions by Store

<u>**Exhibit D**</u>

**Form of FF&E Disposition Agreement**

## PURCHASE AGREEMENT
## FURNITURE, FIXTURES AND EQUIPMENT

To Whom it May Concern,

      This letter will constitute the offer of the Buyer, _____, to purchase certain furniture, fixtures and equipment (collectively, the "FF&E") of _____, (hereinafter "Seller") located at the stores, as identified in <u>Exhibit "A"</u> attached hereto (each individually, a "Store" and collectively, the "Stores"), on the terms and conditions set forth herein. The FF&E shall specifically include, but not be limited to, those items identified in <u>Exhibit "B"</u> attached hereto, and the FF&E shall specifically exclude those items identified in <u>Exhibit "C"</u> attached hereto. Purchaser hereby offers to pay Seller a total, all-cash purchase price of $_____ for the FF&E (the "Purchase Price").

      Upon execution of this Agreement by both parties, Buyer will send a deposit via wire transfer equal to ___% ($_____ ) of the Purchase Price as a good faith deposit ("Deposit") to be applied toward the payment of the Purchase Price, subject to the terms and provisions hereof. Payment of the remaining balance of ___% ($_____ ) shall be by wire transfer of immediately available funds to an account of the Seller or designated party on or before _____.

      The effectiveness of this Agreement against Buyer is conditional upon approval by the United States Bankruptcy Court for the Southern District of Georgia.

**<u>Seller Represents and Warrants to Buyer</u>:**

1. Seller warrants that, upon approval of this Agreement, Seller holds good and marketable title to the FF&E free and clear of any and all restrictions on the transfer or assignment thereof, and that all FF&E shall be sold free and clear of liens or other encumbrances.

2. Upon approval of this Agreement, Seller shall have the right to sell the FF&E to Buyer.

3. The execution, delivery, and performance of this Agreement is, and constitutes, a valid and binding Agreement in accordance with its terms.

Seller Initials: _____        Master Page #:_____        Buyer Initials: _____

4.  The responsibility for insuring the building remains with the Seller, including any damages caused by natural disaster, fire, vandalism, or direct or indirect losses to the premises.

5.  To the best of Seller's knowledge, Seller represents that none of the FF&E contain any environmental hazards, toxic waste, or types of hazardous material in any form whatsoever and that Seller shall be solely responsible and liable for its storage and/or removal. Seller shall indemnify and hold Buyer harmless from any such environmental liability arising from any item of FF&E.

6.  Seller shall provide Buyer, at Seller's sole cost, all essential services, including an alarm system, telephone service, and utilities (utilities shall include lights, water, heat, air conditioning, rent, telephone service and any other services essential to the occupation of the various Stores).

7.  Buyer may use Sellers' business or trade name(s) in sale advertisements, upon prior review and approval by Seller, which approval shall be in a timely manner and not unreasonably withheld.

8.  Seller authorizes Buyer to conduct on-site sales and remove the FF&E with the right to abandon FF&E in place, in each case pursuant to store closing procedures approved by the Bankruptcy Court.

9.  Buyer shall have access to facilities during normal store hours for the purpose of showing and pre-selling FF&E. Buyer is aware that Seller may be conducting a Merchandise GOB Sale at the same time, and Buyer's actions and/or representatives must not interfere or impede the GOB in any manner. Availability of FF&E for removal will be at the discretion of Seller's Representatives until the end of their GOB sale. Such removal shall not be unreasonably withheld. GOB sales are scheduled to conclude on or before _____.

10.  On the day after the GOB sale ends in each store, Buyer will have sole possession of all FF&E and shared control of all facilities, loading docks, entrances and exits as Buyer deems necessary for the sale, removal, and cleaning of the various facilities. Seller's Representatives will be on hand to coordinate.

11.  Buyer must vacate all stores by midnight on _____ or ____ days after FF&E sales conclude in each store, whichever is later.

Seller Initials: _____     Master Page #:_____     Buyer Initials: _____

2

**Buyer Represents and Warrants to Seller:**

1. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of _____. Buyer has all requisite corporate power and authority to enter into this Agreement, and perform its obligations hereunder.

2. The execution, delivery, and performance of this Agreement have been duly authorized and approved by the Board of Directors of Buyer, and this Agreement constitutes a valid and binding agreement of Buyer in accordance with its terms.

3. Buyer will defend and indemnify Seller against the claims of any person, firm, or corporation resulting from the negligence or willful misconduct of the Buyer.

4. Buyer may remove any fixtures and equipment outlined in this Agreement.

5. Buyer will vacate and surrender the various locations on or before midnight _____, or ___ days after FF&E sales conclude in each store, whichever is later, and leave the stores in a broom clean condition with the right to abandon FF&E in place.

6. Buyer will supply a liability insurance policy in the amount of $ _____ naming Seller as co-insured.

7. This Agreement shall be governed by and construed and interpreted under the laws of the State of Georgia.

Seller Initials: _____      Master Page #:_____      Buyer Initials: _____

3

*The foregoing constitutes the entire Agreement between the Seller and Buyer, and no modification or amendment thereof shall be valid or binding unless and until reduced to writing and signed by each of the respective parties.*

**Seller:**                                    **Buyer:**

_____          _____
Signature                                      Signature

_____          _____
Print Name                                    Print Name

_____          _____
Title                                              Title

_____          _____
Date                                             Date

Seller Initials: _____     Master Page #:_____     Buyer Initials: _____

4

**EXHIBIT A**
(Locations)

**EXHIBIT B**
(Included in the Sale)

**EXHIBIT C**
(Excluded From the Sale)

Exhbit E
List of Closing Stores

| STORE # | CENTER | STREET ADDRESS | CITY | ST |
|---|---|---|---|---|
| 4000 | Norgate Plaza | 7255 North Keystone Ave, Suite A | Indianapolis | IN |
| 4005 | Dellview Market Place | 1803 Vance Jackson, Suite 400 | San Antonio | TX |
| 4006 | Mustang Shopping Center | 218 North Mustang Mall Terrace | Mustang | OK |
| 4008 | Knoxville Center | 3001 Knoxville Center Drive, Suite G10A | Knoxville | TN |
| 4011 | Shoppes at Fort Wright | 3450 Valley Plaza Parkway | Fort Wright | KY |
| 4012 | Centre at Lilburn | 40360 Lawrenceville Hwy Suite 09 | Lilburn | GA |
| 4013 | Indian Creek | 10625 Pendleton Pike Suite A-5 | Indianapolis | IN |
| 4014 | Greenfield Station | 1937 Melody Lane | Greenfield | IN |
| 4017 | Taylor'S Square | 3023 Wade Hampton Blvd Suite S | Taylors | SC |
| 4020 | Wal-Mart Supercenter | 2480 E. Wabash Street | Frankfort | IN |
| 4021 | Lawton Plaza | 2413 Northwest 67th Street | Lawton | OK |
| 4022 | Quincy Commons | 1978 Pat Thomas Parkway | Quincy | FL |
| 4023 | Millenia Plaza | 4640 Millenia Plaza Parkway | Orlando | FL |
| 4026 | Town & Country Shopping Center | 16763 Clover Road Unit 7 | Noblesville | IN |
| 4027 | Irving Mall | 3811 Irving Mall | Irving | TX |
| 4031 | Wal-Mart Supercenter | 2308 Treasury Drive, Suite A-1 | Cleveland | TN |
| 4034 | Waldon Park | 10900-B Lakeline Mall Drive, Suite 250 | Austin | TX |
| 4036 | Tyler Shopping Center | 6751 South Broadway | Tyler | TX |
| 5009 | Ashland Square Shopping Center | 123 Hill Carter Parkway | Ashland | VA |
| 5015 | College Park Plaza | 3467 W. 86th St | Indianapolis | IN |
| 5019 | Jasper Mall | 300 Hwy 78 East, Suite 154 | Jasper | AL |
| 5044 | Centre at Evans | 4455 Washington Road, Space 8 | Evans | GA |
| 5046 | Oliver Creek Crossing | 6535 Atlanta Hwy, Shop 5 | Montgomery | AL |
| 5054 | Whitewater Trade Center | 2110 Park Road | Connersville | IN |
| 5062 | Colonial Mall Myrtle Beach | 10177 North King's Highway | Myrtle Beach | SC |
| 5072 | Shannon Mall | 553 Shannon Mall | Union City | GA |
| 5078 | Lakeland Plaza | 543 Lakeland Plaza | Cumming | GA |
| 5079 | Town Center Mall, Suite 160 | 400 Earnest Barrett Pkyway | Kennesaw | GA |
| 5081 | Cumberland Mall | 1165 Cumberland Mall | Atlanta | GA |
| 5082 | Oak Hollow Mall | 921 Eastchester Drive, Suite 2060 | High Point | NC |
| 5089 | College Mall | 2862 East 3rd Street Suite B | Bloomington | IN |
| 5097 | University Square Mall | University Square Mall, Space 2159 | Tampa | FL |
| 5098 | Ennis Plaza | 1012 East Ennis Ave, Suite G | Ennis | TX |
| 5102 | Menger Crossing | 1375 South Main Street, Suite 201 | Boerne | TX |
| 5105 | Fleming Island | 5000 US Hwy 17 South Unit 15&16 | Orange Park | FL |
| 5106 | Gulf View Mall | 9409 US Hwy 19 Suite 215 A | Port Richey | FL |
| 5108 | North Hill Centre | 1186 North Hills Centre | Ada | OK |
| 5109 | Leigh Mall | 1404 Old Aberdeen Road Space 2B | Columbus | MS |
| 5110 | Clayton Town Center | 12977 US Hwy 70 West | Clayton | NC |
| 5112 | College Central Shopping Center | 2886 South Rutherford Blvd | Murfreesboro | TN |
| 5113 | Crystal River Mall | 1801 North West Hwy 19, Suite 413 | Crystal River | FL |
| 5118 | Bradford Plaza | 701 N Main Street, Suite 701 | Stillwater | OK |
| 5122 | Colerain Towne Center | 10206 Colerain Ave #21 | Cincinnati | OH |
| 5123 | Walmart Shopping Center | 1539 Martin Luther King Blvd, Suite 108 | Houma | LA |
| 5124 | Scioto Square | 1637 US Route 36 East | Urbana | OH |
| 5128 | Troy Towne Center | 1875 West Main Street Suite A-102 | Troy | OH |
| 5135 | Grant Line Center | 2936 Grant Line Road | New Albany | IN |
| 5137 | Riverboat Plaza Shopping Center | 1800 Wayne Road Unit B | Savannah | TN |
| 5138 | Wal-Mart Shopping Center | 2202 Hwy 431 | Boaz | AL |
| 5139 | The Shoppes at Lexington | 541 West Church Street, Suite E | Lexington | TN |
| 5142 | The Shops at Selmer | 1017 Mulberry Ave | Selmer | TN |
| 5145 | Mane Street Centre | 1866 N. Mane Street Space A-7 | Shelbyville | TN |
| 5147 | Casselberry Square | 1455 Semoran Blvd Suite 213 | Casselberry | FL |

1

Exhibit E

List of Closing Stores

| STORE | CENTER | STREET ADDRESS | CITY | ST |
|-------|--------|----------------|------|-----|
| 5149 | Townfair Center | 1987 S. Hurstbourne Parkway | Louisville | KY |
| 5150 | | 260 Forest Gate Center, Shop #7 | Brevard (Pisgah Forest) | NC |
| 5153 | Wilker Plaza Shopping Center | 802 US 421 West | Wilkesboro | NC |
| 5161 | Crossroads Statesville Center | 1116 Crossroads Dr | Statesville | NC |
| 5167 | Wal-Mart Center | 257 Premier Blvd | Roanoke Rapids | NC |
| 5168 | Expo Center | 1301 Hervey Street, Suite A | Hope | AR |
| 5169 | North Summit Square | 264 Summit Square Blvd | Winston Salem | NC |
| 5171 | Wal-Mart Plaza | 2239 N Morton Street, Suite F | Franklin | IN |
| 5173 | Woodward Plaza | 3305 First Street | Woodward | OK |
| 5180 | Diamond Plaza | 906-908 Ruth Street | Sallisaw | OK |
| 5181 | Davis Towne Crossing SC | 8528 Davis Blvd Suite 205 | North Richland Hills | TX |
| 5182 | Durant Shopping Center | 519 University Place Unit 201 | Durant | OK |
| 5190 | Northlite Commons | 2239 Spider Drive North East | Concord | NC |
| 5193 | The Shoppes at Northport | 5550 McFarland Blvd Suite 400 | Northport | AL |
| 5195 | Pulaski Shopping Center | 1653 W. College Street | Pulaski | TN |
| 5197 | Salisbury Mall | 1935 Jake Alexander Blvd West Suite B-F | Salisbury | NC |
| 5200 | Austin Highway Shopping Center | 1432 Austin Hwy Suite 102 | San Antonio | TX |
| 5213 | Greenwood West SC | 2326 Highway 82 West | Greenwood | MS |
| 5219 | Monkey Junction Plaza | 5120 South College Road Space 104 | Wilmington | NC |
| 5230 | Columbus Corners | 212 Columbus Corners | Whiteville | NC |
| 5231 | The Oxford Marketplace | 2545 W. Jackson Ave. | Oxford | MS |
| 5234 | Pemberton Square Mall | Pemberton Square Blvd, Space 39 | Vicksburg | MS |
| 5245 | Piedmont Mall | 325 Piedmont Drive, Suite C | Danville | VA |
| 5246 | Wilders Grove Shopping Center | 4111 New Bern Ave | Wilders Grove | NC |
| 5250 | Franklin Plaza Shopping Center | 289 Franklin Plaza Shopping Center | Louisburg | NC |
| 5254 | Tri-Lake Shopping Center | 105-3 John R. Lovelace Dr. | Batesville | MS |
| 5266 | Eastland Mall | 5521 Central Ave, Space Dt 9 | Charlotte | NC |
| 5280 | Janaf Shopping Center, Unit 150 | 5900 Virginia Bch Blvd | Norfolk | VA |
| 5310 | Fort Henry Mall | 2101 Fort Henry Drive, Space E-32 | Kingsport | TN |
| 5326 | Prien Lake Mall G-7 | 404 W. Prien Lake Road | Lake Charles | LA |
| 5333 | Crescent Commons S.C. | 2016 Kildaire Farm Road | Cary | NC |
| 5338 | Jacksonville Plaza | 2070 John Harden Drive, Suite M | Jacksonville | AR |
| 5351 | Cades Center | 1401 West Reelfoot Ave, Suite 107 | Union City | TN |
| 5353 | Audubon Village | 2480 US 41 North Suite T | Henderson | KY |
| 5355 | Eagle Ridge Mall | 758 Eagle Ridge Drive | Lake Wales | FL |
| 5363 | Brazos Mall | 100 Hwy 332 W. , Suite 1320 | Lake Jackson | TX |
| 5376 | Talladega Commons SC | 216 Haynes Street, Suite A | Talladega | AL |
| 5380 | Arrowhead Mall | 501 N. Main Street | Muskogee | OK |
| 5381 | Fox Run Shopping Center | 751 N. Solomns Island Road | Prince Frederick | MD |
| 5384 | | 1079 Hwy 90 E. Suite 2 | Bayou Vista | LA |
| 5385 | Golden Triangle Mall | 2201 South IH-35E, Suite M-6 | Denton | TX |
| 5395 | Selma Plaza | 2414 Kimble Road, Suite B | Selma | AL |
| 5404 | Shawnee Shopping Center | 4903 North Union Suite 121 | Shawnee | OK |
| 5405 | Surfside Commons SC | 2723 Beaver Run Blvd | Surfside Beach | SC |
| 5409 | University Mall, Suite A-13 | 1235 East Main Street | Carbondale | IL |
| 5414 | Mcalester Retail Shops Center | 522 S. George Nigh Expressway, Suite A | McAlester | OK |
| 5418 | Valley Mall, Suite 500 | 1925 E. Market Street | Harrisonburg | VA |
| 5422 | Heritage Park Mall, Suite F-7 | 6763 East Reno Street | Midwest City | OK |
| 5423 | North Park Village SC | 101 North Park Drive | Monticello | AR |
| 5441 | Sunset Mall | 1182 Sunset Mall, Space 1338 | San Angelo | TX |
| 5442 | Landmark Crossing | 1312 Bridford Parkway, Suite 102 | Greensboro | NC |

2

List of Closing Stores

| STORE # | CENTER | STREET ADDRESS | CITY | ST |
|---|---|---|---|---|
| 5443 | Sampson Crossing | 1407-G Sunset Avenue | Clinton | NC |
| 5470 | Post Oak Mall, Space 4018 | 1500 Harvey Road | College Station | TX |
| 5480 | Capital Plaza | 5453 North IH-35 | Austin | TX |
| 5495 | Lexington Parkway Plaza | 47 Plaza Parkway | Lexington | NC |
| 5498 | North West Crossing | 6731 Clinton Hwy | Knoxville | TN |
| 5501 | Tri-Rivers Plaza | 3459 Old Halifax Road, Suite E | South Boston | VA |
| 5522 | Hickory Hollow Mall | 5252 Hickory Hollow Pkwy | Antioch | TN |
| 5530 | South Central Shopping | 639-B Veterans Parkway, Suite -2A | Moultrie | GA |
| 5534 | | 240 Century Plaza, Space Bu10 | Birmingham | AL |
| 5538 | Vernon Park Mall | Vernon Park Mall, Suite H-8 | Kinston | NC |
| 5555 | 2031 White Marsh Mall | 8200 Perry Hall Blvd | Baltimore | MD |
| 5564 | Quail Springs Mall | 2501 W Memorial Rd | Oklahoma City | OK |
| 5568 | North Star Mall | 7400 San Pedro #132 | San Antonio | TX |
| 5572 | Ridge Parker Shopping Center | 1907 W. Parker Road, Suite #E | Jonesboro | AR |
| 5575 | Anderson Mall | 3101 N. Main Street, M-11 | Anderson | SC |
| 5608 | Golden East Crossing | 1100 Wesleyan Blvd. #148 | Rocky Mount | NC |
| 5618 | Shops On The Circle | 3500 Ross Clark Circle, Suite 350 | Dothan | AL |
| 5634 | Madison Shopping Center | 1670 Eatonton Road | Madison | GA |
| 5640 | Jasper Plaza, Space #C-3.1 | 860 West Gibson | Jasper | TX |
| 5651 | Columbus Park Crossing | 5555 Whittlesey Blvd, Suite 2590 | Columbus | GA |
| 5654 | Jennings Plaza | 307 Interstate Drive, Suite A | Jennings | LA |
| 5660 | Seminole Wal-Mart Center | 3633 South Orlando Drive | Sanford | FL |
| 5661 | Atlantic Village Shopping Ctr | 983 Atlantic Blvd | Atlantic Beach | FL |
| 5672 | Seguin Corners Shopping Center | 580 State Highway 123 | Seguin | TX |
| 5673 | Village Square | 3132 College Drive Bldg A, Suite E | Baton Rouge | LA |
| 5674 | University Center | 1655 East Industrial Loop | Shreveport | LA |
| 5678 | Carson Pointe | 7458 Chapman Hwy | Knoxville | TN |
| 5683 | Hunting Hills | 4208 I Franklin Road S.W. | Roanoke | VA |
| 5691 | Allen Central Market Place | 210 Central Expressway South Suite 68 | Allen | TX |
| 5697 | Montgomery Mall | 2739 Montgomery Mall, Suite D8 | Montgomery | AL |
| 5709 | Pennyrile Marketplace | 3028 Ft. Campbell Blvd | Hopkinsville | KY |
| 5718 | Scottsboro Market Place | 24833 John T. Reid Parkway | Scottsboro | AL |
| 5722 | Shady Brook Mall | 800 South James Campbell Blvd, Ste 32 | Columbia | TN |
| 5731 | Athens Shopping Center | 1001 Hwy 72 East Suite 4 | Athens | AL |
| 5735 | Dixieland Mall | 100 N. Dixieland Road Room C-6 | Rogers | AR |
| 5743 | Turfland Mall, Space #1246 | Harrodsburg Road | Lexington | KY |
| 5748 | El Dorado Commons | 2620 North West Avenue, Suite K | EL Dorado | AR |
| 5752 | Lexington Road Plaza | 519 Marsailles Road | Versailles | KY |
| 5754 | Three Star Mall | 1410 Sparta Road, Space #37 | McMinnville | TN |
| 5758 | Kelley Street | 242 Kelley Street | Lake City | SC |
| 5764 | Shreveport Plaza | 6205 West Port Avenue | Shreveport | LA |
| 5766 | Kerrville Junction Shopping Center | 1304 Junction Highway | Kerrville | TX |
| 5768 | Terrells Corner | 177 Sam Walton Way | Terrell | TX |
| 5770 | Emporia Commons | 301 Market Dr.,  Suite D | Emporia | VA |
| 5772 | Castleton Square Mall | 6020 East 82nd St.,  Room 410 | Indianapolis | IN |
| 5781 | Washington Square | 100 N. Wolfe Nursery Road, Suite D1A | Stephenville | TX |
| 5797 | Lafayette Square Mall | 3919 Lafayette Road,  Space 522 | Indianapolis | IN |
| 5803 | Wal-Mart Plaza | 1611 U.S. Hwy 231 South, Space 101-A | Crawfordville | IN |
| 5813 | Shoppes at Murray Central | 654 N. 12th Avenue | Murray | KY |
| 5825 | Bandera Pointe Shopping Center | 11321 State Hwy 16 North | San Antonio | TX |
| 5830 | Highland Lakes Town Center | 7357 West Colonial Drive | Orlando | FL |
| 5834 | Roanoke Landing | 819 East Blvd | Williamston | NC |

3

Exhibit E
List of Closing Stores

| STORE # | CENTER | STREET ADDRESS | CITY | ST |
|---------|--------|----------------|------|-----|
| 5836 | Hamilton Meadows SC | 1434 Main Street, Space 12 | Hamilton | OH |
| 5841 | Wal-Mart Plaza | 8650 Hwy 20 N Space C | Madison | AL |
| 5860 | The Henry Centre | 3538 Tom Austin Highway Suite 14 | Springfield | TN |
| 5868 | Fayette Square Shopping Center | 1359 Leesburg Avenue | Washington Court House | OH |
| 5874 | Atascosa Market Retail Center | 2087 W Oaklawn, Suite 208 | Pleasanton | TX |
| 5882 | Wal-Mart Center | 185 Relco Drive | Manchester | TN |
| 5883 | Calera Shopping Center | 233 Supercenter Dr. Suite C2 | Calera | AL |
| 5894 | Wal-Mart Plaza | 2551 East Main Street | Plainfield | IN |
| 5898 | Arkadelphia Plaza | 112 W.P. Malone Drive, Suite 5-E | Arkadelphia | AR |

4

## Exhibit F

**Severance and Retention Program**

# STORE LIQUIDATION COMPENSATION PLAN
### February 2005

Friedman's has made a prudent business decision to restructure the field organization by closing selected stores and liquidating aged merchandise. Our main priorities are to effectively retain and motivate key Associates in the closing stores, manage the inventory, accurately transfer merchandise, prevent theft and drive sales volumes throughout the restructure and liquidation period. Compensation is the key tool for retaining and motivating associates throughout this critical period as well as maintaining a positive relationship with customers. Their presence will facilitate an efficient wind-down and will help obtain the most value for the Company's assets on behalf of the creditors and other stakeholders to optimize the Company's emergence from bankruptcy. In order to ensure an effective and smooth transition, pre-petition base pay and incentive plans will be replaced with the following programs that have been created to drive expected performance.

▶ **PREMIUM BASE COMPENSATION**
- ➤ <u>Eligible</u>:     Store Managers, Assistant Store Managers, and Sales Associates.
- ➤ <u>Measure</u>:     Based on active employment status.
- ➤ <u>Funding</u>:     Store Manager New Base Pay Rate will consist of:
    - • Current Base Pay Rate, *plus*
    - • Deposit Commission (previous 12 month average).

    All Other Associate's New Base Pay Rate will consist of:
    - • Current Base Pay Rate, *plus*
    - • Incentive Pay (previous 12 month average including sales commission, and sales quota incentives).
- ➤ <u>Period</u>:     February 15, 2005 through the individual store close date.
- ➤ <u>Payments</u>:     Bi-weekly.

▶ **MERCHANDISE TRANSFER INCENTIVE**
- ➤ <u>Eligible</u>:     Selected District Managers, Store Managers, and Assistant Store Managers.
- ➤ <u>Measure</u>:     Based on the timeliness and accuracy of all merchandise, pulled, keyed, tagged, and transferred in/out of each closed store.
- ➤ <u>Funding</u>: Up to three funding levels may be paid upon successful completion of merchandise being shipped out and picked up by UPS by February 21, 2005 and merchandise being received and entered into the POS system by March 2, 2005.

    | | |
    |---|---|
    | District Manager | $3,000 ($1,000 In-coming/$1,000 Out-going and $1,000 bonus if both accomplished timely). |
    | Store Manager | $1,500 ($500 In-coming/$500 Out-going and $500 bonus if both accomplished timely). |
    | Assistant Store Manager | $600 ($200 In-coming/$200 Out-going and $200 bonus if both accomplished timely). |

- ➤ <u>Period</u>:     February 15, 2005 to March 5, 2005.
- ➤ <u>Payment</u>:     First pay period following completion of each reconciliation.

▶ **INVENTORY (SHRINK) INCENTIVE**
- ➤ <u>Eligible</u>:     Selected District Managers, Store Managers, and Assistant Store Managers.
- ➤ <u>Measure</u>:     Based on the quality of inventory preparation activities and execution of operation procedures.
- ➤ <u>Level</u>:     Minimize inventory shrinkage at or below acceptable individual store goal percentage.
- ➤ <u>Funding</u>: District Manager     $3,000

    | | |
    |---|---|
    | Store Manager | $1,500 |
    | Assistant Store Manager | $500 |

- ➤ <u>Period</u>:     February 15, 2005 to March 5, 2005.
- ➤ <u>Payment</u>:     Pay period following completion of reconciliation.

▶ **ETHICS POINT INCENTIVE**
- ➤ <u>Eligible</u>:     All Associates.
- ➤ <u>Measure</u>:     Based on reported incidents of theft, misuse of Company assets, Company policy violations or other related activity reported through Ethics Point and validated by investigation.
- ➤ <u>Funding</u>: $250 for each confirmed violation reported.
- ➤ <u>Period</u>:     February 15, 2005 through the individual store close date.
- ➤ <u>Payments</u>:     Immediately following completion of the investigation.

► **SEVERANCE**
- ➢ <u>Eligible:</u>         Regional Vice Presidents, District Managers, Store Managers, Assistant Store Managers, and Sales Associates.
- ➢ <u>Measure:</u>        Based on company policy and length of service.
- ➢ <u>Funding:</u>Regional Vice President:

|                        | Length of Service    | Amount of Severance |
|------------------------|----------------------|---------------------|
|                        | Up to 2 years        | 12 weeks            |
|                        | 2 to 5 years         | 16 weeks            |
|                        | 5 years and beyond   | 24 weeks            |
| District Manager:      |                      |                     |
|                        | Length of Service    | Amount of Severance |
|                        | Up to 2 years        | 4 weeks             |
|                        | 2 to 5 years         | 12 weeks            |
|                        | 5 years and beyond   | 16 weeks            |
| All Other Associates:  |                      |                     |
|                        | Length of Service    | Amount of Severance |
|                        | Less than 1 year     | 1 week              |
|                        | 1 to 7 years         | 1 week plus 1 week for each complete year of service |
|                        | 7 years and beyond   | 8 weeks             |

- ➢ <u>Period:</u>         Regional Vice President:  Must be actively employed on February 15, 2005.
                        District Manager:          Must be actively employed on March 7, 2005.
                        All Other Associates:      Must be actively employed on the store close date.
- ➢ <u>Payments:</u>       Bi-weekly until end of salary continuation period.

---

**DISCLAIMERS**

- Must be actively employed and in good standing during the entire incentive/bonus period as stated above in order to be eligible for payment.
- All operational disciplines must be in line with Company Policy to receive some or all incentive payments.
- Progressive disciplinary action will be taken due to unacceptable performance or gross negligence.
- Executive management reserves the right to modify or change any or all of the above programs.