FILED

2005 MAR -1 P 12: 26

U.S. BANKRUPTCY COURT
SAVANNAH, GA.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-40129 |
| | ) | |
| FRIEDMAN'S INC., et al., | ) | Chapter 11 |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Lamar W. Davis, Jr. |
| | ) | |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS
## TO DEBTORS' MOTION FOR ORDERS GRANTING
## AUTHORITY TO CLOSE CERTAIN STORES
## AND CONDUCT STORE CLOSING SALES

Friedman's Inc. ("Friedman's") and seven of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), hereby reply to the five objections filed by certain of the Debtors'

landlords[1] to the Debtors' Motion for (I) An Order Approving the Procedures by

which the Debtors May Select A Closing Store Agent, and (II) An Order Approving

---

[1] The objecting landlords are CBL Associates & Associates Management, Inc. and Glimcher Properties Limited Partnership (Docket No. 259) (the "CBL Objection"); New Plan Excel Realty Trust, Inc., Aronov Realty and Federal Realty Investment Trust (Undocketed) (the "New Plan Objection"); General Growth Management, Inc., Gregory Greenfield & Associates, Ltd., and BV Belk Properties (Undocketed) ( the "General Growth Objection"); Tri-Lakes Village, LLC (Undocketed) (the "Tri-Lakes Objection"); Regency Centers Corporation (Undocketed) (the "Regency Objection") (collectively, the "Landlords").

the Terms of a Merchandise Disposition Agreement and the Conduct of Store

Closing Sales (Docket No. 175) (the "Motion")[2] as follows:

### PRELIMINARY STATEMENT

1.      In seeking authority to conduct the Store Closing Sales, the Debtors

served the Motion and the related store closing order on over 1,500 parties-in-interest

including landlords, attorneys general, advertisers, vendors, utility companies, local

law enforcement officials, taxing authorities and others potentially affected by the

Store Closing Sales.  Of all the parties served, the Debtors received only five limited

objections, each of which was filed by a landlord of the Debtors (the "Landlord

Objections").[3]

2.      The Landlords raise a limited number of specific concerns, each of

which, along with the Debtors' specific response, is identified on the attached Exhibit

A (the "Objection Chart").  In general, the Landlord issues can be grouped into two

categories:  First, the Landlords challenge the Court's authority to invalidate

---

[2]Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

[3]The Debtors remain in discussions with respect to issues raised by several State Attorneys General.  Pursuant to an order of the Court entered on February 28, 2005, to the extent that any issues raised by the State Attorneys General are unresolved as of March 2, 2005, the State Attorneys General have until March 3, 2005 to file an objection and any matters raised therein (and only such matters) shall be heard on March 7, 2005.

restrictions in the relevant leases that could impair the Debtors' ability to conduct the Store Closing Sales.  As discussed herein, the Landlords do not cite to a single case in support of their view and, indeed, their assertion is contrary to the overwhelming weight of authority addressing the Court's authority to invalidate lease restrictions in order to facilitate a store closing program.  Alternatively, the Landlords argue that if the Court does prohibit enforcement of the restrictive lease terms, the Debtors' proposed Store Closing Procedures (attached as Exhibit 2 to the Order (A) Approving Store Closing Sales, (B) Authorizing the Debtors to Enter into Merchandise Disposition Agreement (C) Approving Employee Retention Program and (D) Granting Other Relief (the "Proposed Order")) should be modified to address various issues raised by the Landlords.  In general, those issues pertain to signage requirements, the duration of the sale, and the conduct of the Store Closing Sales.

3.      As evidenced by the numerous cases cited below wherein precisely the same relief has been granted, the Debtors submit that the relief requested is normal and customary under the circumstances. Indeed, the requested relief already strikes the "reasonable balance" to which the Landlords refer when weighing the Debtors' interest in maximizing the value of its assets against any alleged harm that could

befall a Landlord during the relatively short time period of the Store Closing

Program.[4]

ARGUMENT

A.    The Court Should Invalidate Any Restrictions in Leases that
      Impair the Debtors' Ability to Conduct the Store Closing Sales

4.    Certain Landlords assert that the Debtors should be required to comply

with all terms and conditions of the leases though unrelated to the Debtors' limited

request to invalidate restrictive lease provisions related to store closing sales.  The

Landlords must note that the Debtors are only requesting limited relief and will

continue to comply with their section 365(d)(3) monetary obligations, as required

under the Bankruptcy Code.  The precise relief the Debtors are requesting merely

authorizes the sales to occur notwithstanding contrary lease provisions, and the

Debtors fully intend to continue to perform rent, common area charges, real estate

taxes and other monetary obligations of this kind, as obligated by the Bankruptcy

Code.

---

[4]On February 28, 2005 the Debtors' filed and served the final agency
agreement (the "Agency Agreement") between the Debtors and a joint venture
comprised of Gordon Brothers Retail Partners, LLC, The Nassi Group, LLC, SB
Capital Group LLC and Bobby Wilkerson, Inc. (collectively, the "Agent").  The
Agent will act as the Debtors' exclusive agent for the purpose of selling all
Merchandise (as defined in the Agency Agreement) located in the 164 Closing Stores
set forth on Exhibit 1 to the Agency Agreement and, to the extent elected by the
Debtors, dispose of furniture, fixtures and equipment owned by the Debtors and
located at the Closing Stores ("FF&E").

5.     Moreover, many of the Landlords specifically request that the Court uphold lease provisions that prohibit store closing, going-out-of-business, inventory liquidation or similar sales.  The CBL Objection asserts that lease prohibitions should be upheld in the shopping center context "absent compelling factual or legal reasons to the contrary."  However, the Landlords cite no case or statute for either of these propositions.  As set forth below, there is substantial authority to the contrary.

6.     Lease provisions that prohibit going-out-of-business and similar sales have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets.  See In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (anti-going-out-of-business sales clause in lease is unenforceable); See In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (enforcement of anti-going-out-of-business sales clause would contravene overriding federal policy requiring debtors to maximize assets); In re Lisbon Shops, Inc., 24 B.R. 693 , 695 (Bankr. E.D. Mo. 1982) (same).

7.     In chapter 11, a debtor in possession has a duty under the Bankruptcy Code to administer estate property, to conduct estate financial affairs for rehabilitation purposes and to maximize creditor recovery.  A Court must weigh this congressional policy against a creditor's right to receive the benefit of its bargain, such as the Landlords' ability to enforce the restrictive lease provisions.  Essentially,

5

the Court must balance the Debtors' ability to effectively reorganize by means of the Store Closing Sales against the potential harm to the Landlord in refusing to enforce the restrictive lease provisions.  Where, as in these circumstances, the Debtors would receive a significant, tangible benefit in being allowed to conduct the Store Closing Sales and the Landlords have made no showing that they will suffer any substantial economic detriment as a result of the failure to enforce the relevant lease provisions, the Court should allow the Debtors to continue with the store closing process.

8.     To be clear, the Debtors are not seeking to invalidate lease restrictions in a vacuum.  To the contrary, the Debtors have proposed detailed Store Closing Procedures that provide adequate safeguards to protect the Landlords of the Closing Stores, while at the same time permitting the Debtors to obtain the greatest recovery for the bankruptcy estate.  The Store Closing Procedures include restrictions on signage, restrictions on marketing and advertising the Store Closing Sales as "going out of business" sales, "bankruptcy" sales, or other similar language, restrictions on the manner of solicitation of customers and various other restrictions on the conduct of the Store Closing Sales.  Furthermore, these Store Closing Procedures address typical concerns raised by landlords and are substantially similar to procedures previously approved by courts in other large chapter 11 retail cases.  See, e.g., In re Crescent Jewelers, Case No. 04-44416 (EDJ) (Bankr. N.D. Cal. Oct. 21, 2004); In re Florsheim Group Inc., Case No. 02-B-08209-13 (Bankr. N.D. Ill. March 25, 2002);

6

In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Mar. 6, 2002); In re Montgomery Ward, LLC, Case No. 00-4667 (RTL) (Bankr. D. Del. Jan. 24, 2001); In re Ames Department Stores, Inc., Case No. 01-42217 (REG) (Bankr. S.D.N.Y. August 20, 2001); In re Bradlees Stores, Inc., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan, 4, 2001); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1999); In re Hechinger Investment Company of Delaware, Inc., Case No. 99-2261 (PJW) (Bankr. D. Del. June 28, 1999); In re Service Merchandise Co., Case No. 399-02649 (GCP) (Bankr. M.D. Tenn. June 18, 1999); In re WSR Corp., Case No. 98-1241 (MFW) (Bankr. D. Del. Oct. 28, 1998).

9.     For these reasons, the Debtors believe that the Court should overrule the Landlords' attempts to enforce restrictive lease provisions which will preclude the Debtors from conducting the Store Closing Sales.

B.     The Conduct of Store Closing Sales Strikes Reasonable
       Balance Between Rights of Landlords and other Creditors

Alternatively, the Landlords request modifications to the Store Closing Procedures with respect to (i) signage, (ii) duration and (iii) the general conduct of the Store Closing Sales. As set forth below, the Store Closing Procedures adequately address the Landlords' concerns in this regard.

SIGNAGE

10.     The Store Closing Procedures already contain specific limitations as to size, number and placement of signs. For instance, paragraph 7 of the Store Closing

7

Procedures provides that "All display and hanging signs used by the Agent in connection with the Sale shall be professionally produced and all hanging signs shall be hung in a professional manner.  The Agent shall not use neon or day-glo signs. Agent shall be permitted to use interior banners in all of the Stores, and exterior banners at non-enclosed mall stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the Store and shall not be wider than the storefront of the Store."  This and similar provisions in the Store Closing Procedures relating to signage strike a reasonable balance between the interests of the Landlord and the interests of the Debtors in maximizing recoveries for the benefit of creditors.

11.     Though the Landlords cite concerns over the number, location and general aspect of signage, the Landlords do not articulate why the Debtors' proposed Store Closing Procedures are unreasonable or inadequate.  Instead, the Landlords seek to micro-manage the store closing process and require additional restrictions which are overly burdensome and harmful to the Debtors' efforts to conduct a successful Store Closing Sale without any corresponding benefit to the Landlord.

12.     For instance, some Landlords seek to limit the specific number of signs, some seek to limit the size and location of signs, and some wish to prohibit the use of all exterior signs and banners altogether.  The Debtors are seeking a modicum of uniformity to run the process and believe their proposed Store Closing Procedures

8

offer the most reasonable mix of signage limitations that will allow the Debtors to maximize the value of the Store Closing Sales while minimizing disruption to the Landlords and other tenants.  It is both unreasonable and impracticable for the Debtors to comply with and fashion an order that is able to account for the idiosyncratic requirements of each and every Landlord.  Furthermore, limiting the Store Closing Sales as the Landlords suggest, with no concomitant benefit to the Landlords (and certainly not to the Debtors' estates), runs afoul of the intended purpose of the Bankruptcy Code.

13.     The Debtors and their Agent will continue to work with the Landlords to address the Landlords' concerns after commencement of the Store Closing Sales. However, given that the Debtors already have satisfied most of the Landlords' concerns by providing for such minimum standards in the Store Closing Procedures, the Debtors believe all Landlord Objections with respect to signage should be overruled.

<u>DURATION OF THE STORE CLOSING SALES</u>

14.     The Agency Agreement provides that the Store Closing Sales shall be completed on or before June 15, 2005.  In the Motion, the Debtors originally contemplated completing the Store Closing Sales prior to Mother's Day (i.e., May 10, 2005).  However, none of the bidders submitted proposals wherein the Store Closing Sales could be completed within that time frame.  All bids required that the

Store Closing Sales take slightly longer, anticipating a termination date in late May or early June.  While the Debtors have attempted, for business purposes, to avoid negatively impacting go-forward stores, the Debtors have come to accept that the industry professionals bidding for employment are not able to complete the store closing process within the original time frame contemplated.

15.     The Landlords suggest that the Store Closing Sales be completed even earlier than what was targeted by the Debtors originally.  While the Debtors' management team has the same desire, this simply cannot be achieved.  The Debtors' merchandise that needs to be liquidated during this process is of such a nature that it will take longer to sell than was contemplated originally.

16.     In addition to attempting to limit the duration of the Store Closing Sales, certain Landlords specifically request that the Court prohibit the Debtors from attempting to extend the term of the Store Closing Sales without first receiving the consent of the Landlords.  The Landlords and the Debtors are mutually interested in concluding the Store Closing Sales as quickly as possible, but to hamstring the Debtors' store closing program by forcing them to rely on the consent of the Landlords could cause significant and irreparable harm should the Debtors require a short extension to complete all sales.

17.     Some Landlords also suggest that augmenting inventory will unnecessarily prolong the store closing process.  This is not necessarily true in this

case.  Augmentation attracts customers into the closing stores by filling holes in the existing inventory as to product mix and providing a more balanced mix of merchandise so as to facilitate sales of more slow moving items.  For instance, a customer may have no desire to buy a necklace without the matching earrings or bracelet.  The Agent can then add the matching earrings and/or bracelet to the Debtors' store inventory, thereby enabling a sale to a customer who would not have bought the necklace on its own.

18.     The Debtors would like to complete the store closing process as quickly as possible and believe that by augmenting inventory in the Closing Stores they will be able to increase customer traffic resulting in an increase of sales.

### CONDUCT OF THE STORE CLOSING SALES

19.     The Debtors already have provided relief for many of the objections raised by the Landlords with respect to the conduct of the Store Closing Sales.  For instance, certain of the Landlords request that the Court preclude solicitation by the Debtors or their Agent outside of the Debtors' stores.  The Debtors and their Agent already have satisfied this concern in paragraph 3 of the Store Closing Procedures, which prohibits the Debtors or the Agent from distributing any advertising materials outside of any Closing Store's premises, except as may have already been permitted in the lease or agreed to by the Landlord.

20.     Similarly, certain of the Landlords also request that the Court require the Debtors and their Agent to comply with lease provisions regarding the Store Closing Sales' hours of operation.  Again, the Debtors and their Agent have already satisfied this concern by providing in paragraphs 1 and 2 of the Store Closing Procedures that Store Closing Sales shall be conducted "during the normal hours of operation" and  in accordance with applicable state and local "Blue Laws."

21.     The Landlords also request that no auction or sale of FF&E or leased personal property shall be conducted at the stores.  The Debtors will not sell FF&E through auctions at store locations, nor will the Debtors sell any leased equipment pursuant to the Agency Agreement.  Furthermore, as provided in paragraph 6 of the Store Closing Procedures, all FF&E sold shall be removed either through the back shipping areas or after normal business hours to avoid disruption to the Landlords and other tenants.

22.     The Debtors believe that the Landlord Objections already have been adequately addressed by the Debtors in the Store Closing Procedures and the Proposed Order in the Debtors' attempt to fashion a mutually beneficial means of conducting the Store Closing Sales.

C.     <u>Miscellaneous Landlord Objections</u>

23.     Certain Landlord Objections request that the Debtors and Agent indemnify the Landlords in the event that the Landlords receive citations or fines

12

from local authorities relating to the conduct of the Store Closing Sales, including, in particular, signage. The Debtors believe that municipalities are unlikely to ignore an order issued by this Court. In the event that a municipality refuses to comply, the Debtors will work with the Landlord to address the concerns of the relevant municipality. However, it is beyond the pale to insist that a chapter 11 debtor indemnify a landlord. It is wholly unreasonable to expect the Debtors to indemnify the Landlords and to impose obligations on the Debtors beyond those which are afforded under the Bankruptcy Code.

24.     Several Landlords request expedited consideration by the Court of any objections to the conduct of the Store Closing Sales during the duration of such sales. First, such relief is not granted in the Case Management Order entered by this Court. Second, if an issue comes to a Landlord's attention, the Landlord should first raise this issue with the Agent, who the Debtors have every reason to believe will reasonably respond to the issue raised. If such is not the case and an emergency exists, the Landlord, at that time, can seek expedited relief with this Court, which the Debtors and other interested parties can respond to as appropriate under the circumstances which may then exist.

25.     Finally, the Landlords believe the Court should impose procedures for assignment and rejection of leases during the term and at the end of the Store Closing Sales. Specifically, certain Landlords assert that the Debtors must immediately reject

13

the relevant lease and return possession to Landlords upon conclusion of the Store Closing Sales or that the Debtors must market the lease during term of the Store Closing Sales.  A party cannot request affirmative relief by way of an objection or responsive pleading.  Moreover, the Debtors will be filing a subsequent motion seeking the approval of procedures for the assignment or rejection of the leases affected by the Store Closing Sales.  By the instant Motion, the Debtors are not seeking to assume, assign or reject any leases.  Accordingly, these objections are premature.  The Landlords are asking for items beyond the scope of relief requested in the Motion and the Landlords' rights are already being adequately protected by performance of the Debtors' monetary obligations under section 365(d)(3).

WHEREFORE, for all the foregoing reasons, the Debtors respectfully request that this Court overrule the objections and grant the Motion and such other and further relief as is just and proper.

Dated: Savannah, Georgia
March 1, 2005

Respectfully submitted,

By: _____
Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga. Bar No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE,
COURINGTON & CHISHOLM,
  A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000

and

John Wm. Butler, Jr.
George N. Panagakis
Timothy P. Olson
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

Attorneys for Debtors and
  Debtors-in-Possession

15

**OBJECTIONS TO MOTION TO APPROVE
STORE CLOSING SALE**

| | OBJECTION ASSERTED | OBJECTION DOCKET NUMBER[1] | RESPONSE |
|---|---|---|---|
| **A.** | **SIGNAGE OBJECTIONS** | | |
| 1. | Placement and appearance of signs should be subject to landlord's advance approval or court should set minimum standards as to signs. | 259 | Agents customarily work with landlords on signage issues; the Store Closing Sale Procedures are more than ample to protect landlord's interests. |
| 2. | Court should prohibit use or condition the number, size, style and location of *exterior* signs:<br>• No signs in street or access ways immediately adjacent to stores' premises.<br>• No balloons or similar items may be used on the exterior of any stores, nor may any such items be attached to the roof.<br>• Signs of 2-3 feet by 8-10 feet or similar length ("Banners") should be prohibited where stores face an interior area or in an enclosed mall and be limited to stand-alone stores or those shopping centers commonly referred to as "strip centers" or "community centers" where the store has frontage facing a street of highway.<br>• Banners shall be no larger than existing signs and shall be placed in proximity of existing sign<br>• No neon or "day glow" colors shall be employed. | 259: New Plan Excel, et al.; General Growth, et al.; Tri-Lakes; Regency Centers | Agents customarily work with landlords on signage issues; the Store Closing Sale Procedures are more than ample to protect landlord's interests. Additionally, many of the landlords concerns with respect to the Sales are already addressed in the revised Store Closing Procedures included as an exhibit to the proposed Agency Agreement which provide:<br>• All display and hanging signs used by the Agent in connection with the Sales shall be professionally produced and all hanging signs shall be hung n a professional manner.<br>• The Agent shall not use neon or day-glo signs<br>• Agent shall be permitted to use interior banners in all Closing Stores, and exterior banners at non-enclosed mall stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the Closing Store and shall not be wider than the storefront of the Closing Store.<br>• Neither the Debtors or Agent shall make any alterations to the storefront or exterior walls of any of the Closing Stores (including the removal of store signs) (the posting of signs, as provided herein, shall not be deemed an alteration). |



EXHIBIT A

| | | | |
|---|---|---|---|
| 3. | Court should condition the number, size, style and location of *interior* signs:<br>• Signs should be limited to one per window not to exceed 64" by 48", set back at least 12" from glass.<br>• No more than 8 hanging signs for each 1,000 square feet of leasable space<br>• Each sign not to exceed 37" by 26".<br>• Toppers not to exceed 7 ½" by 11", of the same color as store signs and limited to one for each rack, counter or shelf.<br>• No neon or "day glow" colors shall be employed.<br>• Banners limited to one per store in the rear 1/3 of the premises.<br>• Signs no larger than 22" by 28"<br>• May post maximum of 6 signs | 259: New Plan Excel, et al.; General Growth, et al. | See reply above comment 3. |
| 4. | Court should prohibit advertising and signage that refers to the following:<br>• going out of business sale<br>• bankruptcy sale<br>• court ordered sale<br>• liquidation sale<br>• chapter 11 sale<br>• lost our lease<br>• similar language<br>• No reference to landlord or mall<br>• Uniform for all locations<br>• Should only state "store closing sale"<br><br>Advertising and signage may indicate "Store Closing Sale". | 259: General Growth, et al.; Tri-Lakes | Agent does not intend to use any of the problematic language on its signs in connection with the Sales.  Moreover, paragraph 7 of the revised Store Closing Procedures specifically provides that sales will not be marketed as (1) "going out of business" sales and (2) in markets with go-forward stores, as "bankruptcy" sales.  In all other markets, advertisements will contain the words "store closing" or words of similar import. |

499940.04-Chicago Server 2A

Draft February 27, 2005 - 10:16 pm

| | | |
|---|---|---|
| 5. | Debtor must immediately remove non-conforming signs if confronted by governmental unit who does not accept Court Order. | General Growth, et al. | The Debtors will attempt to amicably resolve any dispute with a governmental unit that does not accept the Order in the event that any arises.  Furthermore, the Debtors are continuing to work with State Attorneys General from those states affected by the Sales and will continue to address their concerns as they arise during the duration of the Sales. |
| 6. | Landlords should be indemnified by the Debtors and Agent if the Landlord receives citations from local authorities as a result of conduct of Store Closing Sale as a result of the signage employed. | New Plan Excel, et al.; General Growth, et al. | The Debtors believe that municipalities are unlikely to ignore an order issued by this Court.  In the event that a municipality refuses to comply, the Debtors will work with the Landlord to address the concerns of the relevant municipality.  However, it is beyond the pale to insist that a chapter 11 debtor indemnify a landlord.  It is wholly unreasonable to expect the Debtors to indemnify the landlords and to impose obligations on the Debtors beyond those which are afforded under the Bankruptcy Code. |

499940/04-Chicago Server 2A

Draft February 27, 2005 - 10:16 pm

| B. | TIMING OBJECTIONS | | |
|---|---|---|---|
| 7. | Court should limit the duration of the Sales and the Debtors' ability to extend the term of the Sales:<br><br>• Limit sales to 60 days, and<br>• Establish April 30 termination date, and<br>• Extensions should not be granted without the written consent of the landlord. | 259; New Plan Excel, et al.; General Growth, et al.; Tri-Lakes; Regency Centers | The Debtors intend to complete the Sales before June 15, 2005 in accordance with the proposed Agency Agreement. The Debtors originally contemplated completing the Store Closing Sales prior to Mother's Day (May 10, 2005). However, none of the bidders submitted proposals to complete the sales in such time frame. While the Debtors have attempted to avoid negatively impacting go-forward stores, the Debtors have come to accept that the industry professionals bidding for employment are not able to complete the store closing process within the original time frame contemplated.<br><br>The Landlords and the Debtors are mutually interested in concluding the Store Closing Sales as quickly as possible, but to hamstring the Debtors' store closing program by forcing them to rely on the consent of the Landlords could cause significant and irreparable harm should the Debtors require a short extension to complete all sales. |
| 8. | The Debtors should not be able augment inventory. Augmenting inventory will only prolong the sale process. | 259; New Plan Excel, et al.; General Growth, et al. | Augmentation attracts customers into the closing stores by filling holes in the existing inventory as to product mix and providing a more balanced mix of merchandise so as to facilitate sales of slow moving items. A customer may not have bought a necklace without the matching earrings and/or bracelet. The Agent can add the matching earrings and/or bracelet to the Debtors' store inventory, thereby enabling a sale to a customer who would not have bought the necklace on its own. The Debtors would like to complete the store closing process as quickly as possible and believe that by augmenting inventory in the Closing Stores they will be able to increase customer traffic resulting in an increase of sales. |

499940/04-Chicago Server 2A

Draft February 27, 2005 - 10:16 pm

| C. | SOLICITATION, HOURS OF OPERATION, HOUSEKEEPING | | |
|---|---|---|---|
| 9. | Debtors and Agent must maintain certain pre-Store Closing Sale practices:<br>• No solicitation outside store premises<br>• Same "window dressings" shall be maintained<br>• Same "good housekeeping" standards<br>• Same Hours of operation and operating procedures shall be observed<br>• No handbills, leaflets or other advertisement outside premises | 259; New Plan Excel, et al. | The proposed Sales Procedures place precisely these limitations on the process and adequately address legitimate concerns of the landlords. Specifically, revised Store Closing Procedures provide for the following:<br>• Agent or Merchant shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises (such as parking lots or other retail locations within the same mall or center), except as permitted by the lease, previously permitted by the landlord or the mall managements, or agreed to by the landlord.<br>• Sales shall be conducted so that the Closing Stores remain open during the normal hours of operation provided for in the respective leases<br>• Debtors and/or Agent shall not conduct an auction or fire sale and shall abide by mall hours and all mall guidelines concerning, among other things, maintenance, security and trash removal.<br>• Debtors and/or Agent shall keep Closing Store premises and surrounding area clear and orderly consistent with present practices. |
| 10. | Sales should not be conducted in a manner disruptive to other tenants. | New Plan Excel, et al.; Tri-Lakes | The revised Store Closing Procedures provide for manner in which sales will be conducted, and adequate limitations so as not to disrupt other tenants. |

5

| D. | **FF&E/LEASED PROPERTY OBJECTIONS** | | |
|---|---|---|---|
| 11. | No auction or sale of fixtures or leased personal property shall be conducted at the stores. | 259 | FF&E will not be sold through auctions at store locations, and the Debtors will not sell any leased equipment pursuant to the Merchandise Disposition Agreement. Moreover, all FF&E sold will be removed either through the back shipping areas or after normal business hours to avoid disruption. The limitations on the sale of FF&E proposed by the Debtors are reasonable. |
| 12. | Any fixtures or personal property left at the store at the completion of the sale shall be deemed abandoned to the landlord. | 259; General Growth, et al. | This expands landlords' rights under the leases and the Bankruptcy Code, and there are no proper grounds asserted for this relief. The Objectors have provided no evidence to the contrary. The Debtors have included this relief in prior lease rejection orders. However, this Motion does not seek to reject or otherwise return the premises to the landlord. If the Debtors seek to reject the leases in the future, the Debtors likely will seek this relief. |
| E. | **ENFORCEMENT OF LEASE RESTRICTIONS AND 365(D)(3) OBLIGATIONS** | | |
| 13. | Debtors should be required to comply with provisions of the leases, including rent and other monetary provisions, through the date of lease rejection or assumption. | 259; General Growth, et al. | The Debtors will continue to comply with their section 365(d)(3) monetary obligations. Moreover, there is substantial legal authority providing that lease provisions that prohibit going-out-of-business sales are unenforceable in chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets. |
| 14. | The Agent shall comply with all term and conditions of the leases, and the Agent shall guaranty the prompt payment of all amounts owing by the Debtors under the leases. | 259 | The Debtors will continue to comply with their section 365(d)(3) monetary obligations. There is no basis to require the Agent to make or guaranty such payments. Landlords are not third party beneficiaries of the Merchandise Disposition Agreement. |

499940.04-Chicago Server 2A

Draft February 27, 2005 - 10:16 pm

| F. | LEASE ASSUMPTION, ASSIGNMENT & REJECTION | | |
|---|---|---|---|
| 15. | Court should impose procedures for assignment and rejection of leases during the term and at the end of the Sales:<br>• Debtors should not be allowed to "Go-Dark" indefinitely<br>• Debtor must immediately reject lease and return possession to Landlords upon conclusion of the Sales.<br>• Debtors must market lease during term of the Sales<br>• All assignments should be completed by the conclusion of the Sales.<br>• Leases not designated for assignment to third parties should be deemed rejected.<br>• Must give 10 days advance written notice of lease rejection<br>• Rejection effective as of later of (i) 10 day notice period; and (ii) date Debtors surrender possession by delivering keys | 259; General Growth, et al. | The Landlords cannot request affirmative relief by way of an objection or responsive pleading. Moreover, the Debtors will be filing a subsequent motion seeking the approval of procedures for the assignment or rejection of the leases affected by the Sales. By the instant motion, the Debtors are not seeking to assume, assign or reject any leases. Accordingly, these objections are premature. The landlords are asking for items beyond the scope of relief requested in the Debtors' motion and the landlords' rights are already being adequately protected by the Debtors' monetary obligations under section 365(d)(3). |

Draft February 27, 2005 - 10:16 pm

499940.04-Chicago Server 2A

| G. | MISCELLANEOUS OBJECTIONS | | |
|---|---|---|---|
| 16. | Debtors should be required to hold Sales at a location other than the Closing Stores. | 259 | This approach has never been required by any court or statute. Such an unreasonable request would dramatically increase the expenses of the Sales. |
| 17. | Landlords shall continue to have access to the Debtors' stores under the terms of the lease. | 259; Tri-Lakes | The Store Closing Procedures do not purport to limit any access rights the landlords may have under their applicable lease, except to the extent that such access would interfere with the Sales. |
| 18. | Store Closing Procedures should be amended to include the name, address and phone number of the contact person. | New Plan Excel, et al. | The contact information for the Agent is set forth in the Merchandise Disposition Agreement filed with the Court and posted at www.kccllc.net/friedmans. |
| 19. | The landlord shall be entitled to an expedited hearing before this Court with respect to any objection to the conduct of the Store Closing Sale<br>• three days notice<br>• two days notice | 259; New Plan Excel, et al.; General Growth, et al. | There is no basis to vary from the Case Management Order. If any issues arise, the Landlord should first raise this issue with the Agent, who the Debtors have every reason to believe will reasonably respond. If such is not the case and an emergency exists, at that time, the Landlord can seek expedited relief with this Court, which the Debtors and other interested parties can respond to as appropriate under the circumstances which may then exist. |

1.  

| Docket Number | Objecting Party |
|---|---|
| 259 | CB&L & Associates Properties. Inc. and Glimcher Properties Limited Partnership |
| [Undocketed] | New Plan Excel Realty Trust, Inc., Aronov Realty and Federal Realty Investment Trust |
| [Undocketed] | General Growth Management. Inc., Gregory Greenfield & Associates, Ltd., and BV Belk Properties |
| [Undocketed] | Tri-Lakes Village, LLC |
| [Undocketed] | Regency Centers Corporation |