FILED
2005 MAR 11 PH 3:34
U.S. BANKRUPTCY COURT
SAVANNAH, GA

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

|  |  |
|---|---|
| In re: | ) | Case No. 05-40129 |
| | ) | |
| FRIEDMAN'S INC., *et al.* | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hon. Lamar W. Davis, Jr. |

### JOINT APPLICATION OF OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C., ELLIS, PAINTER, RATTERREE & ADAMS LLP AND MESIROW FINANCIAL CONSULTING, LLC FOR AN ORDER AUTHORIZING THE REIMBURSEMENT OF FEES AND EXPENSES PURSUANT TO SECTIONS 503(b)(3)(D) AND (4) OF THE BANKRUPTCY CODE, OR IN THE ALTERNATIVE, LIFTING THE AUTOMATIC STAY TO ALLOW OSH&R TO APPLY OUTSTANDING AMOUNTS AGAINST THE RETAINERS

Otterbourg, Steindler, Houston & Rosen, P.C. ("OSH&R"), Ellis, Painter,

Ratterree & Adams LLP ("Ellis Painter") and Mesirow Financial Consulting, LLC

("Mesirow"; together with OSH&R and Ellis Painter, the "Applicants"), as and for this

joint application (the "Application") for Orders authorizing the reimbursement by

Friedman's Inc., *et al.*, (collectively, the "Debtors" or the "Company") of fees and

expenses incurred by the Applicants pursuant to Sections 503(b)(3)(D) and (4) of the

Bankruptcy Code, or in the alternative, lifting the automatic stay to allow OSH&R to

apply outstanding amounts owed to OSH&R and Ellis Painter against the Retainers (as

defined herein), respectfully represent and allege:

## I.     INTRODUCTION

1.     Each of the Applicants submit this Application in support of their requests

under Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for Orders granting the

503962.7



Applicants allowed administrative expense claims for fees and expenses incurred which made a substantial contribution to these cases.[1]  During the period from January 15, 2005 through and including January 25, 2005, OSH&R incurred fees and expenses in the total aggregate amount of $130,730.19, consisting of legal fees in the amount of $126,085.50 and expenses in the amount of $4,644.69.  During the period from January 15, 2005 through and including January 25, 2005, Ellis Painter incurred fees and expenses in the total aggregate amount of $8,504.10, consisting of (a) legal fees in the amount of $7,260.00 , and (b) expenses in the amount of $1,244.10.  During the period from January 24, 2005 through and including January 25, 2005, Mesirow incurred fees and expenses in the total aggregate amount of $23,331.00, consisting of (a) fees in the amount of $22,674.00, and (b) expenses in the amount of $657.00.

2.    At the conclusion of the January 14, 2005 meeting of the Informal Committee (as defined in the Applicants' retention applications) with the Debtors, and immediately prior to the commencement of these Chapter 11 cases, the Informal Committee, with the support of those vendors participating in the Vendor Program (as defined herein), determined that in the event such participating vendors comprised a majority of the Official Committee of Unsecured Creditors of the Debtors (the "Official Committee"), that the Official Committee would immediately retain OSH&R as counsel and Mesirow as financial advisors to the Official Committee.  The Informal Committee further authorized OSH&R to immediately retain Ellis Painter as local co-counsel to the

---

[1]    Pursuant to discussions with the office of the United States Trustee for the Southern District of Georgia (the "United States Trustee"), OSH&R and Ellis Painter previously sought reimbursement from the Debtors only for fees and expenses incurred during the period from January 24 through and including January 31, 2005, notwithstanding the fact that an interim Order was entered by this Court approving the retention by the Official Committee of OSH&R and Ellis Painter effective as of January 14, 2005.

Informal Committee, with the same understanding regarding representation of the Official Committee should participating vendors hold a majority of the seats thereon.

3.      Thereafter, and immediately upon formation of the Official Committee on January 24, 2005, six (6) of the participating vendors in the Vendor Program who were selected by the United States Trustee to serve as members of the nine (9) person Official Committee requested that the Applicants represent the Official Committee in these cases. Additionally, the Applicants were asked to prepare all necessary legal and financial information required in order to have a substantive and meaningful first meeting of the Official Committee on January 26, 2005.  On January 26, 2005, the full Official Committee endorsed the retention of each of the Applicants.[2]

4.      Each of the Applicants, prior to their selection as advisors to the Official Committee, performed numerous services[3] that made a substantial contribution to, and conferred a tangible benefit upon, the Debtors' estates.  As summarized below, OSH&R performed numerous services, including, without limitation, the following:

(a)      at the request of the Informal Committee, and upon the invitation of the Debtors, OSH&R traveled to Savannah, Georgia and attended meetings on

---

[2]      The retention applications submitted by each of the Applicants recites that the Official Committee decided on January 26, 2005 to retain the Applicants.  If this Court determines that January 26th was the actual date of the Applicants' retentions, then this Application requests reimbursement of fees and expenses incurred through the close of business on January 25, 2005.  If this Court determines that the Applicants were retained by the Official Committee on January 24th, as suggested by each of the Applicants herein, then this Application seeks reimbursement of fees and expenses incurred through the close of business on January 23, 2005.  For the sake of convenience, and to be conservative, the amounts sought by the Applicants to be reimbursed as allowed administrative expense claims in this Application reflect fees and expenses incurred through the close of business on January 25, 2005.

[3]      The descriptions and/or lists of those services provided by the Applicants do not constitute a complete recitation of all services performed.

January 16 and 17, 2005 at the Debtors' headquarters in connection with

the review and preparation of the Debtors' first day motions, all of which

were of urgent and critical importance to the vendor community and other

general unsecured creditors, and included, without limitation, the Debtors'

motion for use of cash collateral, motion to establish procedures with

respect to the treatment of reclamation claims, motion to pay shippers and

vendors for goods in transit, and motion to pay claims of consignment

vendors;

(b)     attended and actively participated, on behalf of the Informal Committee, in

the first day hearing held on January 18, 2005, a meeting with the United

States Trustee and a telephonic scheduling hearing with the Court on

January 19, 2005, the emergency debtor-in-possession ("DIP") financing

hearings held on January 20 and January 21, 2005, and expedited

discovery in connection with the Debtors' efforts to obtain DIP financing;

(c)     aggressively and successfully provided the Debtors and this Court with

comments and perspective from the standpoint of the Debtors' unsecured

creditors, which is very unusual at such an early stage in a bankruptcy

case;

(d)     prepared for and provided the Official Committee at the first meeting held

on January 26, 2005 with essential research, information and analysis of

numerous important issues impacting the Debtors' cases, including,

among other things, issues regarding the Debtors' proposed interim DIP

financing, which enabled the Official Committee to make informed

business decisions concerning a wide variety of issues.

5.    Ellis Painter, a recognized restructuring and bankruptcy firm located in Savannah, Georgia that is fully familiar with the local rules, practices, procedures and precedents, at the request of the Informal Committee and to assist OSH&R, performed numerous services, including, without limitation, the following:

(a)    assisted OSH&R and the Debtors in the review, analysis and preparation of the first day motions and orders;

(b)    prepared and filed a motion for pro hac vice admission of OSH&R in the Southern District of Georgia;

(c)    assisted OSH&R in the representation of the Informal Committee before this Court, including at the first day hearing, the meeting with the United States Trustee and the emergency DIP financing hearings; and

(d)    assisted OSH&R in preparation for the first meeting of the Official Committee held on January 26, 2005.

6.    Mesirow, at the request of the Informal Committee, performed numerous services, including, without limitation, the following:

(a)    reviewed and analyzed various financial information, including, among other things, the Debtors' balance sheets, cash flow statements and projections;

(b)    performed extensive analysis of numerous financial and liquidity issues impacting the Debtors' cases, including, among other things, issues

503962.7                                    5

regarding the Debtors' use of cash collateral and need for DIP financing; and

(c)     prepared detailed reports and other materials for the first meeting of the Official Committee held on January 26, 2005, including, among other things, detailed reports and analyses of the Debtors' proposed DIP financing arrangements.

7.     Based upon the substantial contribution made by the Applicants to the Debtors' estates, as described above and more fully herein, this Application should be granted.

## II.     BACKGROUND

8.     On January 14, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

9.     On January 24, 2005, the United States Trustee appointed the nine (9) member Official Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code. Thereafter, the Official Committee selected OSH&R to serve as its lead co-counsel, Ellis Painter to serve as its local co-counsel, and Mesirow to serve as its financial advisors.

### III.    The Services Performed by OSH&R,  Ellis Painter and Mesirow

A.    Section 503(b)(3)(D) and (4) of the Bankruptcy Code

10.    Section 503(b)(3)(D) and (4) of the Bankruptcy Code authorize the Court to allow as administrative expenses, reasonable compensation for professional services rendered by an attorney or accountant employed by a creditor, to the extent such expenses fall within the parameters described in Section 503(b)(3)(D) and (4).  Section 503(b)(3)(D) provides that after notice and a hearing, there shall be an allowed, administrative expense claim for the actual, necessary expenses incurred by a creditor in making a substantial contribution to a case under Chapter 11 of the Bankruptcy Code.  In applying the plain meaning of the text, courts have held that a substantial contribution is one that "fosters and enhances, rather than retards or interrupts the progress of reorganization."  See In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1253 (5th Cir.1986) (quoting In re Richton Int'l Corp., 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981)).  Other courts have required a showing that the creditors' actions must directly and demonstrably benefit the estate and be considerable in amount, value or worth.  See In re Kidron, Inc., 278 B.R. 626, 632-33 (Bankr. M.D. Fla. 2002).

11.    It is clear that a Court may award as an administrative expense compensation for legal and financial services rendered in making a substantial contribution to Chapter 11 cases.  This is so even if the services rendered by counsel are primarily for the benefit of its client. See Speights & Runyan v. Celotex Corp. (In re Celotex Corp.), 36 BCD 213 (11th Cir. 2000) (holding that an examination of a creditor's intent unnecessarily complicates the analysis of whether the creditor made a contribution

of considerable value or worth"). In this instance, there is no question that the Applicants have conferred a significant benefit to the Debtors' estates and have made a "substantial contribution" as required by Section 503(b)(3)(D) and (4).

B.    Pre-Petition Services Provided by OSH&R

12.    Prior to its selection as counsel to the Official Committee, OSH&R represented the Informal Committee, which was formed at the request of the Debtors on or about July 2004 to work with the Debtors in connection with, among other things, the negotiation and execution of a vendor support program (the "Vendor Program") and to assist with other vendor-related issues. Six participating vendors in the Vendor Program, including the three (3) largest unsecured creditors of the Debtors who were members of the Informal Committee, were selected to serve on the Official Committee. Unfortunately, notwithstanding the efforts of OSH&R and the Debtors' vendors, the Debtors were compelled to file the Chapter 11 petitions due to a variety of factors, including, among other things, certain funding limitations under the Debtors' prepetition financing arrangements.

13.    In connection with the efforts of OSH&R on behalf of the Informal Committee, and pursuant to the engagement letter dated July 26, 2004, effective as of July 11, 2004, and supplemented or modified by subsequent discussions, OSH&R periodically invoiced the Debtors, satisfied the invoices from retainers paid to it prepetition in the aggregate amount of $200,000 (the "Retainers"), and replenished the Retainers when further funds were received from the Company equal to the amount of the invoices. As of the Petition Date, the unapplied portion of the Retainers was

$145,968.76. During the period from January 15 through and including January 25, 2005, OSH&R incurred fees and expenses for services rendered (as described herein), at the request of the Informal Committee and for the benefit of the Debtors' estates, in the aggregate amount of $130,730.19, consisting of legal fees in the amount of $126,085.50 and expenses in the amount of $4,644.69, for which OSH&R has not been paid. Detailed time and disbursement records are attached as exhibits to OSH&R's First Monthly Statement for Compensation and Reimbursement of Expenses.

C.    Services Provided by OSH&R and Ellis Painter in Savannah, Georgia

14.    On Sunday, January 16, OSH&R, at the request of the Informal Committee and upon the invitation of the Debtors, and on Monday, January 17, 2005, OSH&R and Ellis Painter, met and conferred with the Debtors' and their advisors at the Debtors' headquarters in Savannah, Georgia. The purpose of these meetings was to assist the Debtors in the review and preparation of the Debtors' first day motions, all of which were of urgent and critical importance to the vendor community. OSH&R and Ellis Painter successfully provided a voice for unsecured creditors during the initial stages of the Chapter 11 process, something that is almost unheard of in most Chapter 11 cases.

15.    Thereafter, OSH&R and Ellis Painter prepared for and appeared on behalf of the Informal Committee at the Debtors' first day hearing held on January 18, 2005. OSH&R assisted the Court by providing certain background information regarding the events leading up to the Chapter 11 filings and the Informal Committee's position on certain key motions.[4] Ellis Painter was instrumental in familiarizing OSH&R with local

---

[4]    Annexed hereto as Exhibit "A" are pages 32-34 of the Transcript from the first day hearing held

practices and procedures and conferring on accepted forms of relief in this jurisdiction. In a meeting on January 19, 2005 among OSH&R, Ellis Painter and the United States Trustee, OSH&R and Ellis Painter provided the United States Trustee with crucial details and other information regarding, among other things, the Debtors' relationship with the their largest vendors, potential conflicts of the unsecured creditors and background of the events leading up to the Chapter 11 filings. Also on January 19, 2005, OSH&R and Ellis Painter participated in a telephonic hearing with this Court that was called on an emergency basis to address issues relating to the timing of the hearing to consider the DIP financing motion.

16. On January 20 and January 21, 2005, OSH&R and Ellis Painter actively participated in the emergency DIP financing hearings. At the DIP hearings, OSH&R advised the Court of its representation of the Informal Committee, as well as the fact that the Informal Committee would cease to exist once the United States Trustee appointed the Official Committee.[5] At each of the DIP hearings and expedited discovery and meetings, OSH&R and Ellis Painter vigorously represented not only the Informal Committee, but all of the Debtors' unsecured creditors, to ensure that the terms of the DIP financing arrangements were fair and reasonable to the Debtors' constituencies and would help garner much needed vendor support, without which, a successful

---

on January 18, 2005 which include certain preliminary comments made to this Court by Glenn Rice at the hearing, including advising the Court that OSH&R was "invited" to assist the Debtors in preparation for the first day hearing.

[5] Annexed hereto as Exhibit "B" are pages 28-30 of the Transcript of the DIP hearing held on January 20, 2005, which Transcript includes further comments made by Glenn Rice on behalf of the Informal Committee and confirms this Court's belief that Mr. Rice's statements were "helpful" to the Court. Additionally, annexed as Exhibit "C" are pages 32-36 of the Transcript of the DIP hearing held on January 21, 2005 whereat Mr. Rice advised this Court that the Debtors' unsecured creditors supported the Debtors' efforts. More importantly, the Court on page 41-42 commented that everyone hade a "very long week" and thanked all those participating in the hearing for "all the hard work and the give and take that went into it in getting to this point in the case."

reorganization would be impossible to achieve.

17.    OSH&R and Ellis Painter expended a significant amount of time and effort assisting the Debtors and this Court with the all-important first day hearing and subsequent DIP financing hearings.  Because these cases were filed suddenly, and because the Debtors were in the midst of securing merchandise for their second busiest holiday, Valentine's Day, it was critical that the Debtors obtain the immediate support of the vendor community, which holds the vast majority of the aggregate unsecured debt of the Debtors.  At the request of the Debtors, OSH&R arranged for Michael Shaffet of M. Fabrikant & Sons, Inc., one of the Debtors' largest vendors and the co-chairman of the Informal Committee, to travel to Savannah, Georgia in preparation for sworn testimony at a contested DIP hearing on January 21, 2005.  During the course of settlement negotiations, which ultimately resulted in a consensual interim DIP financing agreement, the participation of Mr. Shaffet, OSH&R and Ellis Painter was critical and essential to the consensual outcome.

D.    Services Provided by the Applicants Upon Formation of the Official Committee

18.    Following the appointment of the Official Committee on January 24, 2005, six (6) of the vendors who were selected to serve on the Official Committee requested that the Applicants represent the Official Committee in these cases.  The vendors further requested that the Applicants review and analyze various financial information of the Debtors, including balance sheets, cash flow statements and projections, and prepare cogent and logical summaries of the first day motions and analysis of the Debtors' financial position, in anticipation of the first meeting of the

Official Committee to be held on January 26, 2005. Each of OSH&R and Mesirow prepared substantial and comprehensive reports for the Official Committee which enabled the Official Committee to make reasonable business decisions with respect to a whole host of important issues.

E.    In The Alternative, The Automatic Stay Should be Lifted In Order To Allow OSH&R to Apply the Outstanding Fees and Expenses of OSH&R and Ellis Painter Against the Retainers

19.    Should this Court deny OSH&R's request for reimbursement pursuant to 503(b)(3)(D) and (4), OSH&R requests, in the alternative, that this Court lift the automatic stay to allow OSH&R to apply the sum of $139,234.29, inclusive of fees and expenses incurred by Ellis Painter in the amount of $8,504.10, against the Retainers. OSH&R further requests authority to retain the remainder of the Retainers to pay any fees, charges and disbursements which remain unpaid through the end of these cases, subject to further order of this Court.

20.    The Applicants have been advised that each of the Debtors and the Official Committee support either form of relief sought in this Application and agree that the various services, advice and analysis performed by the Applicants conferred a substantial contribution and tangible benefit upon the Debtors' estates. The Applicants' efforts at the early stages in the Debtors' cases were critical in, among other things, the Debtors' ultimately obtaining interim DIP financing with the full support of the Official Committee and the Debtors' major vendors. The Applicants also provided the Debtors and this Court with significant comments and perspective from the standpoint of the

Debtors' unsecured creditors, as confirmed by the Debtors and this Court on record at the first day and DIP hearings.  Based upon the substantial contribution made by the Applicants to the Debtors' estates, this Application should be granted.

## IV.    CONCLUSION

21.    Based upon all of the foregoing, the Applicants respectfully seek and believe that their requests for reimbursement of fees and expenses incurred are fair and reasonable based upon their substantial contribution to these case.  In the alternative, should this Court deny this Application, OSH&R requests that this Court lift the automatic stay to allow OSH&R to apply the sum of $139,234.29, inclusive of fees and expenses incurred by Ellis Painter, against the Retainers previously paid to it by the Debtors.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, the Applicants respectfully request entry of Orders (1) authorizing and directing the Debtors to reimburse OSH&R for fees and expenses incurred in the aggregate amount of $130,730.19, (2) authorizing and directing the Debtors to reimburse Ellis Painter for fees and expenses incurred in the aggregate amount of $8,504.10, (3) authorizing and directing the Debtors to reimburse Mesirow for fees and expenses incurred in the aggregate amount of $23,331.00, or (4) in the alternative, lifting the automatic stay to allow OSH&R to apply the amount of $139,234.29, inclusive of amounts due and owing to Ellis Painter, against the Retainers, and (5) granting the Applicants such other and further relief as may be just and appropriate.

Dated: Savannah, Georgia
      March 11, 2005

                                      Respectfully submitted:

                                        David W. Adams, Esq.
                                        Ellis, Painter, Ratterree & Adams LLP
                                      Co-Counsel to the Official
                                        Committee of Unsecured Creditors
                                        of Friedman's, Inc., et al.
                                        2 East Bryan Street, 10th Floor
                                        Savannah, Georgia 31401
                                        (912) 233-9700

                                          and

                                      OTTERBOURG, STEINDLER, HOUSTON
                                      & ROSEN, P.C.
                                      Scott L. Hazan, Esq.
                                      Glenn B. Rice, Esq.
                                      Co-Counsel to the Official
                                      Committee of Unsecured Creditors
                                      of Friedman's, Inc., et al.
                                      230 Park Avenue
                                      New York, New York 10169
                                      (212) 661-9100

and

MESIROW FINANCIAL CONSULTING,
LLC
James B. Feltman
Lisa Ashe
Financial Advisors to the Official
Committee of Unsecured Creditors
of Friedman's, Inc., et al.
345 Park Avenue
New York, New York 10154
(212) 954-7042

# EXHIBIT A

503962.7

1  committee, because I happen to believe it is going to the

2  same generally, with some additional appointees, the same

3  creditors who represent our largest creditors are going to

4  be supportive of what we're trying to accomplish.  But we

5  certainly offer that, Your Honor, because we don't want

6  anyone to believe that we're not trying to make sure there

7  is an appropriate statutory review, committee review of what

8  we're proposing.

9         THE COURT:    Mr. Rice.

10        MR. RICE:    Thank you, Your Honor.  Glen Rice,

11  Otterbourg, Stein, Houston and Rosen, counsel for the

12  Informal Creditors Committee as that term is defined in

13  Mr. Cusano's affidavit.

14         A as Mr. Butler advised you, Your Honor, the

15  Informal Committee was organized -- my recollection is the

16  third week in July of 2004 -- to assist the company in its

17  restructuring efforts.  The Trade Vendor Main Program was

18  documented and came into existence simultaneously with the

19  new credit facility in the middle of September of 2004 as

20  well.

21         The participants in that program are 45 vendors

22  which represent -- and I'll have to check with Mr. Cusano --

23  my guess is somewhere between 75 and 90% of the total vendor

24  debt of this company.  Of those 45 vendors that participate

25  in the program, 22 are on the list of the top 30.  The top

1   three creditors, which are Fabrikant, Rosy Blue and Design

2   Works, all participate in the program, and represent roughly

3   50% of the total vendor debt in the case, about 35 Million

4   Dollars.

5           So, I think what Mr. Butler just mentioned to you

6   probably is accurate.  You'll see that those vendors who

7   served on the Informal Committee as representatives -- and

8   there are eight of them -- for the 45 others that signed up

9   for the program represents substantially all of the vendor

10  debt in this case.

11          And aside from that debt, Your Honor, the only

12  other debt that I see on that list of the top 30 is the

13  advertising agency and former counsel to the company, which

14  is Alston & Bird.

15          As is customary for the Skadden, Arps firm, which

16  I have been fortunate or unfortunate in my career to have

17  had many cases with them as debtor counsel and my firearm as

18  creditor counsel, on Friday, we were invited on behalf of

19  the committee to join with the Skadden team, so to speak,

20  which consisted anywhere between four and eight, depending

21  on which time they arrived, over the course of the weekend

22  at the company's headquarters in preparation, to prepare

23  these First Day motions which are before you today, because

24  they did ask for the Informal Committee's input.

25          My colleague and I, Ms. Feeny and Mr. Adams joined

1  us on Monday, and on Sunday worked through these motions,

2  gave our comments on behalf of the Informal Committee, and

3  in fact, there were three or four of the First Day motions

4  which you will hear that are extremely important to these

5  vendors who need the support the company, and those three or

6  four motions, which we'll get to during the course of the

7  day, have the input of this committee.  And the debtor has

8  adopted virtually every single recommendation and suggestion

9  that we have made.

10        So, I understand the U.S. Trustee's concerns that

11  an official committee have the right to review and comment

12  upon these motions.  And again, Your Honor, if that official

13  committee is dominated by the majority of those members of

14  this Informal Committee, then I think for the most part,

15  these motions have been reviewed, commented upon and revised

16  in accordance with the Informal Committee's recommendations.

17        THE COURT:    Mr. Dobbs.

18        MR. DOBBS:    Good afternoon, Judge Davis.  Again Ed

19  Dobbs appearing on behalf of Bank of America.

20        Your Honor, I would like to survey, if I could,

21  just give a brief overview of the existing credit facility

22  and the secured debt structure of this company, because it's

23  slightly unusual.  And I think it may be a relevant to a

24  thorough understanding of some of the orders that may be

25  presented today for Your Honor's consideration.

# EXHIBIT B

503962.7

1    I wanted to make known to Your Honor on the record

2  as well.

3    MR. RICE:    Your Honor has asked for little bit of

4  preview as to what to expect tomorrow.

5    THE COURT:    Yes, sir.  And any comments on the

6  impasse that we have on this one issue.

7    MR. RICE:    Again, it is -- I'm not going to

8  comment upon Mr. Fellman's interpretation of what the law is

9  with respect to priming and not priming because I haven't

10  heard that argument before.  And I frankly don't know if he

11  is correct.  I just have never heard it before.

12    But I will tell you with respect to the business

13  judgment side of the debate that Mr. Butler raised, that --

14  and as I mentioned to Mr. Fellman last Friday, it is our

15  view that this company will not get terms or vendor support

16  so long as Farallon is the lender to this company.  And that

17  is a result -- and that is what the company understands as

18  well.  And that is a result of, among other things, direct

19  discussions between members and representatives of the

20  Informal Committee and Farallon that occurred, without

21  counsel, that occurred -- and that is why somebody is coming

22  down here to testify to that -- without counsel during the

23  early part of December when -- at least my understanding is

24  that they were assured that notwithstanding the waiver of

25  covenants defaults for October and November and anticipated

1  covenant defaults for the end of December that Farallon was

2  standing behind this company and would not, would not pull

3  the plug at the worst possible time of the year, which would

4  have been the first and second week in January, and

5  encouraged the vendor to continue to ship and increase their

6  exposure. That is the 30 to 35 million dollars that

7  Mr. Butler referred yesterday. That is the swing in the

8  secured debt from Tranche A to Tranche C.

9              And then what happened --

10             THE COURT:    Okay. I heard that earlier, and I

11 think I understand. But that was --

12             MR. RICE:    The vendors came in for another

13 30 million. Banks came down by 30 million.

14             THE COURT:    They got paid down --

15             MR. RICE:    Right.

16             THE COURT:    -- because your clients were shipping

17 goods.

18             MR. RICE:    The company sold the goods. Then the

19 vendor debt went up. Okay. They were supposed to get paid

20 down. And the January --

21             THE COURT:    And the revolving debt went down.

22             MR. RICE:    Yes. The revolving debt, yes.

23             THE COURT:    Roughly the same margin.

24             MR. RICE:    And after what they thought were

25 assurances -- again, this was business person to business

1  person, early December, keep shipping, don't worry, we all

2  know they are going to be covenant defaults, don't worry

3  about it.

4        And as a result of that, among other things -- and

5  again, I told Mr. Fellman this Friday.  Farallon has to be

6  taken out.  If it is not taken out, this company will

7  probably, in our view, only get product on cash in advance

8  basis.  Nobody will believe that another covenant default

9  won't be -- that at the right time, for Farallon, whenever

10 they feel like that the lending will stop, if they the right

11 to do it.

12       So, unless there's a replacement lender, I don't

13 believe that this company will ever get terms in Chapter 11.

14 And that's I think Mr. Butler was talking about by way of

15 business judgment.

16       MR. FELLMAN:    Very briefly, Your Honor, because I

17 don't want to do this hearing twice.

18       THE COURT:    I will be glad to hear from you, but

19 no allegation that is made today is deemed to be admitted if

20 it is not specifically responded to.  But this is helpful to

21 the Court.  So, I would like to hear your response.

22       MR. FELLMAN:    A couple of thoughts.  First our

23 testimony will certainly show that the factual assertions

24 that Mr. Rice made with reference toward us is just simply

25 not true.  That is simply not the way this situation came

# EXHIBIT C

503962.7

HRG RE FRIEDMANS 012105_3.txt

3   agreement.  we expect the agreement will go

4   forward.

5       We have -- there are some mechanisms to be

6   worked out, for example, in connection with the

7   measurement of net orderly liquidation value.

8   The definitions and all are in the prepetition

9   agreement, and that controls, but the basis for

10   how one will measure that going forward, we've

11   agreed we'll deal with that in good faith

12   between us on both sides, and we expect that to

13   be the standard on everything we all do

14   together going forward.

15       So, Your Honor, with that, I don't have

16   any other comments, unless Your Honor has

17   questions of me.  There may be other parties in

18   the courtroom that want to say something.

19       THE COURT:  Thank you.

20       Mr. Feldman, is there anything you'd like

21   to add at this point?

22       MR. FELDMAN:  No, Your Honor.

23       THE COURT:  All right.  Thank you.

24       Mr. Dobbs, anything?

25       MR. DOBBS:  Nothing further, Your Honor.

38

1   HEARING RE: FRIEDMAN'S, INC.

2       THE COURT:  Mr. Rice?

3       MR. RICE:  Your Honor, I represent the

4   Informal Committee, which has acted -- or

5   functioned since last July with the company,

6   and it was certainly at the request of the

7   company, after meeting last Friday with the

Page 32

HRG RE FRIEDMANS 012105_3.txt

8      Informal Committee, that we travel down here to

9      protect and represent the interests of those

10    trade vendors that were in what they call the

11    trade vendor program.  They are on a pro rata

12    peripestal (phonetic) basis, depending on the

13    amount of their debt.  I believe they are

14    partially secured creditors, depending upon how

15    you value the collateral.  I don't know what

16    percentage of the debt they may or may not

17    cover.  Certainly, at least in my view, there

18    is a significant portion -- I don't know how

19    much of it -- is unsecured or undersecured.

20        The U.S. Trustee will pick a committee, as

21    I'm advised, on Monday morning, or sometime on

22    Monday, and then that committee will begin to

23    function as of that date as the official

24    committee, at which point there won't be any

25    Informal Committee functioning anymore, so I --

39

1  HEARING RE: FRIEDMAN'S, INC.

2    whatever client I may have at the moment won't

3    exist on Monday.

4        On behalf of the interests of the

5    unsecured creditors, Your Honor, I'm here to

6    tell you that we have supported the DIP

7    proposal of Citibank certainly from the

8    beginning, and we certainly support this

9    settlement.  We certainly hope that there is a

10   final DIP which provides the company with even

11   greater liquidity and availability.

Page 33

HRG RE FRIEDMANS 012105_3.txt

12    And we're sort of in a position I think a

13    little bit more tenuous and a little bit more

14    difficult than we were last summer, when the

15    company needed from its vendor community

16    commitments to ship on normalized times, which

17    involved a standstill agreement on what was

18    past due at that time.  They're going to need

19    that same commitment again to ship on

20    normalized terms, which, usually defined, is

21    not less than 60 days, and there's going to

22    have to be another agreement or modification or

23    revision and an assumption of the existing

24    prepetition agreements in order to accomplish

25    that goal.

40

1  HEARING RE: FRIEDMAN'S, INC.

2    I believe that this is an excellent start

3    along that road, and it ought to provide the

4    company with the flexibility and the

5    availability of liquidity to get that

6    prepetition program somehow amended, revised,

7    assumed, if it is, in fact, an executory

8    contract.  I'm not sure what that animal really

9    was, when you read it, but I guess some people

10    can assume that it is an executory contract,

11    could be a financing agreement, but we can deal

12    with that at some other time.

13    And I'm really hopeful that that gets

14    accomplished and that the company moves forward

15    and is able to obtain the terms it needs from

16    its vendors in order to continue and turn

Page 34

HRG RE FRIEDMANS 012105_3.txt

17      itself around and get back to viability.

18          So on behalf of the unsecured creditors we

19      represent now, may not on Monday, we are

20      supportive of the -- of this settlement.

21          THE COURT:  Thank you.

22          Mr. James, anything from the U.S. Trustee?

23          MR. JAMES:  No, sir, not at this time.

24          THE COURT:  Is there anyone else who would

25      like to be heard?

                                                    41

1   HEARING RE: FRIEDMAN'S, INC.

2           All right.  If not, I'll be prepared to

3       review the order whenever it is submitted.  I

4       understand you're targeting that for some time

5       Monday, and if I'm not here, I can be tracked

6       down by my very able and tenacious staff, so

7       rather than you projecting a time, I'm

8       satisfied to leave it open.

9           I didn't mean that to sound critical,

10      although I guess it came across that way.

11          MR. RICE:  Your Honor, we're all hoping

12      the company projections are better than its

13      attorneys' projections.

14          THE COURT:  I should make comment that it

15      did not go without notice that pleadings,

16      briefs, supplemental pleadings, came in from

17      parties interested in this matter well after

18      the 9:15 time when I received the initial

19      submission from Jewelry Investors.  I think we

20      saw them come across the fax machine at

                        Page 35

HRG RE FRIEDMANS 012105_3.txt

21   3:00-something this morning and maybe again at

22   5:30 and at 6:00, so I know that a lot of folks

23   in this room and outside of this room had a

24   very long night and have had a very long week,

25   but I'm appreciative of all the hard work and

                                                        42

1   HEARING RE: FRIEDMAN'S, INC.

2        the give and take that went into it in getting

3        to this point in the case.

4            MR. BUTLER:  Your Honor, thank you, and

5        thank you again just now.  It's been a long

6        week.  It's been a productive week.  And last

7        Friday, this company unexpectedly found itself

8        in Chapter 11.  Now it has a package of first

9        stay orders and liquidity to move forward in

10       financing to bring inventory into its stores

11       for Valentine's Day and Mother's Day.  So we're

12       off to launch the case, and we'll be back next

13       hopefully in this matter in mid-February and

14       hopefully have good information and good news

15       for Your Honor in moving the case forward to

16       liquidity.

17           THE COURT:  And thank you for mentioning

18       that.  Whatever notices that may be out there

19       for February 11th, the parties wish to have

20       vacated and rescheduled for the 18th at

21       10:00 a.m.  Is that right?

22           MR. BUTLER:  Yes, Your Honor.

23           THE COURT:  I'm not sure if there's more

24       than just the cash collateral order at this

25       point, but we'll get on to that.