UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

**FILED**

2005 JUL 28 P 4: 10

U.S. BANKRUPTCY COURT
SAVANNAH GA.

| | | |
|---|---|---|
| In re: | ) | Case No. 05-40129 |
| | ) | |
| FRIEDMAN'S INC., *et al.* | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hon. Lamar W. Davis, Jr. |
| | ) | |

**FIRST APPLICATION FOR ALLOWANCE OF COMPENSATION AND
REIMBURSEMENT OF EXPENSES OF OTTERBOURG, STEINDLER, HOUSTON &
ROSEN, P.C., AS LEAD CO-COUNSEL TO THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR THE PERIOD
<u>JANUARY 15, 2005 THROUGH MAY 31, 2005</u>**

Name of Applicant:                    Otterbourg, Steindler, Houston & Rosen, P.C.

Authorized to Provide Services to:    Official Committee of Unsecured Creditors

Date of Retention Order:              February 4, 2005

Period for which Compensation/
Reimbursement is Sought:              January 15, 2005 through May 31, 2005

Compensation Sought as Actual,
Reasonable and Necessary:             $1,459,244.50[1]

Expense Reimbursement Sought as
Actual, Reasonable and Necessary:     $43,614.58[2]

This is an: _X_ interim ___ final application
The total time expended for fee application preparation and the corresponding compensation
requested will be addressed on the next interim fee application.

Prior Interim Fee Applications Filed by Applicant:  None

---

[1]  This amount includes an increase of $115.50 for services which were incurred during the First Interim Period
but not included in any of our prior monthly statements.

[2]  This amount includes an increase of $40.00 billed for telephone charges recorded during the First Interim
Period that were not previously billed in any of our monthly statements.

498161.7

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED

2005 JUL 28 ⌐ 4: 11

U.S. BANKRUPTCY COURT
SAVANNAH, GA.

| | |
|---|---|
| In re: | ) |
| | ) |
| FRIEDMAN'S INC., *et al.* | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |

Case No. 05-40129

Chapter 11
Jointly Administered

Hon. Lamar W. Davis, Jr.

**FIRST APPLICATION FOR ALLOWANCE OF COMPENSATION AND
REIMBURSEMENT OF EXPENSES OF OTTERBOURG, STEINDLER, HOUSTON &
ROSEN, P.C., AS LEAD CO-COUNSEL TO THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR THE PERIOD
JANUARY 15, 2005 THROUGH MAY 31, 2005**

TO:  THE HONORABLE LAMAR W. DAVIS, JR.,
     UNITED STATES BANKRUPTCY JUDGE:

The Application ("Application") of Otterbourg, Steindler, Houston & Rosen, P.C.,

("Applicant"), as lead co-counsel to the Official Committee of Unsecured Creditors (the

"Committee") of Friedman's Inc., *et al.*, (collectively, the "Debtors"), respectfully represents

and alleges:

## I.  INTRODUCTION

1.      Applicant, as lead co-counsel to the Committee, makes this first application for

payment of professional services rendered and expenses incurred in its representation of the

Committee as provided under Sections 105(a) and 331 of Title 11 of the United States Code (the

"Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

498161.7

2.     Applicant, for its first interim allowance, seeks an award of compensation in the amount of $1,459,244.50 for 2,828.7 hours of professional services rendered and reimbursement of disbursements actually and necessarily incurred in the amount of $43,614.58. These services were rendered, and disbursements recorded, from January 15, 2005 through May 31, 2005, both dates inclusive (the "First Interim Period").[3]

3.     In accordance with the Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals dated January 18, 2005 (the "Compensation Procedures Order"), the Debtors were authorized to pay certain professionals, including Applicant, eighty percent (80%) of fees and one-hundred percent (100%) of disbursements incurred on a monthly basis (the "Monthly Statements").

4.     Additionally, on March 11, 2005, Applicant filed the Joint Application for Order Authorizing Payment of Fees and Expenses Pursuant to Sections 503(b)(3)(D) and (4) of the Bankruptcy Code (the "Joint 503(b) Application"), in which Applicant requested the payment of fees in the amount of $126,085.50 and expenses in the amount of $4,644.69 incurred during the period from January 15, 2005 through and including January 25, 2005 (the "Pre-Retention Period"). The Court entered an Order on April 8, 2005 which approved the payment to Applicant of eighty percent (80%) of fees and one-hundred percent (100%) of disbursements incurred during the Pre-Retention Period (the "503(b) Order"). A summary of the Monthly Statements and the Joint 503(b) Application is attached as Exhibit "A". As with the Monthly Statements, the Joint 503(b) Application is subject to interim and final Court approval.

---

[3]   Applicant reserves the right to seek at a later date compensation for services rendered and reimbursement for expenses incurred during the First Interim Period which are not included herein.

5.    During the First Interim Period, Applicant has sought $1,459,244.50 in professional fees and $43,614.58 for disbursements, of which $1,167,303.20 and $43,574.58, respectively, has been paid to date by the Debtors in accordance with the Compensation Procedures Order and the 503(b) Order.  As of the date of this Application, Applicant is owed $291,941.30[4] for professional fees and $40.00[5] for disbursements incurred, which amounts have not yet been paid by the Debtors.

6.    Throughout the First Interim Period, Applicant has provided guidance to the Committee with respect to the complexities of the Debtors' Chapter 11 cases (the "Cases").  Applicant was in constant communication with the Debtors' professionals, counsel for Citicorp USA, Inc. ("Citicorp" or the "Bank Agent"), the postpetition lender, the Committee, and the Committee's professionals in order to regularly provide the Committee with advice relating to the Committee's rights and duties, as well as the Debtors' ongoing efforts to maximize value for creditors.  As a result of Applicant's services, the Committee's understanding of the myriad of issues presented by these Cases was greatly facilitated, enabling the Committee to work closely and cooperatively with the Debtors in their effort to promptly and effectively facilitate the Chapter 11 process.  Applicant has rendered services that effectuated results which will preserve value for the creditors, and has taken the necessary and appropriate steps to avoid unnecessary duplicative efforts with the other retained professionals in the Cases.  The services rendered by Applicant related to, among other matters relevant to the Debtors' cases, the following:

---

[4]    The difference between the professional fees requested ($1,459,244.50) and paid ($1,167,303.20), of $291,941.30, represents (a) twenty percent (20%) of the fees requested ($291,825.80) for the period of January 15, 2005 through and including May 31, 2005, which were held back in accordance with the Compensation Procedures Order and the 503(b) Order; and (b) $115.50 in fees incurred during the First Interim Period that were not previously billed in any of our monthly statements.

[5]    The difference between the expenses requested ($43,614.58) and paid ($43,574.58), of $40.00, includes telephone charges recorded during the First Interim Period that were not previously billed in any of our monthly statements.

3

(A)    Debtor-in-Possession Financing;

(B)    Asset Disposition;

(C)    Lease and Real Estate Issues;

(D)    The Review and Analysis of the Debtors' Financial Information and Business Operations;

(E)    Employee and Management Related Matters;

(F)    Equity Committee Issues;

(G)    Creditor Communication, Committee Meetings and Related Services; and

(H)    Fee and Employment/Retention Issues.

## II.    JURISDICTION

7.    This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§157 and 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

## III.    BACKGROUND

8.    Applicant is a professional corporation of attorneys organized and existing under the laws of the State of New York. Its office is located at 230 Park Avenue, New York, New York 10169. Among Applicant's expertise is the representation of creditors, creditors' committees and trustees in all facets of insolvency related proceedings.

498161.7                                4

9.      On January 14, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

10.     The Debtors have represented, among other things, that as of the Petition Date the Debtors operated the third largest chain in the United States of specialty jewelry stores devoted to the sale of fine jewelry through stores located in power strip centers and regional malls. The Debtors represented that as of the Petition Date they employed approximately 4,500 individuals and operated more than 650 retail stores in 22 Southeastern and Midwestern states. As of November 27, 2004, the Debtors represented that they had, on a book value basis, aggregate assets and liabilities of approximately $395,897,000 and approximately $215,751,000, respectively.

11.     On January 24, 2005, the United States Trustee for the Southern District of Georgia (the "United States Trustee") appointed the nine (9) member Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code. Thereafter, the Committee selected Otterbourg, Steindler, Houston & Rosen, P.C. ("OSH&R") to serve as its lead co-counsel. The Committee also selected Ellis Painter Ratterree & Adams LLP ("Ellis Painter") as its local co-counsel and Mesirow Financial Consulting, LLC ("Mesirow") as its financial advisors.

12.     On February 4, 2005, this Court entered an Order authorizing the retention of Applicant by the Committee.

13.     On June 3, 2005, the United States Trustee filed the Amended Appointment of Joint Committee of Unsecured Creditors, which advised of the resignations submitted by four (4)

498161.7                                          5

of the nine (9) Committee members.  On June 22, 2005, the United States Trustee filed the Amended Appointment of Joint Committee of Unsecured Creditors, which added two (2) Committee members, resulting in the current seven (7) member Committee.

14.     As this Court and all parties in interest are aware, prior to their selection as counsel to the Committee, OSH&R represented an informal committee of vendors of the Debtors (the "Informal Committee").  Six participating vendors in the Vendor Program (as defined below), including the three largest unsecured creditors of the Debtors who were members of the Informal Committee, are or were members of the Committee.  The Informal Committee was formed on or about July 2004 at the request of the Debtors to work with the Debtors in connection with, among other things, the negotiation and execution of a secured trade credit program (the "Secured Trade Vendor Program").  The Secured Trade Vendor Program provided for, among other things, the immediate standstill and eventual repayment of amounts outstanding and the reinstatement of merchandise shipping.  In support of the obligations incurred pursuant to the Secured Trade Vendor Program, the Debtors granted to William Kaye, as collateral trustee for the benefit of those vendors party to the Secured Trade Vendor Program (the "Collateral Trustee"), subordinated junior liens on substantially all of the prepetition collateral (the "Subordinated Vendor Liens").  The Collateral Trustee and the Collateral Trust Board (created as part of the Secured Trade Vendor Program) retained the firm of Cohen Tauber Spievack & Wagner, LLP to represent each of them in these Cases.

15.     In connection with the efforts of OSH&R on behalf of the Informal Committee, and pursuant to the engagement letter dated July 26, 2004, effective as of July 11, 2004, and supplemented or modified by subsequent discussions, OSH&R periodically invoiced the Debtors

and replenished the retainer previously paid and supplemented by the Debtors when payment of such invoices was received.

16.     Pursuant to the 503(b) Order, the Court allowed the payment to Applicant of fees and expenses in the amount of $130,730.19, which fees and expenses were incurred during the Pre-Retention Period.

## IV.     PROFESSIONAL SERVICES RENDERED

17.     During the First Interim Period, Applicant actively participated in the Cases and represented the Committee's concerns in an efficient and productive manner. Applicant worked closely with the Committee, as well as with the Debtors, Mesirow, Ellis Painter and other interested parties, to maximize recoveries and to safeguard the interests of general unsecured creditors. Applicant has taken the necessary and appropriate steps to coordinate efforts with the Debtors, Ellis Painter and Mesirow, which has ensured, to the best of Applicant's ability, that unnecessary duplicative efforts have not occurred in these Cases.   As set forth herein, Applicant's efforts assisted in the administration of the Chapter 11 Cases, the closure of unprofitable stores and disposition of inventory, reduced costs to the Debtors' estates, and benefits to general unsecured creditors.

18.     Pursuant to the Compensation Procedures Order, the Court approved the establishment of a Joint Fee Review Committee (the "JFRC") in the Cases, consisting of a representative of the Office of the United States Trustee, two representatives of the Debtors, and two representatives of the Committee. The JFRC developed the Joint Fee Review Protocol (the "Fee Protocol"), which governs, among other things, the filing and preparation of monthly fee

statements and interim fee applications.  The JFRC will review the interim fee applications that are filed and attempt to address any issues relating to fees in advance of the objection deadline.

19.    In order to assist the Court, the Debtors, the United States Trustee, the JFRC and other parties in interest in evaluating this Application for compensation, a summary sheet of the attorneys and paraprofessionals and their corresponding initials, billing rates and the number of hours incurred by each is annexed hereto as Exhibit "B".  A summary sheet which includes identification of services performed by the attorneys and paraprofessionals, categorized by Applicant into "project codes" in order to group related time entries in a certain subject area, is annexed hereto as Exhibit "C", together with the corresponding computerized time records which are being filed with the Court.  A computerized printout of Applicant's disbursements, necessarily incurred in the performance of Applicant's duties as counsel to the Committee, is annexed hereto as Exhibit "D".  Applicant's Affidavit pursuant to Bankruptcy Rule 2016(a) and Section 504 of the Bankruptcy Code is annexed hereto as Exhibit "E".

20.    Set forth below is a brief recitation of certain of the professional services rendered by Applicant during the First Interim Period.  In accordance with the Fee Protocol, Applicant has dispensed with a discussion of the legal standards for granting fee applications.  The following is not intended to be a complete statement of all professional services rendered, but serves only to provide general descriptions of the services of major importance rendered by Applicant during the First Interim Period, which required the special attention, efforts and skills of Applicant, grouped by certain categories which incorporate Applicant's project codes:

(a)    Debtor-in-Possession Financing

21.    On January 20, 2005, the Debtor filed an Application for Orders (i) Authorizing the Debtors in Possession to Enter Into Postpetition Credit Agreement and to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (ii) Granting Liens, Security Interests and Superpriority Claims, (iii) Providing for the Payment of Secured Prepetition Indebtedness, and (iv) Providing Adequate Protection to Prepetition Lenders for Granting of Section 364(d) Lien and the Use of Cash Collateral (the "DIP Motion"). Pursuant to the DIP Motion, the Debtors sought to enter into a $125 million Secured Priority Debtor in Possession Revolving Credit Agreement, dated as of January 31, 2005, as amended by Amendment No. 1 dated as of February 25, 2005 (the "Original DIP Credit Agreement"), with the Bank Agent. Applicant, with the assistance of Mesirow and Ellis Painter, reviewed and analyzed the terms and conditions of the Original DIP Credit Agreement and related documents and provided comments to the Debtors and their professionals. Applicant attended and actively participated in the hearings held on January 25, 2005 and February 18, 2005 in connection with the Debtors' request for interim and final approval of the Original DIP Credit Agreement. Applicant also participated in depositions prior to the January 25, 2005 hearing and negotiations with the pre-petition lenders which had objected to the DIP Motion. On February 18, 2005, this Court entered a final Order approving the Original DIP Credit Agreement.

22.    On or about February 25, 2005, the Debtors paid Jewelry Investors II, LLC ("Jewelry Investors") what the Debtors contended were all amounts (other than certain escrowed sums relating to professional fees) then due under the prepetition credit agreement. Jewelry Investors disputed this contention and asserted certain claims (the "Jewelry Investors Claims") against the Debtors under the prepetition credit agreement in the aggregate amount of over $13

498161.7                                              9

million (plus certain unliquidated amounts), including, but not limited to, claims for damages for the wrongful prepayment of certain of the Debtors' outstanding obligations under the prepetition credit agreement, claims for default interest, certain purported indemnification obligations of the Debtors and reimbursement of professional fees allegedly owed by the Debtors.

23.    Absent settlement of the disputes between the Debtors, the Committee and Jewelry Investors, the parties would have been involved in potentially costly and protracted litigation over the Jewelry Investors Claims.  Fortunately, the parties were able to avoid the potentially costly and protracted litigation by entering into a global settlement in which the Jewelry Investors Claims were allowed in the amount of $1.9 million and were purchased by Harbert Distressed Investment Master Fund, Ltd. ("Harbert").  The settlement further provided that the Jewelry Investors Claims would be converted into equity if Harbert is the plan sponsor.

24.    Thereafter, Applicant actively participated in numerous discussions with the Debtors and Harbert in connection with the proposed amendment to the Original DIP Credit Agreement.  Applicant reviewed, analyzed and advised the Committee with respect to the terms of the Amended DIP Credit Agreement (defined below).  Applicant, on behalf of the Committee, suggested certain modifications to the Amended DIP Credit Agreement, after which the Debtors' counsel incorporated certain of Applicant's suggestions.  On May 26, 2005, the Court approved the Amended and Restated Secured Super-Priority Debtor in Possession Credit Agreement, dated May 20, 2005 (the "Amended DIP Credit Agreement") among the Debtors and the Bank Agent, which restated in its entirety the Original DIP Credit Agreement.  The Amended DIP Credit Agreement established a term loan facility in the aggregate principal amount of $25,500,000 (the "Term Loan"), with a corresponding permanent reduction in the revolving loan facility, thereby making it a $99,500,000 revolving loan facility (the "Revolver").  Immediately upon the

498161.7                                  10

occurrence of the Effective Date, the Bank Agent assigned the Term Loan to Harbert. The Amended DIP Credit Agreement provides, among other things, that on the effective date of a plan of reorganization, and subject to the prior discharge of the Revolver indebtedness, Harbert will have certain rights with respect to conversion of the Term Loan into equity. The Amended DIP Credit Agreement further provides that the Debtors must file a plan of reorganization with the Court on or before February 28, 2006 and that such plan must permit the conversion of the Term Loan into equity. The Amended DIP Credit Agreement greatly enhances the Debtors' liquidity needs.

25. During the pendency of the Cases, Applicant, with the assistance of Mesirow, has continued to monitor the Debtors' financial condition and performance in connection with the financial covenants set forth in the Original and Amended DIP Credit Agreements and the Debtors' liquidity and projected borrowing needs.

(b) Asset Disposition

26. During the First Interim Period, the Debtors began preparations for its store closing initiative and going out of business sales. Applicant, on behalf of the Committee and with the assistance of a real estate subcommittee of the Committee (the "Real Estate Subcommittee"), worked closely with the Debtors in structuring the store closing initiative, including the assessment of bids from various liquidators to assist the Debtors in selling store merchandise, inventory and other assets. Additionally, Applicant discussed with the Debtors' representatives the timing and strategy for disposing of various assets.

27. In conjunction with their Chapter 11 filings and to facilitate an orderly restructuring of the Debtors' operations, the Debtors, on February 14, 2005, filed the Motion for

(I) an Order Approving the Procedures by Which the Debtors May Select a Closing Store Agent, and (II) an Order Approving the Terms of a Merchandise Disposition Agreement and Conduct of Store Closing Sales (the "Store Closing Motion").  Applicant suggested numerous revisions to the bid procedures for selection of the Store Closing Agent (as defined below) originally proposed by the Debtors in an effort to protect the interests of general unsecured creditors. Following numerous discussions with counsel for the Debtors, Applicant's suggested modifications were incorporated into the process.  On February 22, 2005, the Court entered an order approving the procedures for the selection of a Store Closing Agent, which provided that an auction be held on February 25, 2005 at the offices of the Debtors' counsel in Chicago, Illinois.  Applicant attended and was actively involved in the auction, including assisting in an analysis of the competing proposals to determine who submitted the "highest and best" bid to serve as the Debtors' Store Closing Agent.  After consultation by and among Applicant, the Debtors and their professionals, the Debtors selected a joint venture comprised of Gordon Brothers Retail Partners LLC, The Nassi Group, LLC, SB Capital Group LLC, and Bobby Wilkinson Inc., to serve as the Debtors' Store Closing Agent (the "Store Closing Agent"). During this entire process, Applicant kept the Committee fully informed as to the status and progress of the Debtors' efforts.

28.     Thereafter, the Court granted the Debtors authority to (i) discontinue operations at certain closing stores, (ii) enter into an inventory disposition agreement with the Store Closing Agent, and (iii) implement the store closing sales procedures (the "Store Closing Procedures").

29.     With Applicant's assistance, the Debtors implemented the Store Closing Procedures, which allowed the Debtors to close various underperforming and unprofitable stores and to liquidate the inventory and trade fixture assets located at the closing stores through going-

out-of business sales (the "Store Closing Sales").  Applicant and the Real Estate Subcommittee worked closely with the Debtors and the Store Closing Agent in developing a liquidation process that would maximize the recoveries to the Debtors' estates.  Applicant also conferred with the Debtors, the Store Closing Agent and the Real Estate Subcommittee with respect to the disposition of the Debtors' merchandise and other assets, including furniture, fixtures and equipment.  Applicant was in frequent, often daily contact with the Debtors' professionals regarding the procedures utilized to affect the Store Closing Sales and the disposition of assets.

30.    In connection with the store closings, the Debtors received authority to replace their prepetition base pay and incentive plans with a Store Liquidation Compensation Plan (the "Compensation Plan").  Pursuant to the Compensation Plan, various employees of the Debtors, including district managers, store managers, assistant store managers and sales associates, became eligible for certain base compensation, incentive payments and severance payments.  Applicant, with the assistance of Mesirow, reviewed and analyzed the Compensation Plan and made recommendations to the Debtors on ways to improve the Compensation Plan, while still providing sufficient incentives to the Debtors' employees to effect an efficient wind-down of the closing stores.

31.    In furtherance of the Debtors' restructuring efforts, the Debtors sought to sell and market many of their retail store leases, including 140 of their leases where the Debtors ceased operating (the "Closing Locations").  On April 1, 2005, the Debtors filed a Motion for Orders Establishing Bidding Procedures in Connection With the Disposition of Certain Leases and Approving the Disposition of Leases to the Successful Bidder (the "Bidding Procedures Motion").  The Debtors sought to ascertain whether the leases had any value by establishing procedures to sell the leases to the parties submitting the highest and best bids (the "Bidding

498161.7                                                      13

Procedures"). The Bidding Procedures provided alternative methods for the sale of the leases depending upon the buyer (e.g., retailers, real estate investors and other non-end users, and landlords).

32.    In light of the importance of disposing of the leases and the Closing Locations promptly, Applicant reviewed, analyzed and advised the Committee with respect to the Bidding Procedures Motion. Applicant suggested certain modifications to the Bidding Procedures Motion to the Debtors' counsel, which were incorporated by the Debtors' counsel. On April 19, 2005, the Court entered an Order approving the Bidding Procedures Motion. Unfortunately, there was not enough interest in the leases of the Closing Stores to warrant an auction. Notices of asset purchase agreements and termination agreements were filed with the Court on May 12, 2005.

33.    The store closing program terminated on June 16, 2005. The Debtors advised that any remaining closed stores would be rejected as of June 30, 2005. It is believed that the results of the Store Closing Sales exceeded expectations and that the Debtors will participate in the sharing arrangement with the Store Closing Agent above the guaranteed amount provided for in their retention arrangement.

(c)    Lease and Real Estate Analysis

34.    In connection with the efforts to maximize the value of the Debtors' real estate and in order to assist in the auction process, the Debtors entered into agreements with (i) Retail Consulting Services, Inc. for broker and disposition consulting services, (ii) Gemini Realty Advisors LLC for general real estate advisory services, and (iii) Abacus Advisors Group, LLC for advisory and consulting services in connection with inventory liquidations. Each of Gemini

and Abacus assisted the Debtors in analyzing their leases, identifying planned store closures, and preparing information and bid packages for liquidation of inventory. Retail Consulting was retained for the purposes of marketing and selling the properties, including certain leased locations at which the Debtors had already ceased operations prior to the Petition Date. Applicant reviewed, analyzed and advised the Committee with respect to terms of the retention agreements for Retail Consulting, Gemini and Abacus. The final orders approving the terms of the retentions for Gemini and Abacus were entered on February 23, 2005. The final order approving the retention of Retail Consulting was entered on March 24, 2005.

35.    During the First Interim Period, the Debtors also filed two (2) motions for orders authorizing the rejection of approximately 220 unexpired real property leases, including approximately 165 leases which were part of the Store Closing Motion, and approximately 56 leases where the Debtors ceased operations prior to the Petition Date. The Debtors and their professionals determined that the rejection of these leases would favorably affect the Debtors' cash flow and assist them in managing future operations. Applicant reviewed the lease rejection motions and sought to ensure that the Debtors did not reject potentially valuable leases or subject the estates to unnecessary rejection damage claims. Applicant also consulted with the Debtors and the Committee advisors to ascertain the value of the leaseholds and potential interest by third parties, as well as the process being utilized by the Debtors to determine which of the leases would be rejected.

(d)    Review of Financial Information/Business Operations

36.    Applicant, with the assistance of Mesirow, reviewed, analyzed and summarized a myriad of documents related to the Debtors' business and financial operations including, but not

limited to, (i) the Debtors' securities filings, (ii) weekly flash reports on operations; (iii) monthly operating reports; and (iv) various motions related to the Debtors' finances. Additionally, Applicant and Mesirow reviewed, discussed and summarized for the Committee numerous documents, various analyses, valuations, and projections relating to the Debtors' restructuring, the Debtors' reports to the Committee, and the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities.

37.     Such review and analysis of the Debtors' financial condition and projections was particularly important in connection with discussions with vendors regarding future shipments of merchandise on normalized terms. The normalization of trade terms was and is critical to improving and enhancing the Debtors' ability to successfully reorganize. The Committee utilized such financial analysis in negotiations with the Debtors concerning a global vendor program going forward.

(e)     <u>Vendor Related Matters</u>

38.     As previously discussed, prior to the Petition Date, many of the Debtors' vendors entered into the Secured Trade Vendor Program under which the vendor's pre-petition claims were secured by a subordinate lien on substantially all of the Debtors' assets granted in favor of the Collateral Trustee. During the Cases, certain of these vendors (the "Grantors") executed participation agreements with Harbert (the "Participation Agreements") whereby the Grantors granted 100% participation interests in their claims to Harbert. Upon information and belief, Harbert purchased in excess of $50 million of the Grantors' claims.

39.     On May 11, 2005, the Debtors filed their Motion to Authorize Debtors to Consent to Transfers of Participation Interests in Certain Secured Vendor Program Claims (the "Transfer

498161.7                                    16

Motion"). Pursuant to the Transfer Motion, the Debtors sought Court approval to consent to Harbert's and the Grantors' entry into the Participation Agreements and the subsequent assignment of the Grantors' claims to Harbert subject to the satisfaction of two conditions, one of which was that the Grantors would provide the Debtors with acceptable trade terms for 2005. Applicant spent a significant amount of time in reviewing and analyzing the terms of the Transfer Motion and the Participation Agreements. Applicant also researched, evaluated and analyzed the relationship between the Participation Agreements and the Secured Trade Vendor Program documents, focusing on the possible effects that the assignment of the Grantors' claims would have on the Debtors' estates and the permissibility of the Debtors' consent to assignment.

40.     Applicant, in association with Mesirow, Ellis Painter and the members of the Committee that were not Grantors, participated in lengthy and extensive discussions, meetings and conference calls with the Debtors, their professionals and/or Harbert regarding the various issues which arose out of the Transfer Motion and the Participation Agreements. Throughout Applicant's efforts in connection with this matter, Applicant counseled and advised the non-Grantor members of the Committee regarding the major issues that were raised by the Transfer Motion. Applicant specifically advised the Committee with respect to the effect of the Participation Agreements on the Debtors' restructuring efforts through a plan of reorganization.

41.     It was unclear in the Transfer Motion, whether the Committee's rights to later object to a plan of reorganization on any grounds, including the characterization of the Grantors' claims and the effect of the assignment on such claims, were fully reserved. Accordingly, at the direction of the non-Grantor members of the Committee, Applicant prepared a limited objection to the Transfer Motion seeking to fully reserve the Committee's rights with respect to any and all plan-related issues. As a result of extensive discussions with the Debtors' professionals,

498161.7                                    17

Applicant and the non-Grantor Committee members were assured by the Debtors, both during discussions and on the record at the hearing, that the Transfer Motion did not affect any of the Committee's rights. Thus, the Debtors and the Committee were able to amicably resolve the issue without the need to file the limited objection.

42. Applicant attended and actively participated in the hearing held on May 26, 2005, at which the Court approved the Transfer Motion. It is important to note that the order approving the Transfer Motion provides that the effectiveness of the Debtors' consent is conditioned upon (i) the occurrence of the effective date of a plan of reorganization and (ii) each Grantor's compliance with the Debtors' 2005 vendor program.

(f)    Employee Related Matters

43. It is often critical at the beginning of a bankruptcy case, when there is considerable uncertainty among the employees, to implement a program designed to provide economic incentive to employees for them to remain with the company during the reorganization process. The Debtors sought to implement such a program by way of the Debtors' motion to approve a key employee compensation program (the "KECP"). The KECP covers two subsets of the Debtors' employees. One subset is comprised of 83 of the Debtors' senior management level employees who work at the company's headquarters, or "support center," in Savannah, Georgia (collectively, the "Management"). The KECP as it relates to Management is comprised of three components: (i) an annual incentive plan; (ii) a severance plan; and (iii) an exit plan. The other subset of employees is comprised of approximately 3,000 non-management employees, including regional vice-presidents, district managers, store managers, assistant store managers, sales personnel and collections personnel and supervisors.

498161.7                                    18

44. Applicant performed an extensive review and analysis of the KECP and had numerous conference calls and meetings among a key employee compensation subcommittee of the Committee (the "KECP Subcommittee"), Mesirow and Ellis Painter to thoroughly understand the economic ramifications of the KECP and compare it to the programs of similar companies. Together with Mesirow and Ellis Painter, Applicant made recommendations to the KECP Subcommittee on ways to improve the KECP. The recommendations were designed to preserve the estates' assets, while still providing adequate economic incentive to the Debtors' employees. Applicant thereafter engaged in extensive negotiations with the Debtors' advisors, including several conference calls and in person meetings to discuss the KECP Subcommittee's concerns and recommendations. The result of these extensive negotiations was a modified plan that reduced payments under the program, while still providing substantial economic incentives to the Debtors' employees. The KECP was approved by the Court pursuant to an order dated April 4, 2005.

45. Another key concern of the Debtors in attempting to stabilize their businesses, was the retention of senior management to lead the Debtors through their reorganizations. Prior to the Petition Date, the Debtors entered into employment agreements with Sam Cusano ("Cusano"), C. Steven Moore, Eric Kovats and Steven J. Zeringue (collectively, the "Senior Management Employees"), each of whom was hired by the Debtors in connection with the Debtors' 2004 restructuring efforts. The Debtors also entered into one additional employment contract after the Petition Date. The Debtors sought Court approval to assume these agreements pursuant to a motion dated March 11, 2005.

46. Applicant performed an in depth analysis of the proposed employment agreements, paying particular attention to the compensation provisions for these executives.

Applicant compared the compensation packages for such executives with compensation packages of other executives in the industry, particularly similar retail chapter 11 cases in which Applicant had been involved in, and reviewed the roles to be held by each executive and the potential value they may add to the estate. In connection with Applicant's review of the employment agreements, Applicant had frequent conference calls and meetings with Mesirow, the Debtors and the Debtors' advisors regarding the agreements, as well as the Debtors' vision with respect to their management team. Applicant also met and spoke frequently with the KECP Subcommittee and the full Committee, keeping them apprised of management issues, and helping them to formulate recommendations to be made to the Debtors. Applicant presented the Committee's recommendations to the Debtors, and after some negotiation, Applicant and Debtors were ultimately able to amicably resolve any issues. The motion to approve the Debtors' assumption of the employment contracts was approved by the Court pursuant to an order dated April 4, 2005.

> (g)    Equity Committee

47.    During the First Interim Period, Regis Special Situations Fund, L.P. and The Yacktman Funds, Inc. (together, the "Shareholders") sent a letter to the United States Trustee requesting the appointment of an official equity security holders committee. Applicant reviewed and analyzed the letter filed by the Shareholders seeking the appointment of an equity committee, consulted with the Debtors to ascertain their position with respect to such request, and communicated with the Committee and the United States Trustee regarding issues raised by the Shareholders' request, including the potential increase in costs to the estate. Applicant also researched issues that arose in connection with the Shareholders' request, including issues relating to the standards for appointment and factors utilized by Courts in determining the need

498161.7

for such appointment.  On February 28, 2005, Applicant, on behalf of the Committee, sent a letter to the United States Trustee arguing against the appointment of an equity committee. Applicant also had several follow-up communications with the United States Trustee in response to specific questions that were raised.

48.     Applicant also participated in an in-person meeting in New York on April 15, 2005 among representatives of the Debtors, the Debtors' counsel and counsel to the Shareholders.  At the meeting, Applicant and the Debtors each explained to counsel for the Shareholder the many drawbacks and costs involved should an equity committee be formed in the Cases.  Ultimately, after several hours of discussions, the Shareholders' agreed to withdraw their request for the appointment of an equity committee.  Due in part to Applicant's efforts, the Debtors' estates were saved from a potentially costly litigation, as well as from those costs generally associated with the appointment of an equity committee.

(h)     Committee Meeting Related Work

49.     To ensure that the Committee was fully informed of all developments in these Cases, Applicant has extensively consulted and communicated with the Committee.  In most instances, Applicant has been in daily communication with Mesirow, Ellis Painter and the Committee Co-Chairpersons regarding the status of matters affecting the Debtors' estates. Applicant has spent a considerable amount of time coordinating the Committee, which is comprised of creditors located in different states, into a cohesive and responsive group.

50.     Applicant has continually sought to keep the Committee members fully apprised of matters related to these Cases.  In addition to regular oral and written communications with Mesirow,  the  Committee  Co-Chairpersons  and  other  Committee  members  and  their

50. Applicant has continually sought to keep the Committee members fully apprised of matters related to these Cases. In addition to regular oral and written communications with Mesirow, the Committee Co-Chairpersons and other Committee members and their representatives regarding pending matters in these Cases, Applicant prepared summaries and agendas, and organized, attended and participated in Committee meetings and/or Committee conference calls on the following dates: January 26, 2005, February 10, 2005, February 24, 2005, March 24, 2005, April 13, 2005, and May 11, 2005. Applicant also had periodic meetings and conference calls with the five (5) subcommittees established by the Committee to address issues of particular relevance to the Committee and to make reports and recommendations to the full Committee, including meetings and/or conference calls on the following dates: February 10, 2005, March 3, 2005, March 4, 2005, March 8, 2005, March 9, 2005, and May 11, 2005. Applicant prepared the necessary agendas and documents for distribution at all Committee and Subcommittee meetings in order to assist the Committee and Subcommittees in their understanding of the matters that would be addressed. These documents include, among other materials, minutes, status reports and summaries regarding the various applications, stipulations and orders submitted to the Court. Applicant also prepared the by-laws for the Committee.

51. Applicant devoted time to the review and negotiation of the Confidentiality Agreement proposed by the Debtors for use by the Committee, and participated in numerous discussions with Committee members and their counsel regarding the Agreement.

52. Applicant has also responded promptly to general inquiries from creditors regarding the progress and status of these Cases.

(i)      Fee Employment/Objections

53.      Applicant expended a significant amount of effort and time in drafting, revising and negotiating the terms of the Fee Protocol with the members of the JFRC.  In accordance with the Compensation Procedures Order, the JFRC was formed in order to, among other things, review compensation and expense reimbursement requests, and establish a process that will assist the Debtors in budgeting for the fees of retained professionals.  Applicant serves as an ex officio, non-voting member of the JFRC and participated in at least one (1) in-person meeting and two (2) conference calls of the JFRC.  Applicant was instrumental in drafting the Fee Protocol, incorporating the comments, revisions, and suggestions of the members of the JFRC. Applicant was successful in ensuring that the Fee Protocol properly took into account the goals and purposes of the JFRC.

54.      Applicant reviewed, analyzed and summarized the Debtors' motions related to the employment and retention of certain professionals, including, among others: (i) Skadden, Arps, Slate, Meagher & Flom LLP, as principal restructuring and bankruptcy counsel; (ii) Inglesby, Falligant, Horne, Courington & Chisholm P.C., as local reorganization counsel; (iii) Kurtzman Carson Consultants LLC, as claims and noticing agent; (iv) Kroll Zolfo Cooper ("Kroll"), as bankruptcy consultants and special financial advisors; (v) Jefferies & Co., Inc., as financial advisor and investment banker; (vi) White & Case LLP, as special litigation counsel; (vii) Abacus Advisors Group, LLC, as real estate advisor and consultant; (viii) First Annapolis Consulting, Inc., as credit consultants; (ix) Nixon Peabody LLP, as special counsel for the Audit Committee of the Board of Directors of the Debtors; (x) Retail Consulting Services, Inc., as asset disposition consultant; (xi) Jefferson Wells International, Inc., as internal accountants; and (xii) Sitrick and Company Inc., as corporate communications consultants.  Applicant also reviewed,

498161.7                                                     23

analyzed and summarized the Debtors' motion to approve professionals utilized in the ordinary course of business. Applicant reviewed the various supplements to the list of ordinary course professionals filed by the Debtors, and the various affidavits submitted by the ordinary course professionals in connection with the motion.

55.    In connection with the retention of Kroll, Applicant engaged in extensive discussions and negotiations with Kroll regarding Kroll's requested Consummation Fee in the amount of $1.5 million. Pursuant to the order entered on January 26, 2005, the Court approved Kroll's retention, subject to the right of the Committee to object to the requested Consummation Fee by a certain deadline. At the request of the Committee, Applicant prepared an objection to the Consummation Fee sought by Kroll on the basis that a guaranteed fee that was not tied to any performance metrics was unreasonable. Applicant advised both the Debtors and Kroll that the Committee was prepared to file the objection in the event that negotiations proved unsuccessful. The deadline to object to the Consummation Fee was extended on three (3) separate occasions, as Applicant, Kroll and the Debtors continued their negotiations. Through the efforts of all parties, this matter was ultimately settled, without the need for the Committee to file an objection. As provided in the Supplemental Order dated May 11, 2005, Kroll's request for a Consummation Fee was indefinitely adjourned until the end of the Cases, when Kroll would be permitted to again seek authorization for the payment of the Consummation Fee, subject to the Committee's right to object.

56.    Applicant also reviewed and analyzed for the Committee the monthly fee statements filed by the professionals in these Cases, for the period(s) ending: January 31, 2005; February 28, 2005, March 31, 2005, and April 30, 2005.

(j)    Employment/Retention of Committee Professionals

57.    Applicant prepared the applications and the supporting affidavits to retain Applicant as lead co-counsel to the Committee, as well as the application to retain Mesirow as the financial advisors to the Committee. Further, in accordance with the Fee Protocol, Applicant prepared its budgets for the periods March 2005 through May 2005 and June 2005 through September 2005. Applicant also reviewed and analyzed for the Committee the budgets submitted by the other professionals in these cases.

58.    As discussed herein, Applicant prepared the 503(b) Motion on behalf of the Applicant, Ellis Painter and Mesirow in connection with the services performed by each firm during the period from January 14, 2005 through and including January 25, 2005.

(k)    Other Motions and Proposed Orders

59.    At the request of the Informal Committee, and upon the invitation of the Debtors, Applicant traveled to Savannah, Georgia and attended meetings on January 16 and 17, 2005 at the Debtors' headquarters in connection with the review and preparation of the Debtors' first day motions. Thereafter, Applicant attended and actively participated, on behalf of the Informal Committee, in the first day hearing held on January 18, 2005, a meeting with the United States Trustee and a telephonic scheduling hearing with the Court on January 19, 2005, the emergency DIP financing hearings held on January 20 and January 21, 2005, and expedited discovery in connection with the Debtors' efforts to obtain DIP financing;

60.    This Court entered orders (the "First Day Orders") granting most of the relief sought, including, authorizing the Debtors to, among other things: (i) continue to use their

prepetition cash management system, (ii) continue their customer satisfaction programs, to pay customer service providers and to honor credit card transactions, (iii) pay pre-petition wages, salaries, directors' fees and employee benefits, and to continue employee benefit programs; (iv) provide administrative expense treatment for holders of valid reclamation claims and establishing procedures for the payment of such claims; (v) pay prepetition claims of consignment vendors and approving procedures regarding consigned goods; (vi) pay certain contractors in satisfaction of state-created liens; (vii) pay certain prepetition shipping and delivery charges; and (viii) pay prepetition sales, use, trust fund and other taxes.

61.    Applicant reviewed, analyzed, and summarized for the Committee each of the motions and the related First Day Orders in order to understand the status of the Cases and the issues of importance to the Committee. Applicant raised certain issues with respect to the First Day Orders with counsel for the Debtors, after which the Debtors satisfactorily addressed the concerns of the Committee. Applicant aggressively and successfully provided the Debtors and this Court with comments and perspective from the standpoint of the Debtors' unsecured creditors, which is very unusual at such an early stage in the Cases.

62.    Furthermore, during the First Interim Period, Applicant prepared for and attended the omnibus hearings held on: February 18, 2005, March 31, 2005, April 18, 2005, April 25, 2005, and May 26, 2005. Applicant spent a significant amount of time preparing for the omnibus hearings by reviewing and summarizing, for the Committee, the pleadings, motions, and responses filed in these Cases, including, *inter alia*, matters related to the Debtors' motions which sought authorization to: (i) extend the exclusive period to file and solicit acceptances of a plan of reorganization; (ii) establish bar dates for filing proofs of claim; and (iii) extend the time within which to remove actions. Applicant had numerous discussions with Debtors' counsel to

498161.7                                          26

address various issues related to the omnibus hearings.  Applicant also reviewed and summarized the orders entered by this Court in connection with the omnibus hearings.

## V. CONCLUSION

63.    Applicant has necessarily and properly expended 2,828.7 hours of services in performance of its duties as counsel to the Committee during the First Interim Period.  Applicant respectfully requests an interim fee allowance for professional services rendered in the amount of $1,459,244.50.    Applicant has also necessarily incurred disbursements in the amount of $43,614.58 in the performance of Applicant's duties to the Committee during the First Interim Period.

64.    As stated in the Affidavit of Glenn B. Rice, annexed hereto as Exhibit "E", Applicant has not agreed to share any compensation to be received herein with any other person.

[Remainder of page intentionally left blank]

WHEREFORE, Applicant respectfully requests a first interim award of compensation for professional services rendered as counsel to the Committee during the First Interim Period in the sum of $1,459,244.50, together with reimbursement of disbursements in the amount of $43,614.58, and for such other and further relief as this Court deems just and proper.

Dated:  New York, New York
      July 27, 2005

                    OTTERBOURG, STEINDLER, HOUSTON &
                    ROSEN, P.C.

                    By: _____
                        Glenn B. Rice (GR-7605)
                        A Member of the Firm
                    Attorneys for the Official Committee of Unsecured
                    Creditors of Friedman's, Inc., *et al.*
                    230 Park Avenue
                    New York, New York 10169
                    (212) 661-9100

ATTACHMENTS TO APPLICATION ARE EXHIBITS THAT ARE VOLUMINOUS.
COPIES CAN BE OBTAINED FROM THE CLERK'S OFFICE OR THE WEBSITE
ADDRESS OF KURTZMAN CARSON CONSULTANTS LLC @
www.kccllc.net/friedmans