FILED

2005 SEP 20 P 1: 28

BANKRUPTCY COURT
SAVANNAH, GA.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-40129 |
| | ) | |
| FRIEDMAN'S INC., et al., | ) | (Jointly Administered) |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Hon. Lamar W. Davis, Jr. |

## DISCLOSURE STATEMENT WITH RESPECT
## TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
## FRIEDMAN'S INC. AND CERTAIN AFFILIATES,
## DEBTORS AND DEBTORS-IN-POSSESSION

John Wm. Butler, Jr.
George N. Panagakis
Mark A. McDermott
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive
Chicago, Illinois 60606-1285
(312) 407-0700

Kathleen Horne (Ga. Bar No. 367456)
Matthew E. Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE,
   COURINGTON & CHISHOLM, P.C.
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000

Attorneys for Debtors and Debtors-in-Possession

Dated: September 19, 2005
       Savannah, Georgia

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICIT-ING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZA-TION OF FRIEDMAN'S INC. AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (THE "PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATE-MENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CON-TAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF FRIEDMAN'S INC. OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT

BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, FRIEDMAN'S INC. OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

## I. EXECUTIVE SUMMARY

The following discussion provides a general overview of the matters described herein and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes appearing elsewhere in this Disclosure Statement and the First Amended Joint Plan of Reorganization of Friedman's Inc. and Certain Affiliates, Debtors and Debtors-in-Possession (the "Plan"). All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by Friedman's Inc. ("Friedman's" or the "Company") and seven of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), as filed on September 19, 2005 with the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division (the "Bankruptcy Court").

Certain of Friedman's affiliates are not debtors in these Chapter 11 cases, including Cougar Reinsurance Company. Such non-debtor affiliates therefore are not impacted by the Plan to the same extent as are Friedman's and the Affiliate Debtors. Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified. Such modifications, however, will not have a material effect on the distributions contemplated by the Plan.

A copy of the Plan is annexed hereto as Appendix A. A liquidation analysis showing likely recoveries to creditors under Chapter 7 of the Bankruptcy Code is attached as Appendix B. Pro forma financial projections for the reorganized company for the fiscal years 2005 through 2008 are attached as Appendix C. Finally, a reorganization valuation analysis of reorganized Friedman's is attached as Appendix D.

### A.    Overview of Friedman's

Friedman's began in the 1920's as a small, family-owned jewelry retailer called Friedman's Jewelers with its first store located in Savannah, Georgia. At the time of the filing of these cases on January 14, 2005, Friedman's was the third largest jewelry chain in the industry, with approximately 650 stores in 22 southeastern and midwestern states. It currently is the leading operator of fine jewelry stores located in power strip centers, and employs approximately 2,900 associates.

Friedman's operates in the fine jewelry specialty retail market, serving primarily a middle to lower income customer base. Friedman's has positioned itself as one of the few fine retail jewelers to cater to middle to lower income customers who expect good value on

jewelry purchases from a reliable brand. The Company's in-store credit proprietary program is an important part of its value proposition, offering its customer base, which is underserved by most national retailers due to these customers' credit profiles, a way of making fine jewelry purchases available and more affordable. Indeed, in 2004, slightly more than half of Friedman's total sales were purchased using proprietary credit.

Friedman's need to restructure its business through a Chapter 11 reorganization proceeding arose due to the combined effects of a number of factors. The Company experienced explosive growth in the 1990's. However, the lack of coherent and well-integrated long-range planning during this period of growth resulted in a number of operational deficiencies, including an inadequate infrastructure as well as many poorly-placed stores that consistently underperformed. In the fall of 2003, the Securities and Exchange Commission (the "SEC") and the United States Attorneys' Office for the Eastern District of New York ("USAO") announced investigations of Friedman's arising out of a lawsuit filed by Capital Factors alleging that Friedman's and other retail jewelers had conspired to defraud Capital Factors.

Friedman's troubles grew by November 2003 when the Company announced that it had understated its reserves for doubtful accounts in previously issued financial statements, and also announced the need to restate such statements for the fiscal years ended 2000, 2001, and 2002 and for the first three quarters of 2003. Within two months, the Company's chief executive officer and chief financial officer left, leaving a void in senior management that was not filled permanently until late June 2004. Also during this time period, the fall of 2003, the SEC and USAO expanded their investigations to include alleged accounting irregularities.

During this same period, the Company's liquidity began to be constrained. Specifically, beginning in the fall of 2003, the Company's senior secured lenders implemented various borrowing reserves pursuant to Friedman's senior secured credit facility that limited the availability of funds that Friedman's could borrow under such facility. During 2004, the lenders increased the extent of these reserves, culminating in reserves of $45 million by June 2004, to account for additional contingencies the Company faced. These reserves further limited Friedman's ability to access the working capital necessary to operate its business and created significant liquidity issues for the Company.

The depth of the negative effects on the business caused by these matters cannot be overstated. In particular, the investigations being conducted by the SEC and USAO into possible criminal matters created an immense cloud over the business that severely hurt vendor confidence. The events that gave rise to these investigations, including an overly aggressive customer credit policy that led to material mis-statements in public financial statements about the amount of reserves for doubtful customer accounts, created widespread concern about the stability of the company's finances and operations. This concern, and the resultant loss of credibility in the financial markets, had been further exacerbated by the

company's share structure, under which public shareholders who owned the company's class A common stock had the authority to choose only 25% of the company's boards, whereas holders of the class B common stock, indirectly controlled by Mr. Phillip Ean Cohen, had the power to select 75% of the board. As described in more detail below, this share structure arguably allowed decisions to be made whereby tens of millions of dollars of Friedman's value was transferred to another entity also controlled by Mr. Cohen, Crescent Jewelers, which is now the subject of its own Chapter 11 proceedings pending in California.

In any event, in May 2004, the Company's board of directors was substantially reconstituted, resulting in all but one of the directors being new to the board. At all relevant times thereafter, the majority of the board was comprised of independent directors. One of the new board's first significant steps was to hire Sam Cusano as chief executive officer and C. Steven Moore as chief administrative officer and general counsel, both of whom had significant Chapter 11 experience in such capacities with another retailer, Service Merchandise Company, which also sold jewelry, among other retail goods. When Mr. Cusano and Mr. Moore first arrived at Friedman's in the summer of 2004, they were confronted with a host of issues, requiring immediate attention.

On the business front, these issues included severe liquidity constraints and an absence of audited financial statements. The reserves instituted by Friedman's secured lenders created liquidity constraints that prevented Friedman's from paying, among others, its merchandise vendors since at least May 2004, causing such vendors to begin to restrict shipments of merchandise (or, in some instances, cease such shipments altogether). Operationally, even after Mr. Cusano and Mr. Moore joined the Company, Friedman's was functioning without several other key senior management team members, including a chief financial officer and, shortly thereafter, a chief merchandising officer. Management also soon realized that the Company lacked an adequate corporate infrastructure to allow it to address the issues the Company faced in its efforts to restructure its operations. As referred to above, Friedman's was in the midst of a multitude of legal issues, including SEC regulatory issues and investigations by the USAO, complaints from attorneys general in many states, and shareholder derivative, shareholder class action, and other litigation.

With respect to the core business issues, the new senior management team executed several initiatives in an effort to stabilize the Company's affairs. Significantly, in order to obtain additional liquidity, on September 7, 2004, Friedman's entered into an amended and restated credit agreement which provided a Tranche A revolving loan of up to $67.5 million and a Tranche B term loan of $67.5 million. In conjunction therewith, Friedman's organized a committee of its vendors (the "Unofficial Committee") and agreed to pay, on behalf of this Unofficial Committee, legal fees incurred by the Unofficial Committee as it assisted the Company's restructuring efforts. The Unofficial Committee, after signing confidentiality agreements, was given information to enable it to assess the Company's situation and provide input regarding how to best proceed with restructuring Friedman's As a result of this collaborative effort, the Company negotiated and executed, with many of its trade

vendors, a secured trade credit program providing for the immediate standstill and eventual repayment of amounts outstanding and the reinstatement of merchandise shipments. As a result of these initiatives, vendors began shipping merchandise to Friedman's for the 2004 holiday season.

Unfortunately, these efforts did not avoid Chapter 11. Inventory shipments during the 2004 holiday season were later than expected, leading to lower than planned sales. In addition, tighter credit practices implemented by the Company also contributed to reduced sales. Largely as a result of these two factors, the lower sales resulted in covenant defaults under the amended and restated credit agreement. Ultimately, the Company's Chapter 11 filing was prompted by limitations imposed on funding by the lenders under the revolving loan facility beginning on January 11, 2005 following the lenders' decision not to agree to further amended financial covenants. As a result of the funding limitations, Friedman's was unable to satisfy all of its cash requirements in the ordinary course of business. After the lenders declined both the written requests of the Company and the Unofficial Committee to resume ordinary course funding, the Company received a notice of program default under the vendor program on January 14, 2005. The program default permitted the Company's vendors to discontinue shipments to Friedman's and retain their interests in the trade creditor lien earlier granted by the Company to the vendors. The Company filed Chapter 11 later that same day.

## B.    Overview of Operational Restructuring

In light of the foregoing events, Friedman's concluded that Chapter 11 reorganization would afford the Company the best, and likely the only, opportunity for restructuring its affairs and for developing and implementing a long-term, go-forward, retail business strategy. To this end, since the commencement of these cases, Friedman's and its advisors have worked to implement a number of key initiatives designed to turnaround the Company's affairs. Friedman's believes that it has accomplished or will accomplish prior to emergence from Chapter 11 nearly all of the actions which it required Chapter 11 to address, including, among other things, elimination of unprofitable stores and leases, improvement of store operations and inventory management, re-establishment of vendor relations, and the restructuring of its balance sheet.

To this end, Friedman's has reduced its total number of stores from approximately 700 in 2004 to approximately 480 as of the date of this Disclosure Statement. This total reduction includes the closure of approximately 60 stores as part of Friedman's 2004 store rationalization process, plus approximately 160 as part of Friedman's 2005 store rationalization process. Friedman's also utilized the store closing process to liquidate aged and clearance inventory. Friedman's asset and store rationalization strategies have been complemented by several business initiatives designed to attract customers, consolidate vendor support, and increase sales and balance gross margins, including a retail strategy that is centered on quality merchandise and customer relationships rather than predominantly the

sale of credit and related programs, together with a 2005 trade vendor program designed to ensure timely receipt of merchandise in anticipation of the 2005 holiday season. The Company also has undertaken a number of operational restructuring initiatives designed to centralize management functions and implement company-wide policies and procedures, both of which will improve efficiencies and centralize decision-making authority within the Company.

Friedman's asset rationalization and optimization strategies, along with the other business initiatives implemented throughout these Chapter 11 Cases, have begun to bear positive results, including stabilization of the business and improved liquidity. Although Friedman's has accomplished many important goals through the tools afforded by Chapter 11, Friedman's believes that the prospects for further operational improvement will be best achieved outside of Chapter 11. There are continued costs of remaining in Chapter 11 that Friedman's believes warrant emergence at this time, including the administrative costs of the Chapter 11 process and the continued diversion of management time by the Chapter 11 proceedings.

**C.   Summary of the Plan of Reorganization**

Set forth below is a brief summary of the structure of the Plan. The effectiveness of the Plan, and thus the consummation of the distributions provided for in the Plan, is subject to a number of conditions precedent. There can be no assurances that these conditions will be satisfied. In addition, the Debtors have reserved the right to amend or modify the Plan as to any particular Debtor.

Under the Plan, Harbert Distressed Investment Master Fund, Ltd. ("Harbert") has agreed to serve as plan investor in support of Friedman's emergence from Chapter 11. Harbert is a large fund that invests in troubled companies. Harbert has invested significant amounts in Friedman's capital structure, and has agreed to invest significant additional amounts in the Company under the Plan. Specifically, Harbert has acquired certain disputed claims of Friedman's prepetition lenders that will be allowed under the Plan in the amount of $1.9 million, plus interest. Additionally, Harbert has acquired participation interests in approximately $63.4 million face amount of prepetition claims previously held by vendors pursuant to Friedman's prepetition trade vendor program. Harbert also has acquired a $25.5 million term loan under Friedman's debtor-in-possession financing facility. Finally, Harbert will provide additional funding upon the effective date of the Plan to assist Friedman's in reorganizing its affairs.

Under the Plan, in consideration of the foregoing claims and other investments, Harbert will receive substantially all of the stock of Reorganized Friedman's. Harbert has represented to Friedman's that subsequent to the commencement of Friedman's Chapter 11 Cases, Harbert acquired approximately 3,921,000 shares of Friedman's Class A Common Stock and 3,000,000 warrants. However, Harbert will not receive any consideration under

viii

the Plan on account of these equity interests. The funds to be provided by Harbert upon the effective date of the Plan, plus certain other sources of funding available to Friedman's, will be utilized to pay costs in connection with Friedman's Chapter 11 Cases and to provide funding, in the amount of $8,000,000 (subject to the adjustments set forth in Article 1.137 of the Plan). Friedman's believes that it has claims against certain former directors, officers, and other parties on account of various prepetition conduct described in this Disclosure Statement. Under the Plan, a trust will be established for the limited purpose of pursuing such claims. Any recoveries from claims brought by the trust will be distributed to holders of unsecured creditors.

**The Official Unsecured Creditors' Committee (the "Creditors' Committee"), which serves as fiduciary for the benefit of all unsecured creditors, supports the Plan and encourages all creditors to vote in favor of the Plan.**

**D.      Summary of Treatment of Claims and Interests Under the Plan**

The Plan constitutes a joint plan of reorganization providing for the substantive consolidation of the Debtors' estates for distribution purposes. The Plan contains separate classes for holders of claims against and interests in the Debtors. The table below summarizes the classification and treatment of the principal prepetition claims and interests in the Plan. As required by the Bankruptcy Code, administrative claims and priority tax claims are not classified. The classification and treatment for all classes are described in more detail in Section VII of this Disclosure Statement.

The table below also sets forth the Debtors' estimates of the amount of claims that ultimately will become allowed in each class based upon review by the Debtors of all claims scheduled by the Debtors, consideration of the provisions of the Plan that affect the allowance of certain claims, and a general estimate of the amount by which allowed claims ultimately may exceed the amount of claims scheduled by the Debtors. The table below also includes an estimated percentage recovery for holders of claims in each class. For purposes of estimating the percentage recoveries, the new common stock to be issued pursuant to the Plan was assumed to be valued as provided for in the valuation analysis attached hereto as Appendix D. The estimated percentage recoveries set forth below that are based upon distributions of new common stock were calculated using the mid-point of the valuation ranges.

The Debtors, with the assistance of their financial advisors, considered other plan alternatives and approached other potential plan investors as part of their efforts to obtain the highest and best value for the benefit of their stakeholders. Based upon such efforts, the Debtors concluded that the terms contemplated in the Plan, including those related to Harbert as plan investor, are the highest and best available under the circumstances.

ix

The Debtors' investment banker, Jefferies & Co., Inc. ("Jefferies"), performed a valuation of reorganized Friedman's and the new common stock based on information and financial projections provided by the Debtors. The valuation assumptions include, among other things, an assumption that the results projected for reorganized Friedman's will be achieved in all material respects. However, no assurance can be given that the projected results will be achieved. To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative. The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the reorganized Debtors, and (iii) such other investigations and analyses as were deemed necessary or appropriate. The Debtors and Jefferies believe these valuation assumptions are reasonable.

The valuation excludes certain other assets and potential liabilities of the Debtors. For instance, Jefferies did not value (and, thus, did not include in the valuation): (A) the claims that Friedman's has asserted against Crescent Jewelers in connection with Crescent Jewelers' Chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of California, Oakland Division; (B) the potential cash proceeds of federal income tax refunds that Friedman's or reorganized Friedman's may receive or any potential amounts payable to the United States as a result of federal income tax claims; (C) any net operating loss carry forwards to which the Debtors or Reorganized Debtors may be entitled under applicable tax laws; or (D) any proceeds that the Debtors or Reorganized Debtors may receive pursuant to a transaction involving the Company's credit receivables. For purposes of calculating estimated recoveries, the following table also does not give effect to the recoveries, if any, on account of claims of the Debtors on account of the stewardship and related investigations. The anticipated recovery on account of these matters is unknown and, therefore, is not included in the valuation performed by Jefferies.

| Class Description | Treatment Under Plan |
|---|---|
| **Class 1 - Lender Claims** | A lender claim consists of any claim against Friedman's or its affiliates arising out of that certain amended and restated credit agreement entered into by Friedman's and its affiliates on September 7, 2004, as thereafter modified. That credit agreement provided Friedman's a revolving loan facility of up to $67.5 million, plus a term loan facility of another $67.5 million. These loans were secured by liens on substantially all the Debtors' assets. During the Chapter 11 cases, the Debtors repaid in full all amounts outstanding under the revolving loan facility, plus all principal and certain fees outstanding with respect to the term loan, utilizing proceeds of the Debtors' postpetition, debtor-in-possession financing facility. However, there were certain additional claims asserted against the Debtors by Jewelry |

| **Class Description** | **Treatment Under Plan** |
|---|---|
| | Investors II, L.L.C., the holder of the term loan.  These claims, all of which the Debtors disputed, were in excess of $13 million and were based on claims for liquidated damages, a prepayment premium, and additional amounts.  The Debtors and the Creditors' Committee filed a joint objection to these claims.  Ultimately, the parties resolved this dispute by agreeing to allow the claim in a significantly reduced amount equal to $1.9 million, plus interest.  Harbert purchased this claim for a confidential cash payment.  Under the Plan, the claim will be converted into shares of the new common stock of reorganized Friedman's. |

Estimated Amount of Claim:          $1.9 million
Estimated Percentage Recovery:      100%

| **Class 2 – Other Secured Claims** | Other secured claims are other claims secured by liens on property in which Friedman's or its affiliates have an interest.  Friedman's believes that these claims consist primarily of (i) a real estate mortgage on its headquarters building and (ii) the liens and rights of Bank of America in certain cash collateral securing the obligations of Friedman's to Bank of America in connection with an outstanding letter of credit issued by Bank of America under the Credit Agreement and certain cash management services Bank of America provides to Friedman's.  Additionally, there also may be certain real estate tax liens, mechanics' liens, and personal property tax liens that will be honored in the ordinary course of business.  Under the Plan, the legal, equitable, and contractual rights of each other secured claim holder shall be reinstated, which means that the claim holder's rights will be unaltered and that Friedman's will cure outstanding payment defaults. |
|---|---|

Estimated Amount of Claims:         $3.37 million
Estimated Percentage Recovery:      100%

| **Class 3 – Other Priority Claims** | Other priority claims are primarily claims held by current and former employees for unpaid wages, salaries, bonuses, severance pay, vacation pay, and other unpaid employee benefits.  Upon commencement of the Chapter 11 cases, Friedman's obtained authority from the Bankruptcy Court to pay certain of such amounts in the ordinary course of business.  Friedman's believes that it has in fact paid all or substantially all such amounts, and that there should not be a significant amount of such claims, if any, remaining unpaid.  However, in the event there are any valid claims for unpaid amounts, Friedman's will |
|---|---|

| **Class Description** | **Treatment Under Plan** |
|---|---|
| | either pay such claims in full in cash or, if necessary, agree with the claim holder to some other mutually agreeable, and no more favorable, compensation arrangement. |

Estimated Amount of Claims:           $0
Estimated Percentage Recovery:      100%

**Class 4(a) - Non-Partici-pating Program Vendor Claims**

Program vendor claims are comprised of those claims that arose out of Friedman's prepetition secured trade vendor program. Harbert acquired interests in the great majority of these claims during the Chapter 11 cases. Under the Plan, Non-Participating Program Vendor Claims are those program vendor claims not purchased by Harbert. Holders of program vendor claims who did not sell their claims to Harbert shall receive a lump-sum cash payment on the effective date of the Plan (or when their claims are allowed, if later) in an amount equal to 75% of the face amount of their claims.

Estimated Amount of Claims:           Approximately $4 million
Estimated Percentage Recovery:      75%

**Class 4(b) - Participat-ing Program Vendor Claims**

Program vendor claims are comprised of those claims that arose out of Friedman's prepetition secured trade vendor program. Harbert acquired interests in the great majority of these claims during the Chapter 11 cases. Under the Plan, Participating Program Vendor Claims are those program vendor claims purchased by Harbert. Harbert, as holder of the Participating Program Vendor Claims, will receive shares of common stock in reorganized Friedman's in exchange for its claims.

Estimated Amount of Claims:           $58.9 million
Estimated Percentage Recovery:      75 %

**Class 5 - General Unsecured Claims**

General unsecured claims include claims arising as a result of retail merchandise or services provided by trade vendors or service providers (other than program vendor claims described above); rejection of executory contracts and unexpired leases; the deficiency claims of non-participating program vendors; and litigation claims. While Friedman's cannot predict with certainty the total amount of general unsecured claims that ultimately may be allowed, the company believes that non-program trade vendor and service provider claims likely could be approximately $34 million. Additionally, the company

| Class Description | Treatment Under Plan |
|---|---|

anticipates that lease rejection claims in the aggregate amount of approximately $7 million may be filed, although this amount may be reduced on account of landlords' duties to mitigate their damages. Beyond these two categories of claims, a number of contingent, unliquidated claims, many of them based on litigation claims, were filed in these cases. The company cannot predict with certainty the total amount of such claims that ultimately may be allowed. For illustrative purposes only, however, the range of recoveries indicated below assume that litigation claims could be allowed in the aggregate amount of between $20 million and $40 million. Under the plan, general unsecured creditors will receive their pro rata share of recoveries, if any, on account of certain claims of the estate described herein. The anticipated recovery on account of these matters is unknown. An additional $8 million will be allotted to the estate's pursuit of these claims (subject to the adjustments set forth in Article 1.137 of the Plan).

| | |
|---|---|
| Illustrative Range of Claims: | $60 million to $80 million |
| Estimated Percentage Recovery: | TBD |

**Class 6 - AG Claims**

An AG claim is a claim held by a state on account of controversies asserted prior to the petition date, including, with respect to the Debtors' historic credit insurance sales practices. Under the plan, a holder of an AG Claim will receive a pro rata share of the recoveries, if any, on account of certain claims of the estate (as described herein), as if such holder were a member of Class 5. Holders of AG Claims have the option to elect, however, to receive a pro rata distribution of 5% of the recoveries, if any, on account of certain claims of the estate or to participate in a global settlement among all holders of AG claims. The AG Claims are unliquidated.

| | |
|---|---|
| Range of Claims: | Unliquidated |
| Estimated Percentage Recovery: | TBD |

**Class 7 - Intercompany Claims**

An intercompany claim is a claim by one or more of Friedman's and its affiliates against other Friedman's affiliates on account of various matters incurred in the ordinary course of business, not including any claims between Friedman's and Crescent Jewelers. Under the Plan, at the option of Friedman's, intercompany claims may either be rein-

| **Class Description** | **Treatment Under Plan** |
|---|---|
| | stated or eliminated. The ultimate decision will be based upon business planning reasons of the reorganized company and will not affect distributions to other creditors under the Plan. |

| | | |
|---|---|---|
| | Estimated Amount of Claims: | N/A |
| | Estimated Percentage Recovery: | N/A |

| **Class 8 - Subordinated Claims** | Subordinated claims include claims by current or former holders of Friedman's common stock for damages or rescission in connection with the purchase or sale of such stock, including claims asserting that Friedman's historical, public financial statements did not accurately portray Friedman's financial condition. Subordinated claims also include claims by governmental units for penalties, fines, restitution and disgorgement. Under the Bankruptcy Code, such claims have the same priority as Friedman's common stock. Holders of such claims therefore will not be entitled to receive any property on account of their claims under the Plan. |
|---|---|

| | | |
|---|---|---|
| | Estimated Amount of Claims: | N/A |
| | Estimated Percentage Recovery: | 0% |

| **Class 9 - Interests** | Interests include holdings of Friedman's class A and class B common stock, as well as any options, warrants, call rights, puts, awards, or other agreements to acquire such stock. Under the Plan, all interests will be cancelled, and holders of interests will not receive or retain any property on account of such interests under the Plan. Subject to certain restructuring transactions, interests held directly or indirectly by Friedman's will be reinstated. |
|---|---|

| | | |
|---|---|---|
| | Estimated Amount of Interests: | N/A |
| | Estimated Percentage Recovery: | 0% |

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "CREDITORS' COMMITTEE) BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS, AS APPLICABLE. THE DEBTORS AND THE CREDITORS' COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

TABLE OF CONTENTS

PAGE

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES . . . . . . . . . . . . . . . 2
    A.      Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.      Notice to Holders of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    C.      Solicitation Package . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    D.      General Voting Procedures, Ballots, and Voting Deadline . . . . . . . . . . . . . . . . . . . 3
    E.      Questions About Voting Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    F.      Confirmation Hearing and Deadline for Objections to Confirmation . . . . . . . . . . . 4

III. HISTORY OF THE DEBTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.      Overview of Business Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. PRE-PETITION CAPITAL STRUCTURE OF THE DEBTORS . . . . . . . . . . . . . . . . . . . . . 12
    A.      Prepetition Credit Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.      Prepetition Trade Vendor Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    C.      Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. CORPORATE STRUCTURE OF THE DEBTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A.      Current Corporate Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    B.      Board of Directors of Friedman's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    C.      Senior Management of Friedman's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    D.      Friedman's Affiliation with Cougar Reinsurance Company . . . . . . . . . . . . . . . . . 18
    E.      Friedman's Transactions with Crescent Jewelers . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI. THE CHAPTER 11 CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    A.      Events Leading to Commencement of the Chapter 11 Cases . . . . . . . . . . . . . . . . 27
    B.      Continuation of Business; Stay of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    C.      Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases . . . . . 30
    D.      Authorization to Use Cash Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    E.      Post-Petition Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    F.      Other Significant Events During the Chapter 11 Cases . . . . . . . . . . . . . . . . . . . . . 34
    G.      Joint Review Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    H.      Summary of Claims Process and Key Categories of Claims . . . . . . . . . . . . . . . . . 55

VII. SUMMARY OF THE REORGANIZATION PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    A.      Overall Structure of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    B.      Classification and Treatment of Claims and Interests . . . . . . . . . . . . . . . . . . . . . . 86
    C.      Means for Implementation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

xv

PAGE

|   |   |   |   |
|---|---|---|---|
| D. | Unexpired Leases and Executory Contracts | .......................... | 100 |
| E. | Provisions Governing Distributions | .................................. | 104 |
| F. | Allowance and Payment of Certain Administrative Claims | ................ | 109 |
| G. | Friedman's Creditor Trust | ......................................... | 112 |
| H. | Effect of the Plan on Claims and Interests | .............................. | 117 |

VIII. CERTAIN FACTORS TO BE CONSIDERED ................................. 123
|   |   |   |   |
|---|---|---|---|
| A. | General Considerations | .............................................. | 123 |
| B. | Certain Bankruptcy Considerations | ................................... | 123 |
| C. | Business Factors and Competitive Conditions | .......................... | 123 |
| D. | Seasonal Nature of Business | ......................................... | 125 |
| E. | Inherent Uncertainty of Financial Projections | .......................... | 125 |
| F. | Access to Financing and Trade Terms | ................................. | 126 |
| G. | Claims Estimations | ................................................. | 126 |
| H. | Potential Dilution Caused by Options or Warrants | ....................... | 127 |
| I. | Impact of Interest Rates | ............................................. | 127 |

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 127

X. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST .................. 135
|   |   |   |   |
|---|---|---|---|
| A. | Feasibility of the Plan | .............................................. | 135 |
| B. | Acceptance of the Plan | .............................................. | 136 |
| C. | Best Interests Test | .................................................. | 137 |
| D. | Estimated Valuation of the Reorganized Debtors | ......................... | 138 |
| E. | Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Reorganized Debtors | .......... | 138 |

XI. CONFIRMATION ......................................................... 139
|   |   |   |   |
|---|---|---|---|
| A. | Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative | .................................... | 139 |
| B. | Conditions to Confirmation and/or Consummation of the Plan | .............. | 140 |
| C. | Waiver of Conditions to Confirmation and Consummation of the Plan | ........ | 141 |
| D. | Retention of Jurisdiction | ............................................ | 142 |

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................... 144
|   |   |   |   |
|---|---|---|---|
| A. | Continuation of the Bankruptcy Case | ................................. | 144 |
| B. | Alternative Plans of Reorganization | ................................. | 144 |
| C. | Liquidation Under Chapter 7 or Chapter 11 | ............................ | 145 |

XIII. VOTING REQUIREMENTS ................................................ 146

PAGE

    A.    Parties in Interest Entitled to Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
    B.    Classes Impaired Under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

XIV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
    A.    Hearing on and Objections to Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
    B.    Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

## APPENDICES

Appendix A       —    First Amended Joint Plan of Reorganization of Fried-man's Inc. and Certain Affiliates, Debtors and Debtors-in-Possession

Appendix B       —    Liquidation Analysis

Appendix C       —    Pro Forma Financial Projections (2005 – 2008)

Appendix D       —    Reorganization Valuation Analysis

## I. INTRODUCTION

Friedman's Inc. ("Friedman's" or the "Company") and seven of its domestic subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") for use in the solicitation of votes on the First Amended Joint Plan of Reorganization of Friedman's Inc. and Certain Affiliates, Debtors and Debtors-in-Possession (the "Plan") proposed by the Debtors and filed with the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division (the "Bankruptcy Court"), on September 19, 2005. A copy of the Plan is annexed as Appendix A hereto.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization and operations of the Reorganized Debtors. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Claimholders in Impaired Classes must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE SECTION VII – SUMMARY OF THE REORGANIZATION PLAN AND SECTION VIII – CERTAIN FACTORS TO BE CONSIDERED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.  BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.      Definitions

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to United States of America currency unless otherwise expressly provided.

### B.      Notice to Holders of Claims

This Disclosure Statement is being transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes.  The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against the Debtors to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

The Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATE-MENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSE-MENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTI-MATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the projec-

2

tions set forth in Appendix C attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

## C. Solicitation Package

Accompanying this Disclosure Statement are, among other things, copies of (1) the Plan (Appendix A hereto); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan; the date, time and place of the hearing to consider the confirmation of the Plan and related matters; and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); (3) the order entered by the Bankruptcy Court approving this Disclosure Statement and establishing procedures with respect to solicitation of votes on the Plan; and (4) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan.

## D. General Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in the disqualification of your vote on such Ballot. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND ACTUALLY RECEIVED NO

3

LATER THAN NOVEMBER 10, 2005 AT 8:00 P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE") BY KURTZMAN CARSON CONSULTANTS LLC (THE "VOTING AGENT"). YOUR BALLOT CONTAINS THE CONTACT INFORMATION FOR THE VOTING AGENT. THE CONTACT INFORMATION FOR THE VOTING AGENT ALSO IS LISTED BELOW.

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED. BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, THE CREDITORS' COMMITTEE OR COUNSEL TO THE DEBTORS OR COUNSEL TO THE CREDITORS' COMMITTEE.**

**E.      Questions About Voting Procedures**

If (1) you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim holdings or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents please contact:

> Kurtzman Carson Consultants LLC
> 12910 Culver Blvd., Suite I
> Los Angeles, CA 90066
> Attn: Friedman's Inc. Balloting
> Telephone: (866) 381-9100
> http://www.kccllc.net/friedmans

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION XIII – VOTING REQUIREMENTS.

**F.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to begin on November 21-22, 2005, at 10:00 a.m. (prevailing Eastern time) before the Honorable Lamar W. Davis, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division, 125 Bull Street, Savannah, Georgia 31401, Courtroom 228. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are ACTUALLY RECEIVED on or before November 10, 2005, at 4:00 p.m. (prevailing Eastern time) by:

4

*Counsel for the Debtors*

        Skadden, Arps, Slate, Meagher & Flom LLP
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois  60606-1285
        Attn:  John Wm. Butler, Jr., Esq.
             George N. Panagakis, Esq.

        Inglesby, Falligant, Horne, Courington & Chisholm, P.C.
        17 West McDonough Street
        P.O. Box 1368
        Savannah, Georgia 31402-1368
        Attn:  Kathleen Horne, Esq.
             Matthew E. Mills, Esq.

*United States Trustee*

        The Office of the United States Trustee
        222 West Oglethorpe Avenue, Suite 302
        Savannah, Georgia 31401
        Attn:  B. Amon James, Esq.

*Counsel for the Creditors' Committee*

        Otterbourg, Steindler, Houston & Rosen, P.C.
        230 Park Avenue
        New York, NY 10169
        Attn:  Scott L. Hazan, Esq.
             Glenn B. Rice, Esq.

        Ellis, Painter, Ratterree & Adams LLP
        2 East Bryan Street 10th Floor
        Savannah, Georgia 31401
        Attn:  David W. Adams. Esq.

*Counsel for the Postpetition Lenders*

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, NY 10153
        Attn:  Paul M. Basta, Esq.

*Counsel for the Plan Investor*

Kasowitz, Benson, Torres & Friedman LLP
1633 Btoadway Avenue
New York, NY 10019
Attn:    Andrew  K. Glenn, Esq.
         Richard F. Casher, Esq.

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alan W. Kornberg, Esq.
         Diane Meyers, Esq.

McKenna Long and Aldridge
303 Peachtree Street Ste 5300
Atlanta, GA  30308
Attn:    Charles E. Campbell

### III. HISTORY OF THE DEBTORS

**A.     Overview of Business Operations**

   *1.     Summary of the Debtors' Business History.*

Friedman's was incorporated under the laws of the State of Delaware on July 15, 1993.  Friedman's is the successor to a family-owned business called Friedman's Jewelers, Inc., which opened its first store in 1920 in Savannah, Georgia.  The family-owned business slowly expanded, opening its first store outside Georgia in the 1940s, growing to ten stores in the 1960s, achieving $10 million in annual sales in the 1970s, and spreading to Florida in the 1980s.  By 1990, this family-owned specialty retailer of jewelry had grown to 45 stores, and, in May 1990, MS Jewelers Limited Partnership acquired the assets of the Company.  In July 1993, MS Jewelers contributed the assets it acquired to Friedman's in exchange for nearly all of Friedman's class B common stock.  In October 1993, Friedman's launched an initial public offering, and its class A common stock began publicly trading on NASDAQ.  Thereafter, Friedman's experienced a period of rapid expansion, growing from 55 stores in 1992 to over 700 stores by the end of 2002.  In 2004, Friedman's closed approximately 60 stores as part of its 2004 store rationalization program, and closed an additional approximately 160 stores during these Chapter 11 Cases.  In the ordinary course of business, the Company will continue to review and rationalize its store base and look to optimize its retail locations.  To the extent that any decisions are made with respect to these optimization efforts, those decisions will be set forth in an exhibit to be filed on or before the fifth day prior to the voting deadline on the Plan.

2.       *Summary of Friedman's Jewelry Business.*

As of the commencement of these Chapter 11 Cases, Friedman's was the third largest specialty retailer of fine jewelry in the United States, operating approximately 650 stores in 22 southeastern and mid-western states.  Friedman's believes it has uniquely positioned itself among other specialty retailers of fine jewelry by locating approximately 70% of its stores in strip centers (versus the more traditional mall locations) and by providing its customers with access to credit to make jewelry purchases that many of its customers otherwise would not be able to make in this retail segment.  With its corporate headquarters in Savannah, Georgia, Friedman's is the leading operator of fine jewelry stores located in power strip centers.  As of July 22, 2005, Friedman's employed approximately 2,900 employees.

Friedman's is dedicated to providing the customer service expected of a large, national chain to its customers, who are primarily middle- to low-income consumers, ages 18 to 45.  As indicated above, one important aspect of Friedman's customer service is the provision of credit to these customers that otherwise would have few opportunities to purchase finer jewelry.  Friedman's also offers customers a flexible trade-in and 30-day return policy, guaranteed trade-ins on all Friedman's diamond merchandise, and numerous customer appreciation events throughout each year.

With respect to the customer credit program, Friedman's historically offered credit to its customers in the form of an installment loan product with equal payments required over a defined period of time, primarily ranging between six to 18 months in length.  The credit extension and collection process was decentralized, with credit decisions being made at the store or regional level, often by the same personnel responsible for sales.  Collection activity was often made a second priority, especially during the holiday season.  The credit operations also lacked sufficient resources, staff and key analytical positions needed to monitor performance and manage portfolio risk.

In an effort to improve credit management processes, the Company hired First Annapolis Consulting ("First Annapolis") in November 2004 to analyze its current credit business and help in the development of a strategy for improving credit and collections, including optimizing credit sales decisions.  In addition, in December 2004, the Company hired Steve Zeringue as the new vice-president of credit to oversee the migration of credit and collection operations and their strategic implementation.  In addition to these profes-sional changes, the Company has begun to establish better risk management practices in its credit underwriting process through the formation of a centralized, focused credit granting and authorizations group.  Accordingly, subjective credit granting decisions have been removed from the store and field level and are now made by associates whose sole focus is to make sound credit granting decisions.

The Company has tightened credit to higher risk customers through the introduction of hard cut-offs based primarily on credit ratings using custom and generic scoring developed

7