# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**
at  10  O'clock & 23  min A  M
Date  8/23/06

United States Bankruptcy Court
Savannah, Georgia

In the matter of:　　　　　　　　　)

FRIEDMAN'S, INC., et al.,　　　　　)

　　　　　　　　　*Debtors*　　　　)

Chapter 11 Case

Number 05-40129

## MEMORANDUM AND ORDER ON THE POST-EFFECTIVE DATE COMMITTEE'S OBJECTION TO THE CLAIM OF JAMES DUNLAP

The Debtors' Chapter 11 case was filed on January 14, 2005, and a Plan of Reorganization (the "Plan") was confirmed on November 23, 2005. The Plan created a Post-Effective Date Committee (the "PEDC") with the responsibility of administering, disputing, objecting to, compromising, or otherwise resolving all general unsecured claims against the Debtors. *See* Dckt. No. 1338, Plan ¶ 9.6(b) (November 23, 2005). Pursuant to that grant of authority, the PEDC filed an objection and later a supplemental objection to the claim of James Dunlap, Claim No. 1928 (the "Dunlap claim"). *See* Dckt. No. 1623 (May 5, 2006); Dckt. No. 1687 (June 9, 2006). A hearing on this matter was held on June 29, 2006.

## BACKGROUND AND PROCEDURAL HISTORY

Dunlap is a plaintiff and the class representative of a class action that was instituted against Friedman's, Inc., and various other defendants pre-petition in West Virginia in 2000. Dunlap seeks to act on behalf of a class of consumers who allegedly were the

✎AO 72A
(Rev. 8/82)

victims of consumer fraud perpetrated by Friedman's in violation of the West Virginia Consumer Credit and Protection Act (the "Dunlap Class Action"). *See* W. Va. Code § 46A-1-101 *et seq*. That class action was conditionally certified by a West Virginia court, and after a series of motions elsewhere, it was referred to this Court.

The PEDC acknowledges that Friedman's was guilty of some acts that gave rise to a claim for recovery to some West Virginia consumers. Indeed, the West Virginia Attorney General sued Friedman's for the same or similar conduct, resulting in a settlement agreement. Under the terms of that agreement, Friedman's paid a little over $90,000.00 in compensatory damages to 1,720 West Virginia consumers. Neither the terms of the settlement agreement nor West Virginia law precluded further action by those 1,720 consumers against Friedman's. *See* W. Va. Code § 46A-7-113. Conditionally certified by the West Virginia state courts, the Dunlap Class Action purportedly includes those 1,720 consumers as well as some 2,100 additional consumers whose claims were not represented by the West Virginia Attorney General and have received nothing. In this Chapter 11 case, Dunlap's counsel timely filed a proof of claim marked "other," "Contingent Unliquidated see attached." No dollar amount was filled in and no priority status was specified, but the Second Amended Complaint filed in the West Virginia state court and the order granting conditional certification to the Dunlap Class Action were attached.

Among the multiple matters before this Court triggered by the PEDC

objection to the Dunlap claim, Dunlap moves this Court to estimate the Dunlap claim against the Debtors for purposes of administering the Debtors' bankruptcy estate. *See* Dckt. No. 1682 (June 9, 2006). That motion asserts components of a claim not previously spelled out in the proof of claim totaling nearly $7 million comprised of the following:

### SUMMARY OF CLASS CLAIM FOR ESTIMATION PURPOSES ("Estimation Summary")

1. WV consumers who purchased insurance that constitute class members:

   | | |
   |---|---|
   | Before March 1, 2000: | 3,603 |
   | After March 1, 2000: | 230 |
   | Total | 3,833 |

2. Damage Calculation:

   (a) Compensatory damages. *W. Va. Code* §46A-6-106(1) provides for the "recovery of actual damages, or $200, whichever is greater." For purposes of this calculation, the statutory minimum liquidated amount is utilized.

   | | |
   |---|---|
   | 1720 consumers @ $200.00, less $92,380.00[1] = | $251,620 |
   | 2113 consumers @ $200.00 = | 422,600 |
   | Total Minimum Compensatory Damages | $ 674,220 |

   (b) Prejudgment Interest under *W. Va. Code* §56-6-31 (7 years @ 10% per year): $674,220 x 10% x 7.0 = $ 471,954

   (c) Statutory Penalties under *W. Va. Code* §§ 46A-5-101 and 106[2]

   | | |
   |---|---|
   | 3,833 violations (assumes average penalty of $1,000 per class member)[3] | $3,833,000 |

   (d) Attorney Fees and Costs under *W. Va. Code* §46A-5-104 and applicable common law theories of recovery:

   | | |
   |---|---|
   | Attorney Fees @ 40% of the estimated damages in subparts (a), (b) and (c), *supra* (per contract) | $1,991,669 |

|  |  |
|---|---|
| Litigation Costs (Estimated) | 25,000 |
| 3.  **Total Estimated Claim**[4] | **$6,995,843** |

---

[1]   Under an agreement with the W. Va. Attorney General, Friedman's paid 1720 consumers (44.8% of the class) a total of $92,380, with an average per customer refund of $53.71.  Pursuant to the terms of the agreement, this settlement does not limit any individual claims the consumers have against Friedman's and other co-defendants.

[2]   This estimate assumes only one violation per class member even though the evidence indicates that there are multiple violations for each class member.

[3]   The statute provides for a mandatory statutory penalty of $100 to $1,000 per violation.  *W. Va. Code §46A-5-101.*  However, the statute provides for an adjustment of the statutory penalty to account for inflation from the effective date of the law (September 1, 1974) to the present.  As adjusted, the range of the mandatory statutory penalty is currently $398.22 to $3,988.21 (as of April 2006).  Dunlap's penalty estimate of $1,000 represents twenty-five percent of the maximum available penalty.  Accordingly, it is a conservative estimate.

[4]   There are other claims for compensatory, punitive and other damages that are assertable by the class under state law.  While these damages have not been included for claim estimation purposes here, the class reserves its rights to assert any and all such claims against any applicable party in the future.

*See* Dckt. No. 1682, Ex. B. (June 9, 2006).

The PEDC seeks to disallow the Dunlap claim or alternatively to subordinate it to the claims of other general unsecured creditors.  As a practical matter, subordination of the Dunlap claim will have the same effect as disallowance.  Under the terms of the Plan, Class Five unsecured creditors will receive pro-rata shares of the net recoveries, if any, by the Friedman's Creditor Trust, which is empowered to investigate and litigate pre-petition claims belonging to the Debtors.  Class Eight consists of Subordinated Claims, which receive nothing under the Plan.

The PEDC asserts three alternative grounds for disallowance or

subordination of the Dunlap claim. First, the PEDC argues that the Dunlap claim is disallowed under binding Eleventh Circuit precedent because it consists of fines and penalties and is punitive in nature ("penalty/punitive claims"). Second, if the Dunlap claim is not disallowed, it is classified as a Class 8 Subordinated Claim under the terms of the Plan. Third, if the Dunlap claim is not subordinated by the terms of the Plan, the PEDC asserts that it should be equitably subordinated by virtue of 11 U.S.C. § 510(c).[1]

Dunlap argues that no provision in the Bankruptcy Code permits a claim to be categorically disallowed or subordinated solely because it is based on penalties or punitive damages. Furthermore, he disagrees with the PEDC's interpretation of the Plan. He also claims that the Dunlap Class Action is not subject to subordination because its class members are innocent of any inequitable conduct.

## CONCLUSIONS OF LAW

### I. Disallowance of Penalty/Punitive Claims

The PEDC relies on Novak v. Callahan (In re GAC Corp.), 681 F.2d 1295 (11th Cir. 1982) for the proposition that penalty/punitive claims are disallowed in bankruptcy. In disallowing a creditor's claim for punitive damages, the Eleventh Circuit Court of Appeals noted that the fundamental purpose of punitive damages to punish the wrongdoer cannot be achieved in bankruptcy. The "effect of allowing a punitive

---

[1] Hereinafter, all Section references are to Title 11 of the United States Code.

damages claim [in bankruptcy] would be to force innocent creditors to pay for the bankrupt's wrongdoing. Such a result would be inequitable, and the punitive damages claim was properly stricken [by the bankruptcy court]." Id. at 1301. Novak is not universally followed. The Seventh Circuit Court of Appeals referred to this portion of Novak as a "single thinly reasoned paragraph." In re A.G. Fin. Serv. Ctr., Inc., 395 F.3d 410, 414 (7th Cir. 2005). Furthermore, the rationale of Novak has been disregarded and/or qualified by courts in the Eleventh Circuit. *See, e.g.,* In re Hillsborough Holdings Corp., 247 B.R. 510, 512 (Bankr. M.D. Fla. 2000)(allowing a claim of punitive damages where the feasibility and the debtor's ability to consummate the confirmed plan of reorganization was not in jeopardy); In re Allied Mech. Services, Inc., 38 B.R. 959, 963-64 (Bankr. N.D. Ga. 1984)(allowing a claim for punitive damages asserted by the Secretary of Labor against the debtor).

However, Novak remains the law of the Eleventh Circuit unless that court or the United States Supreme Court says otherwise. I recognize that one bankruptcy case in the Eleventh Circuit has distinguished Novak because it was decided under the Bankruptcy Act of 1898, which was replaced by the Bankruptcy Code of 1978. *See* Unsecured Claims Administrator v. Franks (In re Centennial HealthCare Corp.), No. 02-74974 (August 29, 2005)(Massey, J.). However, I respectfully disagree with my colleague on this point. In reaching its decision in Novak, the Eleventh Circuit did not interpret a now-repealed statutory provision of the former Act. Rather, the Novak court articulated an equitable doctrine, applicable in any bankruptcy case unless affirmatively

at odds with any current statutory provision. *See* <u>Jim Walter Homes, Inc. v. Adams (In re Hillsborough Holdings Corp.)</u>, 146 B.R. 1015, 1022 (Bankr. M.D. Fla. 1992)("[It] is clear that even though Chapter 11 of the Bankruptcy Code does not specifically provide for the treatment of claims based on a fine, penalty or punitive damages, the bankruptcy courts traditionally have not favored such claims.").

<u>United States v. Noland</u>, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) may lead to a different result. In that case, the United States Supreme Court reversed the bankruptcy court's decision to subordinate a post-petition tax penalty claim on equitable grounds pursuant to Section 510(c). It held that the bankruptcy court's decision to permit categorical subordination of tax penalty claims simply because they were in the nature of a penalty, in disregard of the Code's priority provisions written by Congress, swept away "the distinction between characteristic legislative and trial court functions." <u>Id.</u> at 540. The court stated that decisions "about the treatment of categories of claims in bankruptcy proceedings are not dictated or illuminated by principles of equity and do not fall within the judicial power of equitable subordination." <u>Id.</u> at 540-41 (quotations omitted). The Supreme Court found that Congress had expressly created a first priority status for post-petition tax penalties in Sections 503(b)(1)(c), 507(a)(1), and 726(a)(1). To permit bankruptcy courts to subordinate such claims despite the priority explicitly assigned to them by the Code would result in the derogation of Congress's power. <u>Id.</u> at 541.

Despite the fact that Noland dealt with categorical subordination and not disallowance, a fair reading of that decision leads to the conclusion that Novak's categorical disallowance of penalty/punitive claims would also be viewed by the United States Supreme Court as in derogation of Congress's authority. In Section 502(a), Congress expressly provides for the allowance of a claim unless a party in interest objects to the claim. 11 U.S.C. § 502(a); Welzel v. Advocate Realty Investments, LLC (In re Welzel), 275 F.3d 1308, 1316-17 (11th Cir. 2001)("[Section] 502 lays down general instructions for the bankruptcy court in considering whether a claim should be allowed or disallowed."). At the outset, claims allowance looks to state law. Then, Section 502(b) sets forth categories of claims that Congress has determined to be disallowable in bankruptcy. There is no language anywhere in Section 502(b) that indicates a congressional intent to disallow penalty/punitive claims. *See* Id. at 1318 (allowing a claim for attorney's fees after determining that none of the exceptions listed in Section 502(b) applied to disallow such a claim). "[If] state law allows punitive awards against insolvent parties, there is no federal bar." A.G. Fin. Serv. Ctr., Inc., 395 F.3d at 414. In the present case, West Virginia law permits consumers to seek statutory penalties against violators of the West Virginia Consumer Credit and Protection Act. *See* W. Va. Code § 46A-5-101(1). Therefore, to the extent that Novak previously authorized the disallowance of penalty/punitive claims, and in light of the provisions of Section 502 and Noland's prohibition against the categorical treatment of claims different than as provided in the Code, I hold that the Dunlap claim is not subject to disallowance on account of its nature as a penalty/punitive claim.

## II. *Subordination by the Terms of the Confirmed Plan*

The PEDC seeks to subordinate the Dunlap claim based upon the terms of the Disclosure Statement, the Plan, and the Order confirming the Plan (the "Confirmation Order"). The Disclosure Statement and the Plan designated classes of claims and described the type of treatment that each class would receive. Class Eight includes all subordinated claims, which receive no distribution under the terms of the Plan. "Subordinated Claim" is defined by the Plan in relevant part to include "any claim against a Debtor" (other than claims of the Securities Exchange Commission, government settlement claims, or AG claims) for six categories of claims, the final one being "all fines, penalties, Claims for disgorgement, or order of restitution against any of the Debtors." *See* Dckt. No. 1338, Plan ¶ 1.132(vi) (November 23, 2005).

Entered November 23, 2005, the Confirmation Order held that the Plan and its classification of claims complied with the applicable provisions of the Code (Dckt. No. 1338, ¶ O); that the Debtors had complied with the applicable provisions of the Code (Dckt. No. 1338, ¶ P); and that claims would not be subordinated to a greater extent than provided for by the Code (Dckt. No. 1338, ¶ 49). In addition, the Confirmation Order found that the provisions of the Plan and Confirmation Order were "nonseverable and mutually dependent." (Dckt. No. 1338, ¶ 3). No party sought appellate review of the Confirmation Order.

Dunlap was served with a copy of the Plan; the Disclosure Statement; the

✎AO 72A
(Rev. 8/82)

Solicitation Procedures order; the Confirmation Hearing Notice; and the Notice of Voting Status for Holders of Disputed, Contingent or Unliquidated Claims. He was advised that he would not receive a ballot for voting and was not entitled to vote on the Plan unless he filed a motion under Rule 3018 seeking temporary allowance of his claim for voting purposes. Dunlap did not file an objection to the confirmation of the Plan on any ground, did not file a Rule 3018 motion, did not attempt to cast a ballot, and did not attend the confirmation hearing in person or by counsel. At the June 29, 2006, hearing, Dunlap's counsel did not dispute these facts nor did they assert that any other provision in the Disclosure Statement, Plan, Confirmation Order, or any other evidence was relevant to this Court's analysis of the treatment of the Dunlap claim. Inasmuch as the Confirmation Order is final, principles of *res judicata* are applicable. Section 1141 provides for binding finality of the Plan provisions on the Debtors and all creditors. 11 U.S.C. § 1141(a).

In interpreting the Plan and applying Section 1141 and binding precedent concerning *res judicata*, I conclude that the PEDC's position is correct. In <u>Finova Capital Corp. v. Larson Pharmacy Inc. (In re Optical Technologies, Inc.)</u>, 425 F.3d 1294 (11th Cir. 2005), the Eleventh Circuit held that a provision in the debtor's confirmed plan of reorganization was enforceable and binding, even though a proper and timely objection might have resulted in rendering the provision unenforceable and stricken from the plan. Because no objection was filed, however, the plan as confirmed with the provision intact was enforceable and binding upon all parties in interest. <u>Id.</u> at 1301,

✎AO 72A
(Rev. 8/82)

1304.

As applied to this case, <u>Optical Technologies</u> teaches that even if the Dunlap claim was not the proper object of subordination, it can still be subordinated by virtue of a Plan provision approved in the Confirmation Order. The definition of "Subordinated Claim" in ¶ 1.132 of the Plan is lengthy, somewhat technical, but in the final analysis, clear. All claims for fines or penalties (except those held by the Securities Exchange Commission, government settlement claims, or AG claims) are Class 8 Subordinated Claims.

When the Plan was circulated for voting, nearly 5,000 creditors (including Dunlap) were given a complete package with instructions concerning the confirmation process. If any creditor objected to the Plan or was uncertain about its terms, it was incumbent on that creditor to file pleadings to raise that issue at confirmation where ambiguities could be corrected, objections ruled upon, and final action taken. In failing to make such an objection or motion, creditors assume a risk that they will be bound by a later interpretation of a provision whose impact might otherwise have been avoided. *See* <u>In re Harvey</u>, 213 F.3d 318, 322 (7th Cir. 2000)("[It] is perfectly reasonable to expect interested creditors to review the terms of a proposed plan and object if the terms are unacceptable, vague, or ambiguous."); <u>Andersen v. UNIPAC-NEBHELP (In re Andersen)</u>, 179 F.3d 1253, 1257 (10th Cir. 1999)("A creditor cannot simply sit on its rights and expect that the bankruptcy court or trustee will assume the duty of protecting

its interests."). All parties are bound by the definition of what constitutes a Subordinated Claim, including Dunlap. I agree with the PEDC that much, if not all, of the Dunlap claim is for a fine or penalty. Therefore, those portions of the Dunlap claim are subordinated by the terms of the Plan.

### III. Equitable Subordination under Section 510(c)

Pursuant to Section 510(c), a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1). By adopting this provision, Congress intended for bankruptcy courts to both adhere to existing doctrine when applying "principles of equitable subordination" as well as to continue the development of this judge-made equitable doctrine. United States v. Noland, 517 U.S. 535, 538-39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). Benjamin v. Diamond (In re Mobile Steel Co.), a Fifth Circuit opinion that is binding on this Court, required three conditions to be satisfied for a court to equitably subordinate a claim: (1) The claimant must have engaged in some inequitable conduct; (2) The misconduct must have resulted in injury to creditors of the debtor or conferred an unfair advantage on the claimant; and (3) Equitable subordination of the claim must not be inconsistent with the provisions of the Code.[2] 563 F.2d 692, 699-700 (5th Cir. 1977); Allied Eastern States Maint. Corp. v.

---

[2] The Supreme Court recognized Mobile Steel as an "influential" opinion in the development of the principles of equitable subordination. Noland, 517 U.S. at 538.

Miller (In re Lemco Gypsum, Inc.), 911 F.2d 1553, 1556 (11th Cir. 1990)(stating that equitable subordination is appropriate only where three elements are established, including that the claimant engaged in some type of inequitable conduct); Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.), 799 F.2d 726, 731 (11th Cir. 1986)("If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoilation or overreaching, and prove it with particularity."). It is noteworthy, however, that neither Mobile Steel, Lemco, nor N & D dealt factually with a penalty/punitive claim. In each of these cases, the claim was compensatory and not punitive in nature. Thus, it is unclear whether these cases mandate that there be a finding of creditor misconduct in order to equitably subordinate penalty/punitive claims or alter Novak's view of penalty/punitive claims as "inequitable" when they are funded by innocent unsecured creditors and not the guilty debtor.

Under the Supreme Court's decision in Noland, a bankruptcy court's authority under Section 510(c) does not extend to the categorical subordination of a congressionally-mandated priority claim nor is it "free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." 517 U.S. at 539. In United States v. Reorganized CF & I Fabricators of Utah, Inc., the Supreme Court extended the Noland rationale so as to prohibit the categorical subordination of a "disfavored subgroup"

within an unsecured class of creditors.[3] 518 U.S. 213, 229, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). Therefore, it is impermissible to categorically subordinate penalty/punitive claims.

Noland still authorizes a court to engage in the non-categorical application of subordination principals. *See* 517 U.S. at 540 ("[The] adoption in Section 510(c) of 'principles of equitable subordination' permits a court to make exceptions to a general rule when justified by particular facts."). In re A.G. Financial Service Center, Inc. found this to be a strong implication that "case-by-case administration of the Code's authority for equitable subordination is the right way to deal with all punitive financial claims." 395 F.3d 410, 414 (7th Cir. 2005). It noted that although state law will control whether a claim for punitive damages will be *allowed* in a bankruptcy case, "whether a punitive award should be *subordinated* to other claims is open to independent consideration under the terms of the Bankruptcy Code." Id. (emphasis added).

In Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.), the First Circuit Court of Appeals echoed the Seventh Circuit's interpretation of Noland and CF & I. 420 F.3d 53 (1st Cir. 2005). In Merrimac, the court addressed a

---

[3] "We held [in Noland] that the subordination fell beyond the scope of a court's authority under the doctrine of equitable subordination, because categorical subordination at the same level of generality assumed by Congress in establishing relative priorities among creditors *was tantamount to a legislative act and therefore was outside the scope of any leeway under [Section 510(c)] for judicial development of the equitable subordination doctrine.*" United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 229, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (emphasis added).

✎AO 72A
(Rev. 8/82)

bankruptcy court's decision to equitably subordinate a retired employee's claim against a Chapter 11 debtor that arose from a stock redemption note. The bankruptcy court had relied on previous First Circuit opinions holding that stock redemption claims were the type of claims that could be categorically subordinated without a showing of inequitable conduct by the claimant. Id. at 59-60. Citing Noland and CF & I, the First Circuit in Merrimac concluded that this categorical approach was no longer appropriate. While claims of this type "generally should be regarded as suspect," the court concluded that Noland and CF & I required the bankruptcy court to "consider whether subordinating a particular claim would be fair based on the totality of the circumstances in the individual case." Id. at 63. In doing so, it expressly reserved the issue of whether Mobile Steel's three-prong test was still viable. I read this as recognition that a "totality of the circumstances" test is a broader, more flexible inquiry than the application of the more rigid Mobile Steel test.

A.G. Financial Service Center and Merrimac are instructive on the matter now before this Court. While equitable subordination is generally triggered when there is some inequitable conduct on the part of the claimholder, that factor is neither a statutory nor mandatory prerequisite to the imposition of the doctrine. See, e.g., In re Virtual Network Services Corp., 902 F.2d 1246, 1250 (7th Cir. 1990)("It is clear that in principle, equitable subordination no longer requires, in all circumstances, some inequitable conduct on the part of the creditor.")(emphasis added); In re Chapman, 146 B.R. 411, 418 (Bankr. N.D. Ill. 1992)("[Except] in very rare circumstances, equitable

✎AO 72A
(Rev. 8/82)

subordination requires wrongdoing by the creditor whose claim is to be equitably subordinated.")(emphasis added).  Recognizing a disagreement amongst courts in the various circuits, the Supreme Court in <u>Noland</u> explicitly left unresolved the question of whether evidence of creditor misconduct must be presented before every type of claim is equitably subordinated.  *See* 517 U.S. at 543 ("[We] need not decide today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated.").

As noted in part I, the Eleventh Circuit's decision in <u>Novak v. Callahan</u> <u>(In re GAC Corp.)</u>, 681 F.2d 1295 (11th Cir. 1982), decided after <u>Mobile Steel</u>, remains the law of this circuit, except to the extent it has been circumscribed by the Supreme Court in <u>Noland</u> and <u>CF & I</u>.  Furthermore, numerous post-<u>Mobile Steel</u>, post-1978 Code rulings have held that penalty/punitive claims are to be treated as suspect in bankruptcy.  *See, e.g.*, <u>Owens Corning v. Credit Suisse First Boston</u>, 322 B.R. 719, 724 (D. Del. 2005)("[If] subordination of punitive damage claims is mandated in Chapter 7 liquidations, it seems entirely appropriate to subordinate such claims in the Chapter 11 setting."); <u>Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)</u>, 162 B.R. 935, 947 (Bankr. S.D.N.Y. 1994)("[The debtor] correctly argues that a Bankruptcy Court can subordinate, disallow or limit punitive damage claims."); <u>In re Bicoastal Corp.</u>, 134 B.R. 50, 54 (Bankr. M.D. Fla. 1991)("It is clear that even though Chapter 11 of the Bankruptcy Code does not specifically provide for the treatment of claims based on a fine, penalty, or punitive damages, the Code traditionally has not favored such claims.");

In re Celotex Corp., 128 B.R. 478, 484 n.12 (Bankr. M.D. Fla. 1991)("Although Section 726(a)(4) is inapplicable to Chapter 11 reorganizations, it is well-established that bankruptcy courts have inherent equitable power to disallow, limit, or subordinate claims for punitive damages in Chapter 11 reorganizations."); In re Allegheny Int'l, Inc., 106 B.R. 75, 79 (Bankr. W.D. Pa. 1989)(stating that a bankruptcy court's equitable powers allow it to eliminate, subordinate, or limit claims for punitive damages); In re Colin, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984)(subordinating a claim for punitive damages pursuant to Section 510(c) despite a lack of creditor misconduct because a failure to do would harm innocent creditors).  In Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.), the Eleventh Circuit observed that Congress was aware of the bankruptcy courts' historical exercise of equitable powers in the context of subordination, citing the legislative statement that accompanied Section 510(c): "a claim is generally subordinated only if the holder of such claim is guilty of inequitable conduct, *or the claim itself is of a status susceptible to subordination, such as a penalty* or a claim for damages arising from the purchase or sale of a security of the debtor." 156 F.3d 1114, 1123 n.14 (11th Cir. 1998)(citations omitted)(emphasis added).

In light of these cases, Novak (as limited by Noland) is still viable and articulates a standard that permits penalty/punitive claims to be viewed as inherently unfair, even in the absence of any mention of creditor misconduct, if paid at the expense of innocent creditors.  With regard to those creditors asserting claims for compensatory damages, diluting the amount that they would otherwise receive by paying

penalty/punitive claims forces them to "pay for the bankrupt's wrongdoing" and is "inequitable." Novak, 681 F.2d at 1301. Under Noland, certain types of tax penalty claims are statutorily protected from subordination, but not claims such as the Dunlap claim. Therefore, while penalty/punitive claims enjoy protection as to their allowance in Section 502, part I *supra*, they do not enjoy additional specific statutory protection as to priority or against subordination.

Novak's precise ruling was to disallow, not subordinate, claims for punitive damages. Noland eviscerates the argument that Novak requires the categorical disallowance of certain claims. Noland, however, does not negate the Eleventh Circuit's view that payment of penalty/punitive claims at the expense of innocent creditors results in "inequitable" consequences. I find this conclusion sufficient to authorize bankruptcy courts to engage in further review of these claims and examine them on a case-by-case basis for purposes of equitable subordination.

In the context of penalty/punitive claims, Mobile Steel's three-prong test should not be applied inflexibly but rather as a non-exclusive list of factors that may be considered. This means that the absence of creditor misconduct is not fatal to an action to equitably subordinate a claim. Rather, the absence of that factor is relevant, but not dispositive, in a more flexible case-by-case analysis that examines the totality of the circumstances. *See* A.G. Fin. Serv. Ctr., Inc., 395 F.3d at 414; Merrimac, 420 F.3d at 62. Based on the factors discussed below, I hold that the penalty/punitive claims of the

Dunlap Class Action should be equitably subordinated pursuant to Section 510(c) to the claims of all other general unsecured creditors in this case. They are not subordinated as penalties *per se*, but because of the totality of the circumstances in this case.

First, the failure to subordinate the penalty/punitive claim will dilute the dividend of all other unsecured creditors. Presently, Class 5 general unsecured creditors are not projected to receive one hundred percent of their compensatory claims. Under Novak, this dilution is inequitable when the penalty/punitive claim arises due to the Debtors' misconduct yet the cost of that conduct would be borne and suffered by innocent creditors holding compensatory, non-penalty claims. Standing alone, while this fact does not permit categorical subordination, it remains a factor in a totality of the circumstances analysis.

Second, in the Disclosure Statement, the Debtors estimated that general unsecured claims would total between $60 million and $80 million. *See* Dckt. No. 1041 (September 20, 2005). This estimate was communicated to general unsecured creditors and became an underlying assumption upon which the Plan was confirmed. The post-confirmation allowance of a potential multimillion-dollar consumer fraud class action penalty claim, which was never quantified by Dunlap pre-confirmation despite being informed that he held a disputed claim, does not meet an appropriate standard of fairness to the hundreds, if not thousands, of general unsecured creditors who voted to accept the

Plan with no concept of this potential dividend dilution. In other words, it is not dilution alone but dilution that flies "under the radar" until revealed after confirmation that should, in fairness, be subordinated. The Dunlap claim has been in litigation for more than five years in both state and federal courts. Dunlap's proof of claim stated no dollar figure. The attached pleadings in the class action were simply insufficient to place creditors, or the Debtors for that matter, on notice of the potential size of the claim. Dunlap was informed that his claim was disputed, that he was not entitled to vote, and that he could seek relief under Rule 3018 if he wished to have his claim temporarily allowed for voting purposes. He could have, but did not, then, seek temporary allowance of a claim of $6.9 million or more.[4] While falling short of the type of creditor misconduct in the "assertion"of his claim that would satisfy the creditor misconduct element for equitable subordination, that omission is still a permissible factor to consider in a totality of the circumstances review.

Third, it is not clear how the United States Supreme Court would apply the interplay between Sections 726(a)(4) and 1129(a)(7) in a case involving the subordination of a penalty/punitive claim. CF & I expressly excluded that element of the case from its ruling because the Tenth Circuit did not rely on any authority other than Section 510(c). *See* 518 U.S. at 228. Under the facts in the present case, I conclude that this interplay is relevant to a consideration of the totality of the

---

[4] Dunlap's motion to estimate seeks $6.9 million, but it also reveals this to be a "conservative" estimate.

circumstances. Section 726(a)(4) "categorically" subordinates all non-pecuniary fines, penalties, forfeitures, and punitive or exemplary damages to general unsecured claims in distributing estate property in a Chapter 7 case. Section 1129(a)(7)(A) requires a bankruptcy court in confirming a plan to find that general unsecured claimants either (i) have accepted the plan *or* (ii) will receive as much under the Chapter 11 plan as they would receive in a hypothetical Chapter 7 liquidation. To meet that latter test, Section 726(a)(4) must be applied, with the result that all penalty/punitive claims are subordinated.

In this case, Class 5 unsecured creditors accepted the Plan, so the Court was not called upon to perform the hypothetical Chapter 7 liquidation analysis. However, had this class failed to accept the plan, this Court would necessarily have subordinated the penalty/punitive claims of the Dunlap class pursuant to Section 1129(a)(7)(A)(ii). That analysis never occurred, however, because Class 5 unsecured creditors were not put on notice of the possibility of a substantial dilution of their dividend. I find that equitable subordination is appropriate as a remedial measure to compensate for their lack of notice and an opportunity to present this issue at confirmation.

Fourth, the plaintiffs in the Dunlap Class Action assert statutory minimum damages of $200.00 per person, which stem from a West Virginia statutory provision that allows a plaintiff who suffers "any ascertainable loss" to bring an action to recover

"actual damages or two hundred dollars, whichever is *greater*."  *See* W. Va. Code § 46A-6-106(a) (emphasis added).  The Supreme Court of Appeals of West Virginia has determined that a plaintiff does not need to allege a specific amount of actual damages to satisfy the "any ascertainable loss" requirement but must only prove that he "purchased an item that is different from or inferior to that for which he bargained." In re West Virginia Rezulin Litig., 214 W. Va. 52, 75, 585 S.E.2d 52, 75 (2003).

The Dunlap claim seeks to recover $200.00 for each class member even though many if not most members suffered less than $200.00 of actual compensatory damages.[5]  Arguably, the amount which exceeds actual compensatory damages has the characteristics of a fine, penalty, or punitive damage.  In deference to state law, however, I conclude that that amount should not be subordinated.  Although these damages exceed the class members' actual compensatory losses, the West Virginia legislature presumably contemplated that proof of damages in a *de minimus* amount can be difficult, tedious, and not cost effective, and it elected to provide those plaintiffs who could establish certain consumer law violations with a minimum "civil liability" award.[6]  Allowing this portion of the Dunlap claim in Class 5, even when it exceeds actual compensatory losses and is non-compensatory to some extent, strikes an appropriate

---

[5] Dunlap's actual damages were $1.48 plus $6.96 for a total of $8.44.

[6] "The legislature in enacting the West Virginia Consumer Credit and Protection Act, W. Va. Code 46A-1-101, *et seq.*, in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act.  To further this purpose the legislature, by the express language of W. Va. Code, 46A-5-101(1), created a cause of action for consumers and imposed a civil liability on creditors who include unconscionable terms that violate W. Va. Code, 46A-2-121 in consumer agreements."  Orlando v. Fin. One of West Virginia, Inc., 179 W. Va. 447, 449-50, 369 S.E.2d 882, 884-85 (1988)(quotations and citations omitted).

balance between subordination of the entire Dunlap claim, which would appear "categorical," and the case-by-case subordination approved in Noland and CF & I. This decision will permit some claimants who prove a consumer law violation to recover more than their actual damages, but less than the full statutory penalty allowed under West Virginia law. *See* W. Va. Code § 46A-5-101.


## O R D E R

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that the PEDC's objection to the Dunlap claim is SUSTAINED IN PART.   The claims enumerated in the Estimation Summary set forth on page three of this Memorandum and Order are therefore treated as follows:


2.(a)   A civil liability award of up to $674,220.00 is provisionally allowed as a Class Five claim;

2.(c)   All Statutory penalties are subordinated to the claims of all other unsecured Class Five creditors;

2.(d)   Attorney's fees of up to 40% of the final amount allowed in paragraph (a) will be allowed as a Class Five claim.


The PEDC and Dunlap are ORDERED to meet and confer and within thirty (30) days and enter a stipulation as to the amount to be allowed in paragraphs 2.(a) and 2.(d) and to stipulate the amount, if any, of pre-judgment interest in paragraph 2.(b). If an agreement is not reached, the parties shall, within fifteen (15) additional days, brief

their position on the unresolved items. The Court will review those pleadings and convene an evidentiary hearing to set or estimate the amount of the claim. At that time, all relevant evidence will be received on any remaining issues, including:

1) Size of the class in paragraph (a);

2) Allowability and rate of pre-judgment interest;

3) Amount and source of payment of attorney's fees.


_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge


Dated at Savannah, Georgia
This 23rd day of August, 2006.